HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br><br>Plaintiff,<br>v.<br><br>OLYMPIC GAME FARM, INC. ROBERT BEEBE, JAMES BEEBE, and KENNETH BEEBE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:18-cv-006025-RSL<br><br>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>**Noting Date: April 16, 2021** |

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - i
No. 3:18-CV-06025-RSL

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

TABLE OF CONTENTS

EXHIBIT LIST ........ iii
I. MOTION ........ 1
II. INTRODUCTION AND FACTUAL BACKGROUND ........ 1
III. ARGUMENT ........ 3
A. Standard of Review. ........ 3
B. OGF Takes Tigers and Grizzly Bears in Violation of the Endangered Species Act. ........ 3
C. OGF is a Public Nuisance. ........ 24
D. ALDF Has Standing to Bring Its ESA Claims. ........ 30
E. ALDF Has Standing to Bring Its Public Nuisance Claim. ........ 33
IV. CONCLUSION. ........ 34

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

## EXHIBIT LIST

Exhibit A: Carrisoza Deposition Transcript Excerpts

Exhibit B: *Waye v. Olympic Game Farm*, Order denying in part and granting in part motion for summary judgment

Exhibit C: Dr. Sarah Owens Deposition Transcript Excerpts

Exhibit D: Eugene Pate Deposition Transcript Excerpts

Exhibit E: Robert Beebe, corporate designee of Olympic Game Farm, Deposition Transcript Excerpts

Exhibit F: Clay Richmond Deposition Transcript Excerpts

Exhibit G: Dr. Michael Briggs Deposition Transcript Excerpts

Exhibit H: James Beebe Deposition Transcript Excerpts

Exhibit I: Dr. Heather Short, corporate designee of Sequim Animal Hospital, Deposition Transcript Excerpts

Exhibit J: Dr. Tara Black Deposition Transcript Excerpts

Exhibit K: Dr. Beth Shapiro, corporate designee of University of California at Santa Cruz Paleogenomics Lab, Deposition Transcript Excerpts

Exhibit L: Ellie Armstrong Deposition Transcript Excerpts

Exhibit M: Dr. Diane Forbes, USDA Inspector, Deposition Transcript Excerpts

Exhibit N: *Kuehl v. Sellner* Declaratory Judgment Order

Exhibit O: Dr. Mike Tyler, corporate designee Deposition Transcript Excerpts

Exhibit P: *Animal Legal Def. Fund v. Fur-Ever Wild,* Motion for Summary Judgment Hearing Minutes

Exhibit Q: Kyle Taylor, corporate designee of Washington Animal Disease Diagnostic Laboratory, Deposition Transcript Excerpts

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

## I. MOTION

Plaintiff Animal Legal Defense Fund ("ALDF") hereby moves for partial summary judgment and respectfully requests the Court enter an order finding that Olympic Game Farm, Inc. ("OGF") is liable for violating the Endangered Species Act ("ESA") and maintaining a public nuisance, and that the Court has jurisdiction over ALDF's claims. Other issues of liability and remedies will remain for trial.

## II. INTRODUCTION AND FACTUAL BACKGROUND

This is a citizen suit brought against OGF and its shareholders Robert, James, and Kenneth Beebe (collectively, "Defendants" or "OGF") for ongoing violations of the ESA and Washington state animal protection laws.

OGF operates as an unaccredited drive-through animal exhibitor facility where visitors throw bread at brown bears and feed numerous species of hoofed animals through their windows in overcrowded, muddy, and feces-laden fields. It also displays ESA-listed lions, tigers, wolves, and a Canada lynx, among numerous other species, all of whom are kept in small, barren enclosures and deprived of veterinary care for their many diseases and wounds.[1] These dismal conditions have existed for years. For instance, according to a former employee, OGF allowed a jaguar's claws "to be so overgrown that they grew back into the paws, causing the paws to bleed continuously," such that the jaguar could "barely walk" and "couldn't feed herself." Ex. A (Carrizosa Dep. 110:14-111:15 & Ex. 4). While OGF claims to be a retirement home for animals and that its animals die of "old age," reality is much grimmer. Death by "old age" at OGF can even mean a gunshot to the head—and it typically means painfully succumbing to severe and obvious illness without veterinary treatment.

[1] In addition to exhibiting animals, OGF has participated in the wildlife trade. It has bred, sold, and acquired a wide variety of captive wild animals, and has transferred animals with notorious private animal dealers like Robert Sawmiller and Troy Hyde. *See* Waltz Decl. Ex. 1 (recent USDA suspension of Sawmiller's AWA license based on welfare concerns); *In re: Animals of Montana, Inc.*, AWA Dkt. D-05-0005, 2009 WL 624354 (USDA Mar. 10, 2009) (terminating Hyde's AWA license and disqualifying Hyde from obtaining an AWA license for two years based on, *inter alia*, wildlife trafficking violations).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Animal welfare and adequate animal care is not a priority at OGF. The facility has a long history of U.S. Department of Agriculture ("USDA") citations for Animal Welfare Act ("AWA") violations, including, among others, repeated violations for failing to give prescribed medications and failing to supervise drive-through interactions to discourage visitors "from contacting the animals in a harmful way."[2] OGF has retaliated against employees who reported animal cruelty.[3] In the two years before ALDF filed suit, OGF averaged $2,542 per year for veterinary care of all of its over 300 animals, less than one percent of the annual $300,000 spent on advertising. Waltz Decl. Ex. 6 (OGF profit and loss sheet). Its past and current heads of "Animal Care" have had no professional training and neither could discern dire welfare problems—like an arctic fox on the cusp of death, whose urinary tract blockage led to a massively distended bladder crushing her other organs. Ex. D (Pate Dep. 22:11-23:25; 87:8-88:9); Waltz Decl. Ex. 7 (pathology report). And OGF management has ignored the numerous pleas of traumatized visitors, either by not responding to communications or by falsely claiming OGF will never again acquire certain endangered animals.[4]

It is not just unsuspecting visitors who express anguish about the animals' living conditions and care. Dr. Sarah Owens, a veterinarian who worked for OGF in 2010, testified as follows when asked her concerns about OGF animals:

> I need to narrow it down a little. They had inadequate nutrition, inadequate habitat, inadequate recordkeeping, uneducated staff, understaffed, inadequate enrichment. . . [and] Obviously, inadequate veterinary care.

Ex. C (Owens Dep. 31:25-32:8; *id.* at 53:23-54:15) (adding that OGF "had the worst enclosures of any zoo I have been to, apart from Kathmandu Zoo, which was in the process of upgrading to fabulous enclosures"). Similarly, Washington Department of Fish & Wildlife ("DFW") veterinarian Kristen Mansfield relied on her firsthand experiences to observe:

---

[2] *E.g.*, Waltz Decl. Ex. 2 (Apr. 3, 2017 Inspection Report); *id.* Ex. 3 (Apr. 23, 2015 Inspection Report).

[3] *See* Order 5-7, Dkt. 39, *Waye v. OGF*, Case C99- 05512RJB (W.D. Wash. Sept. 8, 2000) (Ex. B) (denying OGF summary judgment motion against plaintiffs' claim they "tried to correct and prevent the unnecessary animal suffering they witnessed, complained to their employer, were retaliated against, and constructively discharged").

[4] *See, e.g.*, C. McGee Decl. ¶ 15. *And, e.g.*, *compare* Waltz Decl. Ex. 4 (Robert Beebe telling a "depress[ed]" visitor that "I personally have no plans to replace large cat breeds when they pass") *with id.* Ex. 5 (2017 USDA record showing OGF acquisition of one lion and one tiger).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

> [I]t is my strong opinion that our agency should avoid being associated with OGF to the greatest extent possible. In addition to the awful housing conditions for the animals there and the multitude of USDA citations and citizen complaints, I am 100% certain that they are violating our laws. . . .

Waltz Decl., Ex. 8.

As explained in detail below, these widespread harms to OGF animal welfare persist. ALDF respectfully asks the Court to grant partial summary judgment on jurisdiction and liability as to certain ESA and public nuisance violations, allowing ALDF to move to the remedy stage and provide many of OGF's long suffering animals the relief they deserve. The attached proposed order identifies the several discrete issues ALDF asks the Court to resolve on summary judgment.

## III. ARGUMENT

### A. Standard of Review.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of fact for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party demonstrates the absence of any genuine issue of material fact, the nonmoving party must set forth, by affidavit or otherwise, specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### B. OGF Takes Tigers and Grizzly Bears in Violation of the Endangered Species Act.

OGF has violated the ESA by taking several members of protected species and is likely to continuing doing so absent relief from this Court. This motion addresses just two species, tiger and grizzly bear, and only some of the manners of take.[5]

---

[5] ALDF satisfied the ESA's notice requirement to bring these citizen suit claims by sending a detailed notice letter to Defendants, the Secretary of Interior, and the FWS Director on Sept. 27, 2018. Dkt. 1 ¶ 23; Dkt. 21 ¶ 23; Waltz Decl., ¶ 10; Ex. 9 (notice letter). *See NRDC v. Zinke*, 347 F. Supp. 3d 465, 502 (E.D. Cal. 2018) (notice letter must only "'provide sufficient information of a violation so [the defendant] could identify and attempt to abate the violation'"; it need not "list every specific aspect or detail of every alleged violation" nor "describe every ramification of a violation.") (quoting *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015) and others).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

**1. Regulatory Background.**

When Congress passed the ESA in 1973 it "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). "Congress has spoken in the plainest of words [in enacting the ESA], making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Id.* at 194.

Congress intended the ESA to afford captive species members the same protections as wild ones. *See* H.R. Rep. No. 93-412 (1973) ("[t]he term 'fish or wildlife' means all wild animals, whether or not raised in captivity").[6] According to the U.S. Fish and Wildlife Service ("FWS"), which implements the ESA, there is a danger of "captive-bred animals . . . used for purposes that do not contribute to conservation, such as . . . for entertainment," 57 Fed. Reg. 548, 550 (Jan. 7, 1992), and "uses of captive wildlife can be detrimental to wild populations," 44 Fed. Reg. 30044, 30045 (May 23, 1979).[7] FWS has long maintained that "[p]opulations of species in captivity are, in large degree, removed from their natural ecosystems and have a role in survival of the species only to the extent that they maintain genetic integrity and offer the potential of restocking natural ecosystems . . ." 43 Fed. Reg. 16144 (Apr. 14, 1978). Similarly, FWS has long doubted that "education of the American public through exhibition of living, non-native wildlife actually accomplished measurable enhancement of the survival of the affected species in the wild." 63 Fed. Reg. 48634, 48635 (Sept. 11, 1998).[8]

Section 9 of the ESA makes it unlawful to "take" endangered species. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined broadly to include harass, harm, shoot, wound, kill, trap,

---

[6] *See also* 77 Fed. Reg. 431, 434 (Jan. 5, 2012) (the ESA "specifically covers any species that is listed as endangered or threatened, whether it is native to the United States or non-native and whether it is in captivity or in the wild"); 78 Fed. Reg. 35201, 35204 (June 12, 2013) ("the Act does not allow for captive-held animals to be assigned separate legal status from their wild counterparts …").

[7] *See also* 77 Fed. Reg. 431, 434 (Jan. 5, 2012) ("While the Service does believe that captive breeding can provide a significant benefit to endangered species, such benefits can only be realized when the breeding program is scientifically based and conducted in a manner that contributes to the continued survival of the species….").

[8] *See also Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 67-68 (D.D.C. 2013) (discussing how listing both captive and wild members of a species under ESA is consistent with purposes of ESA)

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

capture, or collect a protected species, "or to attempt to engage in any such conduct." *Id.* § 1532(19); *Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.*, 515 U.S. 687, 698, 704-06 (1995) (take defined in "broadest possible manner" and "deserves a respectful reading."). "Harm" comprises any act that "actually kills or injures wildlife," including actions that "significantly impair[] essential behavioral patterns" like breeding, feeding or sheltering. 50 C.F.R. § 17.3. "Harass" includes acts that create "likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns" such as breeding, feeding or sheltering. *Id.*

When applied to captive wildlife, there are three limited exceptions to the harass definition:

> **[G]enerally accepted**: (1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act, (2) Breeding procedures, or (3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, **when such practices, procedures, or provisions are not likely to result in injury to the wildlife**.

*Id.* (emphasis added). In other words, to qualify for any of the three exceptions, the conduct must be both "generally accepted" and "not likely to result in injury" to the animal. *Id.* FWS established these limited exceptions to encourage "humane and healthful care" of captive wildlife, recognizing that "human activities, including normal husbandry practices, provided in caring for captive-held wildlife in all probability disrupt behavior patterns." 63 Fed. Reg. at 48638; 58 Fed. Reg. 32632, 32635 (June 11, 1993) (without the exception, ESA would "virtually result in a comprehensive prohibition on the possession of listed wildlife"). Thus, the ESA "continues to afford protection to listed [captive] species that are not being treated in a humane manner." 63 Fed. Reg. at 48638.

In keeping with Congress's purposefully broad definition of "take," appellate courts have strictly and narrowly interpreted the exception to the definition of harassment. *Hill v. Coggins*, 867 F.3d 499, (4th Cir. 2017) (holding that mere compliance with the AWA does not absolve a zoo of ESA take liability); *Kuehl v. Sellner*, 887 F.3d 845, 853–54 (8th Cir. 2018) (same).

**2. OGF takes tigers in violation of the ESA.**

Since 2014, OGF has had at least seven ESA-protected tigers. Four of these tigers have died (Bree, Amadeus, Tzar, and Tiggers), leaving three at OGF today (Sher-khan, Sasha, and Anu).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Waltz Decl., Ex. 10 at 14, 18. OGF keeps its tigers alone in small barren cages, exposed to the elements, and feeds them donated horse and cow carcasses three times a week. Harrenstien Decl., ¶¶ 15-18. These conditions "harass" tigers by significantly disrupting their normal behavioral patterns including, breeding, feeding, and sheltering. 50 C.F.R. § 17.3. OGF cannot meet the regulatory exception for captive wildlife because the conditions at OGF are not "generally accepted," they do not meet AWA standards (especially for vet care), and they are likely to (and often do) result in injury. *Id.* OGF also indisputably committed take by shooting and killing Bree and wounding Tiggers's feet.

Applicable AWA regulations require OGF to, *inter alia*, (1) "have an attending veterinarian who shall provide adequate veterinary care to its animals"; (2) "assure that the attending veterinarian has appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use"; (3) provide for adequate personnel and "use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries"; and (4) if anyone other than the attending veterinarian performs the requisite daily health checks on the animals, "a mechanism of direct and frequent communication is required so that timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian." 9 C.F.R. § 2.40. As described in detail below, OGF has failed to meet these minimum standards, failed to provide the "generally accepted" level of care for its tigers, and created a likelihood of injury—resulting in harassment and harm in violation of the ESA. 50 C.F.R. § 17.3. A federal district court recently granted summary judgment on similar facts. *PETA v. Tri-State Zoological Park of W. Md., Inc.*, 397 F. Supp. 3d 768 (D. Md. 2019).

**a. Amadeus**

The story of Amadeus, a male Siberian tiger who died in October 2017 after suffering from serious untreated illness for a year and half, is illustrative. Harrenstien Decl., ¶¶20-29. In March 2016, OGF first informed its attending veterinarian that Amadeus's drinking and urination volume had increased over the "past few years," he had been wheezing for two to three weeks, and recently

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

decreased eating. Waltz Decl. Ex. 11. OGF was aware that increased drinking and urination is associated with kidney disease in tigers, yet it failed to report the symptom for years. Ex. E (OGF 30(b)(6) Dep. 90:17-91:4); Ex. D at 38:20-39:2, 69:19-70:9; Ex. F (Richmond Dep. 129:2-14, 143:10-25). OGF's vet, Dr. Black, visually examined Amadeus but performed no physical exam or diagnostics, and prescribed ten days of asthma steroids. Waltz Decl. Ex. 11. Acknowledging her inexperience with tigers, Dr. Black called Dr. Collins, a vet at Woodland Park Zoo for guidance. *Id*. Dr. Collins did not suspect asthma and thought kidney failure was more likely, so he suggested a course of treatment including subcutaneous fluids, diet changes, and an appetite stimulant drug. *Id*. OGF's proffered expert, Dr. Briggs, agreed that Dr. Collins's suggestions are appropriate treatment for kidney disease in large exotic cats and has provided similar treatment at AZA-accredited zoos where he worked. Ex. G (Briggs Dep. 193:7-203:5).[9] OGF did not implement any of these suggestions, nor do any diagnostics, nor provide any further treatment for Amadeus. See Harrenstien Decl., ¶¶ 24-26.

On February 20, 2017, Amadeus had a seizure, but OGF did not report it to its attending vet until Amadeus had a second seizure a week later. Waltz Decl. Ex. 11.[10] OGF's vet later attributed the seizure to the presumed (but unconfirmed and untreated) kidney failure. *Id*. Dr. Collins consulted again and suggested OGF consider humane euthanasia, which OGF declined. Ex. E at 100:8-101:21. Instead, Amadeus was left to suffer at least 14 seizures over eight months, and developed an open sore on his chin, but was not examined by a vet, much less treated. *Id*. at 103:17-21; Waltz Decl. Ex. 12; Ex. D at 68:2-69:12. Perhaps because Amadeus was visibly ill and thin, OGF hung a sign on his cage claiming he was under veterinary care, Ex. E at 107:1-22; Long Decl., ¶¶ 13-15, but he was not receiving vet care of any kind. On October 17, 2017, Amadeus

[9] Both parties' experts also agree that the asthma medication given to Amadeus would not have done anything for kidney disease, but it would have increased Amadeus's already increased water intake and urination. Ex. G at 201:16-202:18; Harrenstien Decl., ¶ 24.

[10] OGF staff acknowledges that a seizure should be immediately reported to the vet. Ex. F at 63:14-64:13.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

suffered a 30-minute seizure and died. Ex. E at 108:8-109:7. OGF records claim that the vet euthanized Amadeus, but deposition testimony revealed that the vet never came. *Id.*

In short, there is no material dispute over the basic minimum standard of vet care for tigers, or how to diagnose and treat kidney disease in tigers. OGF's proffered expert explains how he treated four large cats with kidney disease at other zoos: all were diagnosed promptly and given multiple concurrent treatments. One had a successful kidney transplant, while the other three were humanely euthanized within a few weeks of diagnosis when the zoos determined it was virtually impossible to give the necessary intensity of treatment. Ex. G at 193:7-199:14; *see also* Harrenstien Decl., ¶¶ 25-26, 32-36. None of this happened to Amadeus. He instead suffered multiple symptoms of serious illness and presumed kidney failure for years, without treatment. OGF's conduct falls far below AWA requirements for vet care and generally accepted husbandry practices and resulted in harm, injury, and death to a protected tiger, *i.e.*, "take" in violation of the ESA. *Id.*, ¶ 29; *see United States v. Lowe*, 20-cv-0423-JFH, 2021 WL 149838, *7-8 (W.D. Okla. Jan. 15, 2021) (month-long delay between onset of symptoms and vet care for tigers indicative of ESA violation); *In re Wallace,* AWA Dkt. 20-J-0018, 2020 WL 1916144, *2-3 (USDA Mar. 31, 2020) (failure to provide vet care for lion who showed illness for a month is willful AWA violation); *see also* Ex. C at 77:25-78:2) (responsible zoos practice timely humane euthanasia).

**b. Bree**

Like Amadeus, Bree was denied both treatment and appropriate euthanasia. In 2014, Bree stopped eating, had lost a lot of weight, and was suffering badly. OGF felt she was too old to try to save, and rather than calling the vet to evaluate her or perform chemical euthanasia, OGF staff killed her with a .22 Magnum. Ex. F at 102:8-104:13, 184:9-18; Waltz Decl. Ex. 10 at 18 (listing cause of death as "old age"). Shooting this tiger is a "take" in violation of the ESA. 16 U.S.C. § 1532(19). OGF's opinion that shooting Bree was appropriate is irrelevant and directly contrary to USDA AWA inspector Ruth Hanscomb's admonition to OGF that gunshot is not an acceptable form of euthanasia for a large cat. Waltz Decl. Ex. 13.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

**c. Tzar**

Tzar was a white tiger who died in October 2018. *Id.*, Ex. 10 at 18. Dr. Harrenstien observed Tzar with severe and likely chronic lameness in June 2018. Harrenstien Decl., ¶ 30. The floor of his enclosure was concrete, which exacerbates joint problems. *Id.* OGF did not even notice his condition until mid-August. Waltz Decl. Ex. 14 at 033. At least a few months before he died, Tzar increased his drinking, but OGF did not communicate this to its vet. Ex. D at 38:20-39:8. Then Tzar reduced his already decreased food intake for a week. *Id.* at 74:10-18; Waltz Decl. Ex. 15. But it was not until Tzar suffered a seizure on October 29, 2018, that OGF even called its vet to report Tzar was ill. Waltz Decl. Ex. 15. The vet never came to see Tzar. Tzar was found dead the next day. Ex. D at 72:20-73:5. Like Amadeus, Tzar never received a physical exam much less any diagnosis or treatment from OGF's attending vet. Harrenstien Decl., ¶¶ 31-36.

**d. Tiggers**

Tiggers, a Siberian tiger who died in August 2020, likewise suffered without any treatment for her serious health problems. Harrenstien Decl., ¶ 37. Tiggers came to OGF with a history of a severe urinary tract infection. *Id.* ¶ 39; Waltz Decl., Ex. 10 at 14 & Ex. 16. Six months after arrival, in early 2018, Tiggers showed signs of urinary problems, including hunching and apparent abdominal pain; she also was not eating. *Id.*, Ex. 14 at 031; Ex. D 42:14-25. OGF efforts to address the problem were limited to ineptly collecting a urine sample from the ground that showed very abnormal results indicative of kidney failure. Harrenstien Decl., ¶ 40. OGF never collected a better urine sample, much less provided treatment for Tiggers. *Id.* As Dr. Harrenstien notes, "[t]he lack of follow-up, actual veterinary assessment and specific treatment seen here with Tiggers is similar to the severely deficient veterinary care provided for other tigers 'Amadeus' and 'Tzar.'" *Id.*

In April 2019 OGF informed its vet that Tiggers had a history of intermittent lameness and the vet suggested supplements for suspected arthritis. *Id.* at ¶ 42; Waltz Decl., Ex. 16. OGF's now head of "animal care" testified OGF never gave the supplements to Tiggers. Ex. D at 224:10-23. Based on the tiger's known lameness, the pathologist who necropsied Tiggers assumed she was

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

given anti-inflammatory medication. Ex. Q (Taylor Dep. 58:23 to 59:2). To the contrary, no physical exam or diagnostics were performed to confirm Tiggers' arthritis or its severity and no medication was prescribed. Ex. D at 52:22-24. As the court found in *Tri-State Zoo*, the failure to diagnose and treat an endangered cat's abnormal gait "constitutes harassment under the ESA." *PETA v. Tri-State Zoological Park of W. Md.*, 424 F. Supp. 3d 404, 430 (D. Md. 2019).

On December 12, 2019, OGF informed its vet that Tiggers's drinking had "increased recently." Waltz Decl., Ex. 16. OGF had also trimmed Tiggers's claws "recently." *Id*. This means that OGF had anesthetized Tiggers for a nail trim without the vet present. Had OGF notified the vet that Tiggers was showing signs of illness (*i.e.*, increased drinking) in a timely manner, the vet could have performed appropriate diagnostics while Tiggers was sedated for the nail trim, but this was not done. Harrenstien Decl. ¶ 43. The vet was left to suggest diagnostics at the *next* nail trim. Waltz Decl. Ex. 16.

The next nail trim came eight months later and just a week before her death. At this point, Tiggers was not eating or drinking enough and her nails were so overgrown that they were piercing into her paw pads. *Id*. at Ex. 17; Ex. G at 156:3-10. According to Clay Richmond, who worked in OGF's animal care from 1977 to October 2019, this happens with all of OGF's tigers in their late teens because they get so arthritic that they cannot care for themselves. Ex. F at 71:6-75:18. Failure to provide vet care for a tiger whose claw has grown into her foot pad is an AWA violation. *In re Wallace*, 2020 WL 1916144 at *2-3. It was only deep into her decline, and just days before her death, that Tiggers was sedated for the one and only full physical exam on any of OGF's tigers. Again, the failure to provide a tiger with timely vet care violates the AWA and thus the ESA. 9 C.F.R. § 2.40; *Lowe*, 2021 WL 149838 at *7-8.

On August 26, 2020, a vet from Woodland Park Zoo helped OGF's vet interpret the diagnostic work for Tiggers and, based on the results, recommended euthanasia. Waltz Decl. Ex. 17. OGF declined. *Id*. Countermanding a vet's euthanasia recommendation violates the AWA. *See In re Wolf Haven Int'l,* AWA Dkt. 07-0119, 2008 WL 1957802, *1-3 (USDA Apr. 7, 2008). On

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

August 31, OGF's vet deemed Tiggers's quality of life "very poor"—she was dragging her hind end and not eating or drinking; OGF finally authorized euthanasia. Waltz Decl. Ex. 17.

Tiggers's necropsy revealed seven inflamed and infected half-centimeter deep lesions on all of her paws, which the pathologist estimated had been present for at least five days. Waltz Decl. Exs. 18 & 19. OGF staff caused these lesions by cutting Tiggers's severely overgrown and ingrown claws. Ex. G at 155:6-156:10. In the course of doing so, OGF staff either cut her paw pads or drove nails deeper into the pad, drawing blood. Ex. H (J. Beebe Dep.). 145:14-20; 146:25-147:8. This constitutes "take" in violation of the ESA. 16 U.S.C. § 1532(19).

Tiggers's necropsy also confirmed what should have been diagnosed and treated years before: she had end-stage kidney failure; chronic, severe arthritis in both hind limbs and right forelimb; and cancer in her uterus and abdomen (likely causing urination pain). Harrenstien Decl., ¶¶ 48-50. Tiggers was also severely dehydrated and had a mouth sore associated with anorexia. *Id.*; Waltz Decl., Ex. 19. Despite all this, OGF head of animal care Eugene Pate described Tiggers's decline as "fast" and did see any lessons on how to better care for tigers. Ex. D at 57:3-16.

**e. Lack of vet care for living tigers.**

Given head of animal care Pate's testimony, it is unsurprising that OGF's vet care for still-living tigers fares no better.[11] During their January 6, 2020 visit, ALDF's experts observed that Sher-khan, the surviving white tiger at OGF, suffers from rear leg lameness. Harrenstien Decl., ¶ 52. OGF did not have medications for Sher-khan's joint problems, which are exacerbated by the concrete floor of his housing. *Id*. Weeks after the site visit, OGF and, later, its vet recognized that Sher-khan had signs of arthritis including a limp and muscle atrophy in his hind legs. Waltz Decl. 20; Ex. D at 79:3-81:17. The vet prescribed daily pain medication, which OGF gives only three times per week. *Id*. at 85:16- 86:4, 81:18-82:11; Waltz Decl. Ex. 21. Sher-khan still exhibits a limp but OGF has not increased the frequency of medication, only medicating when feeding the tiger.

[11] See *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 (9th Cir. 1994) ("Past takings are indeed instructive, especially if there is evidence that future similar takings are likely").

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Ex. D at 81:18-82:11, 84:17-85:14. By mid-2020, OGF noticed Sher-khan was starting to drink more water (a known sign of kidney disease) but as with the other ailing tigers, there was no attempt to diagnose or treat him. *Id*. at 38:20-39:8; 75:11-76:6 *see also* Waltz Decl. Ex. 22.

* * * *

As these many examples illustrate, OGF has a long and unabated pattern of inadequate veterinary care for tigers resulting in numerous violations of the ESA. To summarize: in the last decade, OGF's attending vets have performed just one physical exam on an OGF tiger (Tiggers), and even that was far too late—by then, Tiggers had multiple severe advanced diseases. In contrast, both parties' experts agree that tigers should receive annual physical exams. Ex. G at 214:7-18; Harrenstien Decl. ¶ 33. *See also Tri-State Zoo,* 397 F. Supp. 3d at 773 ("Generally accepted husbandry practices also entail annual examinations of young and healthy animals, and semi-annual examinations of senior animals or animals with health issues . . . Such preventative screening remains particularly important for wild animals like the big cats because they typically do not manifest their illnesses until the disease is well-progressed.").

On the rare occasions when OGF's attending vets find out about a tiger's symptoms, they rarely see the tiger in person or prescribe appropriate treatment. Despite the requirement that an attending veterinarian "received training and/or experience in the care and management *of the species being attended*," 9 C.F.R. § 1.1 (emphasis added), neither of OGF's attending vets have experience caring for tigers beyond their OGF work. Ex. I (Short Dep. 17:6-8; 20:25-21:15; 21:25-23:3; 29:4-18)[12]; Ex. J (Black Dep. 17:6-18:10; 19:15-17); *see United States v. Lowe*, 20-cv-0423-JFH, 2021 WL 1087805, *4-5 (W.D. Okla. Mar. 22, 2021) (finding failure to retain "qualified" veterinarian with species expertise violated AWA regulations). When OGF's vets do consult more experienced vets and recommend treatment for the tigers, OGF does not follow it. *See In re Wolf Haven*, 2008 WL 1957802 at *1-3 (failure to give medication as prescribed and failure to notify vet that animals

[12] Following a 2010 stipulated order related to veterinary malpractice that ended in the dehydration and death of a horse, Dr. Short stopped treating large animals, although OGF still considers her its attending veterinarian. Ex. I at 27:6-17 (testifying in third person); Waltz Decl. Ex. 23.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

are exhibiting pain violates AWA). Although the AWA requires OGF to frequently communicate with its vets and give them "the appropriate authority to ensure the provision of adequate veterinary care," 9 C.F.R. § 2.40, OGF's attending vets admit they have no authority to ensure their recommendations are followed and they make no attempt to find out if they were. Ex. J at 84:5-13; Ex. I at 59:5-7, 142:23-143:18, 193:8-14.

Much like the court found in *Tri-State Zoo,* OGF's vet care is "always too little and far too late," there is a lack of "palliative treatment and pain management for serious illnesses [which] is a basic standard of care," and "the consistent lack of in-person evaluations shows clearly that the provision of veterinary care remained grossly inadequate." *Tri-State Zoo*, 424 F. Supp. 3d at 413; *see also Lowe*, 2021 WL 149838 at *8, 11. The Court should find that OGF's deficient vet care for tigers and the associated actual and likely injuries and deaths constitute "take."

**3. OGF takes grizzly bears in violation of the ESA.**

**a. OGF has several ESA-protected grizzly bears.**

The ESA protects from take all members of the subspecies *Ursus arctos horribilis* found in the lower 48 states of the United States. 50 C.F.R. §§ 17.11, 17.40(b) ("no person shall take any grizzly bear in the 48 conterminous states"). FWS further explains that *U. a. horribilis* is any member of the brown bear species "that occurs in North America outside of Kodiak Island, Alaska." 72 Fed. Reg. 14866, 14884 (Mar. 29, 2007). Brown bears living on the islands of the Kodiak archipelago classify as a different subspecies, *U. a. middendorfi*, which is not covered by the ESA. *Id.* at 14866, 14884; *see also* 70 Fed. Reg. 69854-55 (Nov. 17, 2005) (describing taxonomy, clarifying that *U. a. horribilis* has the "historic range of North America"). All brown bears are physically capable of breeding with each other for generations, and the subspecies distinction "is based on geography," not genetics. Ex. K (Shapiro Dep. 76:1-77:7); *see also* Ex. G at 237:15-238:19 (subspecies distinction among North American brown bears is meaningless).

Several brown bears living at OGF fall within ESA coverage, including Donald and Moxie, whom OGF acquired as cubs from a Canada dealer. Dkt. 134 ¶ 8. The transfer permits and health

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

certificates, required by the Convention on International Trade of Endangered Species, refer to Donald and Moxie as both "N. American brown bears" and "grizzly bears." *Id*. at Exs. C-F. In addition, OGF's proffered expert on bear genomics determined that Donald and Moxie's DNA clustered with brown bears from Glacier National Park and the ABC Islands. Ex. L (Armstrong Dep. 177:13-179:8); Dkt. 128, Ex. D at 9-13 (Armstrong Rep.). According to OGF's expert, the results are "consistent with documentation showing that Donald and Moxie were imported from Alberta, Canada." *Id.* at 12.

Donald and Moxie are covered by the ESA, regardless of whether their ancestry is from the mid-continent of North America or the ABC Islands. Neither location is on the Kodiak archipelago.[13] As brown bears from North America who are not from the Kodiak archipelago, they are members of the subspecies *U. a. horribilis* and thus protected from take in the lower 48 states.

Similarly, the brown bears Connie, Lillie, Fee, Fie, and Fumm (all still living), and Patches, Good Momma, Marsha, and Samantha (who have died since this case was filed) (collectively, "OGF-born bears"), are protected by the ESA. It is undisputed that all these bears are North American brown bears born at OGF. *See* Waltz Decl., Ex. 25 at 8:6-12:7. It is also undisputed that these bears descend from a line of bears born at OGF going back several generations. *See* Ex. E at 179:5-17. In short, they are North American brown bears not from the Kodiak archipelago, *i.e.*, *U. a. horribilis*. They too are protected from take in the lower 48. *See* 50 C.F.R. §§ 17.11, 17.40(b).

OGF may contend that the OGF-born bears' distant ancestors were born on Kodiak Island, which exempts the progeny from ESA protections. This is wrong legally and factually. First, the birthplace of an individual or her ancestor is immaterial; the ESA covers listed species' members according to where they are "found." *See* 50 C.F.R. § 17.11.[14] Moreover, North American brown

---

[13] Waltz Decl. ¶ X, Ex. 24. The Court may take judicial notice of a Google map "as a source whose accuracy cannot reasonably be questioned" to find that the ABC Islands (*i.e.*, Admiralty, Baranof, and Chicagof Islands in Alaska) are not part of the Kodiak archipelago. *See United States v. Parea-Rey*, 680 F.3d 1179, 1182 n.1.

[14] *Cf.* 62 Fed. Reg. 39147, 39155 (Jul. 22, 1997) ("Prior to this final rule, the jaguar was listed under the Act as an endangered species only from Mexico southward . . . . It was not listed in the United States. Jaguars which may have occurred in, *or immigrated into*, the United States were not protected by the Act.") (emphasis added).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

bear subspecies are not genetically distinct, but rather distinct by dint of geography. 72 Fed. Reg. at 14884; Ex. K at 76:1-77:7. As Dr. Shapiro, a leader in the field of bear evolutionary genomics, explained, "bears move all over the place." *Id*. at 73:20-24. Exempting from the ESA a brown bear who can breed with all other North American brown bears just because an ancestor temporarily stopped on the Kodiak archipelago before the lineage moved elsewhere has no basis in the ESA and is contrary to its prophylactic purpose and history. *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1106 (9th Cir. 2012); *Crow Indian Tribe v. United States*, 965 F.3d 662, 672 (9th Cir. 2020) ("Indeed, the ESA's passage was partially because of the grizzly's population decline").

In addition, OGF cannot proffer any admissible evidence showing that the OGF-born bears did in fact descend from bears living on the Kodiak archipelago. *See* Ex. E at 179:5-181:13 (only basis is hearsay); Ex. H at 49:24-51:4 (does not know where bears' ancestors came from). OGF's expert offers no help—she did not include bears from the Kodiak archipelago in her DNA analysis reference set. *See* Dkt. 128, Ex. B at 9-13. And the matrilineal line for the OGF-born bears, as tested and analyzed by Dr. Shapiro's lab, shows the bears cluster closer to a bear from Kenai (on the Alaskan mainland) than to a bear from Kodiak Island. Ex. K at 73:13-74:14 (Good Momma "clusters most closely to the JX bear than any other bear"); *id*. Ex. 8 at 4 (showing "JX" bear was from Kenai). In sum, all the OGF-born bears are *U. a. horribilis* individuals protected by the ESA.

**b. OGF's husbandry for grizzly bears causes take.**

OGF subjects its grizzly bears to unlawful take by, *inter alia*, keeping them in unsafe and unsanitary enclosures, failing to provide adequate vet care, and withholding regular meals (and the medication that accompanies those meals) to make the bears more entertaining for the tourists who throw slices of bread at them.

**i. Enclosures and related deficiencies in care.**

All of the grizzly bears are kept in pens bound by a low fence and an electrified "hot line." Harrenstien Decl., ¶ 55. Several bears have unsanitary drinking water, and some of the pens have dirty, uncleanable "ponds" which are simply holes dug in the dirt. *Id.* ¶¶ 56-57. During ALDF's

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

January 2020 site visit, every pen was muddy with pockets of green standing water throughout. *Id*. Muddy conditions persist at other times of the year, even summer, when OGF puts water sprinklers at the fence line, where the bears' pacing has worn the area to dirt. Waltz Decl., Ex. 26. The bears' enclosures also contain cheatgrass or foxtail, a plant with barbed seeds ("awns") that can burrow through skin and cause serious injuries. *See* Ex. I at 95:18-96:20. OGF is well aware of the cheatgrass in the bears' enclosures and the need to eradicate it. *See* Ex. F at 179:16-182:3.[15] However, OGF has not adequately controlled the cheatgrass, which has led to serious injuries to multiple grizzly bears. *Id*. at 179:16-182:3; Ex. E at 48:23-49:25; Ex. H at 109:10-24 (cheatgrass "found in the majority of the bear pens") & 113:15-24 (mature cheatgrass seen in the bear fields as recently as September 2020). These injuries have been aggravated by the muddy, unsanitary conditions in the bears' enclosures, and inadequate vet care.

Good Momma. On September 9, 2019, OGF noted Good Momma had multiple cheatgrass wounds on her wrist. Ex. D at 159:7-14. OGF sedated Good Momma and attempted to remove the cheatgrass without a licensed vet present.[16] A week later, Good Momma's condition had worsened: she had been lying in the mud in her "den" (a domed sheet of metal) with maggots on her rear for two straight days. Waltz Decl. Ex. 27. This time the vet came and removed more cheatgrass. *Id*. The vet drew blood for analysis, but this was pointless both because OGF's vet lacks the experience or resources to interpret bloodwork for a bear,[17] and because Good Momma died the next afternoon, September 20. *Id.* Good Momma's necropsy describes ten "penetrating wounds" ranging from 1 cm in diameter to 2 cm x 3 cm. *Id*. at Ex. 28. About 40 cheatgrass awns were embedded in her skin and one in her stomach wall. *Id*.

[15] The cheatgrass problem at OGF is pervasive and not limited to grizzly bears. *See* Ex. I at 94:14-17 (ESA-listed Canada lynx had cheatgrass abscess; attempts to sedate the lynx for treatment ended in a fractured leg); Ex. F at 108:17-25 (black bear with cheatgrass wounds on feet) & 182:4-183:4 (listing animals with cheatgrass wounds dating back to early 2000s).

[16] OGF's vet's testimony and records show that no vet visited OGF on September 9. *See* Ex. I at 172:25-174:19 (discussing single incident for Good Momma just before her death); Waltz Decl. Ex. 27.

[17] Reputable zoos would have access to reference ranges for bear bloodwork. Harrenstien Decl., ¶ 64.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

The necropsy also showed kidney disease, heart problems, "extensive and severe arthritis of the hips, shoulders, elbows and knees, with joint cartilage being entirely missing in the hip joints and quite worn away in the other joints," as well as fused vertebrae resulting from chronic disease. *Id.*; Harrenstien Decl., ¶ 65. Despite its severity and chronicity, OGF first noted Good Momma's arthritis during the September 9 sedation and did not report it to the vet until September 19. Waltz Decl. Ex. 28. The vet prescribed pain medication, but not until the day Good Momma died. *Id.*

Samantha. In August 2019, OGF saw cheatgrass wounds on grizzly bear Samantha's rump, chin, face, and right forelimb. *Id*. Ex. 29. On August 8, OGF's vet prescribed controlled drugs over the phone; OGF sedated Samantha, attempted to remove the cheatgrass, and injected an antibiotic, all without a licensed vet present. *Id.*; Ex. D at 128:9-130:17. Nearly a month later, the chin and forearm wounds were not healing and still had a purulent discharge. *Id.* During that time Samantha was favoring her right arm, which was certainly painful. Ex. D at 134:24-135:2. In September, OGF's vet tried, unsuccessfully, to extract the cheatgrass from the infected wounds and also prescribed a short course of antibiotics, but neither the vet nor the head of animal care could confirm the wounds ever healed. *Id.* at 137:25-138:10; Waltz Decl. Ex. 29.

Rather, the evidence indicates that Samantha's infected cheatgrass wounds persisted for several months without any more treatment or vet care. On February 10, 2020, OGF again saw purulent wounds on Samantha's right forearm and again anesthetized her, attempted to clean the wounds, and injected drugs without a vet present. Waltz Decl. Ex. 29. Over the phone the vet recommended two weeks of meloxicam and the antibiotic Baytril, knowing that OGF had trouble getting Samantha to take Baytril in the past. *Id*. OGF did not give Samantha any of the two-week course of antibiotics. *Id.* Ex. 30; Ex. D at 132:15-18. USDA has cited OGF multiple times for failing to give antibiotics as prescribed, as this is a blatant violation of AWA regulations. *E.g.*, Waltz Decl., Ex. 2.

In April 2020, OGF yet again noted wounds on Samantha's right forelimb. *Id*. Ex. 31 at 0162. OGF deemed the situation unworthy of immediate vet care, so the vet came a week later. *Id.*

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

On April 22 the vet found wounds so extensive and infected they caused Samantha to limp. *Id. See also* Ex. D at 142:11-13. According to the treating vet:

> The leg was covered by mud and matted down fur. There was a malodorous smell and purulent material noted in some areas. . . Numerous ulcerated lesions ranging in size from 1-4inches diameter were noted from the dorsal region of the paw extending to the elbow. The leg was swollen, slightly edematous and warm to the touch. About 20% of the lesions were exuding purulent material and one raised fluctuant lesion was lanced and about 2mls of purulent material exuded from the wound.

Waltz Decl. Ex. 31 at 0162. The "numerous ulcerated purlent [sic] lesions cover[ed] about 70% of the right forelimb." *Id*. at 0153; id. at Ex. 32. The vet found numerous awns embedded in Samantha's fur but could not retrieve any from her wounds. *Id*. Ex. 31 at 0162. The vet recommended multiple antibiotics, pain medication, and moving Samantha out of her muddy enclosure to a clean location. *Id.* at 0163. Lab analysis revealed that by this point Samantha was suffering from a deep drug-resistant infection. Harrenstien Decl., ¶ 66. OGF moved Samantha to a small transport trailer for "a couple of weeks" to keep her leg out of the mud and give the intensive treatment needed for the severe infection. Ex. D at 143:15-144:2; Waltz Decl. Ex. 31 at 0163).[18] As Dr. Harrenstien explains, housing a bear in a small barren trailer for over a few hours is not an acceptable practice and demonstrates the need for significant improvements in the bears' usual enclosures. Harrenstien Decl., ¶ 67-70.

On July 24, 2020, OGF noticed two five-inch diameter puncture wounds on Samantha's left shoulder, presumably caused by Lillie, who shared Samantha's pen. Ex. D at 146:19-147:5; Waltz Decl. Ex. 31. By the time the vet looked at the bear three days later, the wounds were infected and draining purulent material. *Id*. at Ex. 31 at 0152). Samantha returned to the trailer and was given intensive antibiotics from July 29 to August 8. *Id.* at Ex. 30. When OGF's expert Dr.

[18] OGF has historically kept wounded bears in trailers for weeks or months at a time, either because it knows that leaving them in their dirt pens would lead to infection or because numerous visitors complain and otherwise express concerns about the bears' wounds. Ex. F at 106:12-107:25.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Briggs visited on August 3, he observed a scarred Samantha in the trailer slowly moving around while "chuffing" to warn him she was upset. Ex. G at 123:24-125:11.[19]

The housing and husbandry for grizzly bears at OGF constitute harm and harassment in violation of the ESA. Keeping animals in muddy enclosures with hazardous plants is neither "generally accepted" nor AWA-compliant, and, as evidenced by Good Momma and Samantha, is likely to cause injury. *See, e.g.*, Ex. I at 96:4-10 (cheatgrass is known problem and requires vigilant control); Harrenstien Decl., ¶¶ 57, 66-70, 72. AWA regulations require that OGF's premises "shall be kept clean and in good repair in order to protect the animals from injury and to facilitate the prescribed husbandry practices." 9 C.F.R. § 3.131(c); *see id*. § 3.125(a) ("The indoor and outdoor housing facilities . . . shall be maintained in good repair to protect the animals from injury."). Outdoor enclosures must also be well-drained to prevent standing water. *Id*. § 3.127(c) ("A suitable method shall be provided to rapidly eliminate excess water.").

**ii. Arthritis, diet, and deficient vet care.**

Like the tigers, most of the grizzlies have insufficiently treated arthritis and joint pain. The relationship between diet and arthritis is two-fold: (1) up to one third of the bears' diet is sliced bread, which contributes to inflammation and obesity, aggravating joint pain; and (2) OGF only gives the bears pain medication when it feeds them meat, which is far less frequently than needed to manage their pain. Harrenstien Decl., ¶¶ 58-63. To make matters worse, during the tourist season, OGF withholds one of the three weekly meat meals to make the grizzlies more "active and reactive" to the tourists who throw them bread. Ex. F at 131:18-132:9.

Grizzly bear Marsha was known to have severe arthritis as early as 2015. OGF's vet struggled with how to treat it and ultimately prescribed daily meloxicam and gabapentin. Waltz Decl. Ex. 33 at 2-4. ALDF's expert agrees that arthritis requires multiple concurrent daily pain medications. Harrenstien Decl., ¶¶76-77. OGF never administered a single pill of meloxicam.

[19] Dr. Briggs directed counsel to take photos during this visit of scenes he felt rebutted ALDF's concerns but did not see it fit to photograph the scarred bear in the small barren transport trailer. Ex. G at 110:4-17; 128:24-129:2.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Waltz Decl., Ex. 2. USDA cited this AWA violation during its 2017 inspection. *Id.* Marsha's severe arthritis went untreated until December 2019--four years after OGF knew of her arthritis and two years after the citation--when the vet re-prescribed daily meloxicam. *Id.* Ex. 33 at 1.

In April 2019, OGF's vet noticed that grizzly bear Connie, who had a history of lameness, was arthritic and prescribed daily meloxicam for her. *Id.* Ex. 34. Samantha was also prescribed daily meloxicam. *Id.* Ex. 29. OGF began medicating the bears, but only on the few days a week they are fed meat, because OGF finds that easier. Ex. D at 150:16-22. The rate OGF was refilling its prescriptions for Connie indicates OGF was giving just 1/5 to 1/6 of what the vet prescribed. Harrenstien Decl., ¶¶ 80-81. The medication records for each bear show that OGF gave the bears meloxicam just twice a week throughout most of the year, despite telling its vet that the bears are fed and medicated at least three times a week in the spring and summer. *Compare, e.g.*, Waltz Decl., Exs. 35 & 36.

OGF's current head of animal care testified that if the bears showed stiffness, OGF would know that meant they needed more frequent medication. Ex. D at 151:5-17. However, he also testified that Marsha generally continued to show stiffness when getting up, *id.* at 152:13-153:5, the same condition that caused the vet to prescribe pain medication for Connie. Waltz Decl. Ex. 34. Marsha's necropsy confirmed she had chronic and severe arthritis, compounded by obesity. Harrenstien Decl., ¶ 79. In short, despite their own observations and two necropsies showing severe arthritis, and against its vet's prescriptions, OGF has continued to treat its bears' arthritis based on when they feed meat, not based on symptoms. This is inadequate care.

OGF's practices of allowing tourists to feed grizzlies excessive quantities of bread, withholding normal meals, and under-medicating arthritic bears constitute harm and harassment under the ESA. None of these practices satisfy the captive species exemption because they are neither "generally accepted" nor compliant with the AWA. Several health problems are associated with the bears' high-content bread diet, including obesity and inflammation which aggravate the chronic, severe arthritis that is common in OGF's bears. Harrenstien Decl., ¶¶ 59-63. Dr. Briggs

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

admits he is unaware of any zoo that allows visitors to feed brown bears bread—though he knows of zoos feeding bread to bears who need to gain weight. Ex. G at 227:11-18. And while the USDA has not directly cited OGF for feeding bears bread, that is apparently because USDA inspectors were misled to think the bread tourists feed to the animals is merely a "'snack' and not the animals daily diet." Ex. M at 107:22-108:15 & Ex. 22. OGF's attending vet has the same mistaken belief. *See* Waltz Decl. Ex. 35 (assuming bears are fed three times a week in summer). Even with that mistaken belief, USDA inspector Tom LeCroy "strongly advised" that OGF transition "as soon as possible" to a more species appropriate snack such as vegetables, grain, or forage. *Id.* Ex. 38 at 2. Furthermore, OGF's practice of withholding 1/3 of their regular meals, along with 1/3 of their pain medication to make the bears more entertaining for tourists directly contradicts the AWA:

> The food shall be . . . of sufficient quantity and nutritive value to maintain all animals in good health. The diet shall be prepared with consideration for the age, species, condition, size, and type of the animal. Animals shall be fed at least once a day except as dictated by hibernation, veterinary treatment, normal fasts, or other professionally accepted practices.

9 C.F.R. § 3.129(a).

OGF's overall vet care for its grizzlies also falls far short of AWA standards. *See* Harrenstien Decl., ¶¶ 54, 72-73, 75, 77. In addition to the examples above, OGF recognized that Lillie also appeared arthritic but, like Good Momma, Lillie's arthritis has never been treated. Ex. E at 120:5-15; Waltz Decl. Ex. 39 (symptoms not reported to vet who rarely sets eyes on Lillie). Similarly, there are no vet records whatsoever for Patches, a grizzly who died of unknown causes in March 2019 and was buried without a necropsy. OGF's attending veterinarian was unaware that OGF even had a bear by that name. Ex. I at 171:22-172:1. *See* 9 C.F.R. § 2.40 (requiring timely and accurate communication with vets).

**c. OGF's anesthesia practices "take" ESA-protected species.**

OGF's practice of anesthetizing ESA-listed animals without proper precautions and frequently without a licensed vet present constitutes take in violation of the ESA. Ex. G at 141:2-

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

19; *Tri-State Zoo*, 397 F. Supp. 3d at 776 (summary judgment based on anesthesia performed by a vet without sufficient monitoring). "Provisions of veterinary care for confining, tranquilizing, or anesthetizing," are exempt from the definition of "harass" only when they are both "generally accepted" and "not likely to result in injury to the wildlife." 50 C.F.R. § 17.3.

Dr. Harrenstien explains that anesthesia "introduces a significant risk of death" for animal patients and is therefore "a strictly veterinary procedure, not to be performed by someone other than a veterinarian or veterinary technician." Harrenstien Decl., ¶ 86. OGF's attending vet and Dr. Briggs agree that anesthesia poses serious risks, particularly in older animals and animals with kidney problems, and repeatedly use this risk to excuse OGF's failure to provide vet care for its animals. Ex. G at 170:3-18; Ex. I at 137:18-23; Ex. J at 80:18-81:3; 86:19-87:1; 136:12-25. Reputable zoos mitigate these risks by having only knowledgeable vets with proper monitoring and support equipment to perform general anesthesia on wild animals. Harrenstien Decl. ¶¶ 86-88.[20] *See also Tri-State Zoo*, 397 F. Supp. 3d at 774 (describing "[g]enerally accepted standards" for veterinary anesthesia).

OGF does not have the equipment or expertise to place an IV catheter or to monitor blood pressure, nor to intubate an animal. Ex. E at 161:16-162:2. *See also Tri-State Zoo* 397 F. Supp. 3d at 774 (holding that zoo whose veterinarian who lacked this equipment and expertise caused take). Yet OGF has repeatedly anesthetized listed species, including animals with blood flow and kidney problems, by shooting them with a dart containing controlled drugs, without a vet present for any part of the process. *Id.* at 160:20-161:17. For example, OGF anesthetized Tiggers, whom they considered a geriatric tiger, for a claw trim in late 2019 without the vet and without IV fluid support. Waltz Decl. Ex. 16 at 1. Around that same time, OGF had noticed Tiggers showing signs of renal disease, later confirmed to be severe. *Id.*; Harrenstien Decl., ¶¶ 43, 48, 50. To quote OGF's expert, who rejected the idea that Tiggers should have been anesthetized two years earlier:

[20] OGF's vets do not know proper drugs and doses for OGF animals. *See* Ex. I at 115:4-120:4 .

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

> Since Tiggers was not known to have significant medical issues to a large degree and also having not had multiple workups and experiences with anesthesia, it could be dangerous and cavalier to begin multiple anesthetic events in this geriatric animal, especially since staff did not observe any signs of ailments or pain. **That would be especially true if the veterinarian or animal care person had reason to believe the animal may have renal insufficiency** or even hepatic disease.

Waltz Decl. Ex. 26 at 10. If anesthetization of the geriatric Tiggers with a vet present would have been "dangerous and cavalier" in 2017, it surely was unacceptably dangerous to anesthetize her without a vet present in 2019 when renal disease was suspected. OGF's practice of anesthetizing animals, especially older animals with under-appreciated disease, without veterinary oversight and supportive equipment, constitutes harassment in violation of the ESA.

Even when OGF's vets physically examine an anesthetized animal, OGF almost always performs the anesthesia before they arrive, and no one observes the risk mitigation measures. Ex. I at 71:2-14. *See Tri-State Zoo*, 397 F. Supp. 3d at 776 ("The most critical times during anesthesia are induction and recovery."). For example, OGF anesthetized grizzly Good Momma on September 9 without a vet, without blood pressure monitoring, and without IV fluids. Ex. E at 114:13-116:10. Ten days later OGF sedated her again and the vet came but there is no indication she received IV fluids. Harrenstien Decl., ¶ 64. The vet also did not stay to ensure Good Momma recovered from the anesthesia. Ex. I at 174:9-19; *see Tri-State Zoo* at 776 (finding take from veterinarian leaving tiger "alone to recover from the anesthesia, despite the high risk of an adverse reaction during the recovery period."). Indeed, she did not recover well: following the anesthesia Good Momma could not rise on her hind limbs and died the next day. Waltz Decl. Ex. 27 at 3. As Dr. Harrenstien explains, the "blood pressure and hydration effects of anesthesia could very well have precipitated her death," the following day "especially considering her poor kidney function status and restricted blood flow (atherosclerosis)." Harrenstien Decl., ¶ 64.

OGF's dangerous anesthesia practices create a likelihood of injury to the endangered and threatened animals and are not generally accepted 50 C.F.R. § 17.3. The Court should grant summary judgment just as the court did in *Tri-State Zoo* based on remarkably similar facts.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

**C. OGF is a Public Nuisance.**

The Court should grant summary judgment on ALDF's public nuisance claim based on OGF's violations of the federal ESA, as well as Washington's ESA and cervid laws. Under state law, a nuisance is "unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others . . . or in any way renders other persons insecure in life, or in the use of property." RCW 7.48.120. Nested within that broad definition, a public nuisance is "one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." *Id.* 7.48.130.

As this Court explained in its decision on OGF's motion to dismiss, "The violation of federal and state laws [] supply a predicate for a public nuisance action." *ALDF v. OGF*, 387 F. Supp. 3d 1202, 1207 (W.D. Wash. 2019) (collecting state court cases). This is consistent with other federal courts that "have found a public nuisance claim exists where the defendant's business involves the abuse or mistreatment of animals." *Collins v. Tri-State Zoological Park of W. Md., Inc.*, 2021 WL 211301, *4-5 (D. Md. Jan. 21, 2021) (violations of civil animal welfare statutes support a claim that zoo "unreasonably interfered with a right common to the public"); *ALDF v. Special Memories Zoo LLC*, 2021 WL 101121, *1-2 (E.D. Wis. Jan. 12, 2021) (enjoining defendants from "maintaining a public nuisance by confining [various] animals in inhumane and unsafe conditions"); *Dist. of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113 (1953) (citing *Johnson v. Dist. of Columbia*, 30 App. D.C. 520, 522 (D.C. 1908) (animal cruelty laws are "in the interest of peace and order and conduces to the morals and general welfare of the community")).[21]

**1. OGF is a public nuisance by "taking" animals in violation of the federal ESA.**

As explained in detail above, OGF is violating the federal ESA. These violations of federal law are sufficient predicate for ALDF's public nuisance claim against OGF. *See ALDF*, 387 F.

[21] *See also ALDF v. Lucas*, 2019 WL 5068531 (W.D. Pa. Oct. 9, 2019); *Kuehl v. Cricket Hollow Zoo*, EQCV008505 (Iowa Dist. Ct., Delaware Cty. Nov. 24, 2019) (finding zoo a public nuisance in violation of Iowa's Animal Neglect Statute and ordering immediate removal of animals) (attached as Ex. N); *Penn. Soc'y for the Prevention of Cruelty to Animals v. Bravo Enters., Inc.*, 428 Pa. 350, 260 (1968) (finding "cruelty to animals statute" "declarative of public policy" and activity in violation of statute "properly enjoinable" as "the essence of public nuisance").

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Supp. 3d at 1207; *see also Miotke v. City of Spokane*, 678 P.2d 803, 815 (Wash. 1984) (finding that pollution that violates "federal and state statutory schemes," "constitutes a nuisance"). The Court should find that OGF's treatment of these animals is a public nuisance.

**2. OGF is a public nuisance by "taking" animals in violation of the State ESA.**

In addition, OGF is taking State-listed Canada lynx, grizzly bears, and wolves. Washington prohibits the "possess[ion]" of "fish and wildlife designated by the commission [Fish and Wildlife Commission] as endangered," if that possession "has not been authorized by rule of the commission, a permit issued by the department [Department of Fish and Wildlife, or "DFW"], or a permit issued pursuant to the federal [ESA]." RCW 77.15.120(1). The statute further declares that "each individual animal unlawfully taken or possessed is a separate offense." RCW 77.15.030.

**a. OGF possesses a State ESA listed Canada lynx.**

It is undisputed that OGF possesses a Canada lynx, Dkt. 21 ¶ 35; Waltz Decl. Ex. 25. The Commission classifies Canada lynx as endangered. WAC 220-610-010.[22]

**b. OGF possesses State ESA listed grizzly bears.**

Similarly, there is no material dispute of fact that Donald, Moxie, and all the grizzlies born at OGF are protected by the State ESA. The regulations implementing the State ESA define "endangered" as "any wildlife species native to the state of Washington that is seriously threatened with extinction" in the state. *Id*. 220-610-110(2.4).[23] The Commission lists the entire brown bear species *Ursus arctos* as "endangered," without limitation to a subspecies. WAC 220-610-010. As explained above, it is undisputed that Donald, Moxie, and the brown bears born at OGF are North American brown bears and members of the species *Ursus arctos,* which includes both North

---

[22] OGF's violation of the State ESA prohibition of taking the Canada lynx, also amounts to a violation of the federal ESA. The "special rule" that accompanied the listing of Canada lynx as threatened under the federal ESA required that activities concerning captive lynx "must comply with all applicable State and tribal laws and regulations. Violation of State or tribal law will also be a violation of the Act." 50 C.F.R. § 17.40(k)(5).

[23] "Species" means "any group of animals classified as a species or subspecies as commonly accepted by the scientific community." *Id*. 220-610-110(2.6).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

American subspecies. *See also, e.g.*, Waltz Decl. Ex. 25 at 8:6-12:7. Thus, these bears are protected by the State ESA. *See* WAC 220-610-010.

**c. OGF possesses State ESA listed wolves.**

Washington also lists the gray wolf, *Canis lupus*, as endangered under the State ESA. WAC 220-610-010. OGF has possessed at least twelve gray wolves since 2011, ten of whom live at OGF today.[24] OGF called these animals wolves until ALDF filed this lawsuit—then OGF redefined them as "wolf-dog hybrids." Ex. M at 125:20-127:17 & Exs. 5, 26 (showing past OGF veterinary plans sent to USDA called the animals "wolves" but in 2019 changed to hybrids).[25]

Moreover, the *Daubert*-sufficient genetic analyses performed in this case shows that all the canids are covered gray wolves. According to genetic analysis performed by Dr. vonHoldt, whom OGF's proffered expert acknowledged is a leader in the field of canid genomics, Ex. L at 90:3-8, all the OGF-born and the four Predators of the Heart canids "are gray wolves with no evidence of dog or coyote genetic ancestry." vonHoldt Decl. ¶ 29; *see also* Freedman Decl. ¶¶ 4-10 (ALDF expert reviewing a refined dog-wolf hybridization test performed by lab at University of California at Davis, finding OGF-born Brutus is "unequivocally" a wolf and not a hybrid). In contrast, OGF's expert used methodologies riddled with mistakes and arrived at conclusions contradicting even her own results. *See generally* ALDF *Daubert* Mot. (concurrently filed).[26]

---

[24] Eight of the wolves were born at OGF and share the same parents: Brutus, Angie, Cocoa, Ginger, Jacob, Leah, Lilly, and Elbey. OGF has since shipped Elbey to Bob Sawmiller—the dealer who so egregiously violated the AWA that USDA has suspended his AWA license—for "breeding purposes." Waltz Decl. Ex. 40. Brutus died during the pendency of this lawsuit. *Id.* Ex. 25 at 17:12. OGF acquired the other four, named Seth, Sam, Tonka, and Grace, as pups from Predators of the Heart—another Washington facility that exhibits, breeds, and transfers wolves. *See* Ex. E 175:9-21, 190:6-21 & Exs. 23, 24.

[25] *See also* Waltz Decl. Ex. 41 (screen shots from OGF website referring to canids as "timberwolf"); Ex. O (Tyler Dep. 48:23-50:11 & Ex. 7) (past vet records for Elbey notes she is a "wolf pup" and species "timber wolf").

[26] Even though Armstrong's error-strewn methodology and analysis predictably increases the percentage of dog ancestry in the OGF canids, she notably does not call Tonka and Grace hybrids. Ex. L at 114:23-115:2, 116:20-25. She further concedes the *only* evidence Seth and Sam are hybrids occurs in just one of several cluster analyses in one of three tests she runs, despite elsewhere stating "you wouldn't use any singular K value to come to [a] conclusion" and one must look to "the plots in their entirety, and not any single one of these plots." Compare *id.* 119:22-24 *with id.* 117:13-118:12. In fact, Armstrong admits that under one of her tests—the PCA analysis—all the OGF canids cluster with the wolves from Canada, Yellowstone, and Mexico, not dogs. *Id.* 151:16-23.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Even under the erroneous Armstrong conclusions for Brutus and Jacob (two OGF-born canids who were tested), the two are gray wolves. Armstrong found that, based on eyeballing one of several of the DNA testing methods she undertook, Brutus and Jacob are "approaching" 20% dog ancestry, with the remaining 80% or more being wolf ancestry. Ex. L at 122:13-25. A canid with that estimated ancestry mixture is considered a wolf—and not a hybrid—in the relevant field. *See* vonHoldt Decl. ¶ 15 & Ex. C (federal government papers explaining identification of animals with as minimum thresholds from 75% to 87.5% wolf to be identified as red wolves in red wolf recovery management); *see also id*. ¶ 12 (noting that population geneticists refer to "hybrids" as a first generation, or F1, cross between a wolf and a dog); Freedman Decl. ¶ 22 (same); Ex. L 102:15-17 (conceding "some people use hybrid only to refer to the F1 offspring").[27]

A recent federal court to review a dispute of whether certain canids are wolves or wolf-dog hybrids similarly found, on summary judgment, that the federal ESA covers "even those animals that had negligible or small amounts of non-endangered animals in their DNA makeup." *See* Ex. P (Hearing Minutes, *ALDF v. Fur-Ever Wild*, 17-cv-4496 (D. Minn. June 13, 2019)). Expressly relying on expert analysis from Dr. vonHoldt and the lack of documentation from the defendants showing that a parent or grandparent was a dog, the court observed that no animal was "a 75 percent situation," i.e., one dog grandparent, and held that all ten canids at issue were wolves. *Id*.

So too, here, it is undisputed that all of the OGF canids are more than 75 percent wolf. And OGF has not produced any evidence that any of the OGF canids' ancestors, let alone parents or grandparents, were dogs. *See* Ex. F at 156:10-161:8, 163:9-164:11 (former OGF staffer explaining

[27] Armstrong's alternative definition—that any animal where a dog crossed with a wolf at any point in her ancestry, no matter how many generations back that occurred, is a "hybrid or descendant of a hybrid lineage," *see* Ex. L at 106:12-108:4—leads to absurd results. *See id.* 111:12-112:7 (noting that she would call an animal with 99.5 percent wolf ancestry and 0.5 percent dog ancestry a "hybrid," and pointing out that is the ancestry mixture humans have with Neanderthals). Under Armstrong's definition, many wolves living in packs in the wild are not members of the species. *See* Freedman Decl. ¶ 13 (black wolves in wild have black fur because of dog genes from a historical cross); Ex. F at 163:23-164:6 (former OGF staffer noting "almost any wolf" in wild will show dog ancestry).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

that the parents and grandparents of Brutus and his siblings were all wolves, including untamed wolves, and that in his 45 years at OGF, "we didn't have any dogs on the farm").[28]

**d. The Washington state and federal governments have neither authorized by rule nor issued any permit allowing OGF to take the State ESA listed animals.**

It is also undisputed OGF does not meet any of the three exemptions from the State ESA prohibitions: the Commission has not "authorized by rule," and DFW and the federal government have not issued any permits, allowing OGF to take Canada lynx, grizzlies, or wolves. *See* RCW 77.15.120(1). No Commission rule exempts OGF's State ESA violations. And OGF's corporate designee testified that OGF has neither applied for a federal ESA permit nor for a DFW permit to possess state endangered species. *See* Ex. E at 212:13-213:7. Because OGF takes state listed Canada lynx, grizzlies, and wolves without meeting any exemption, it is violating the State ESA.

**3. OGF is a public nuisance by violating the state cervid laws through its possession and breeding of Roosevelt elk and sika deer.**

**a. OGF is unlawfully possessing and propagating Roosevelt elk.**

Under WAC 220-450-030(2), it is unlawful to possess or propagate within Washington listed Cervidae species, including Roosevelt elk.[29] The main exemption from this prohibition is the DFW director "may issue written authorization for a person to import into the state, hold, possess and propagate live specimens of wildlife listed in subsection (2) of this section . . . for display by zoos or aquariums who are accredited institutional members of the Association of Zoos and Aquariums (AZA)." WAC 220-450-030(7).

OGF admits it possesses and displays Roosevelt elk without being AZA accredited. Dkt. 21 ¶¶ 13, 35, 120; *ALDF*, 387 F. Supp. 3d at 1207 (noting defendants admit "they are not accredited but 'possess or display Roosevelt Elk'"). As of late 2020, OGF had 29 Roosevelt elk, and more

[28] *See also* Waltz Decl. Ex. 42 (Lloyd Beebe, WILDERNESS TRAILS AND A DREAM: THE STORY BEHIND THE OLYMPIC GAME FARM 22 (3d ed. 2005)) (writing that since 1938, "we have raised more than one hundred wolves").

[29] Such a prohibition prevents harm to "*both* the agricultural industry and wildlife resources," and another state's courts have found that a facility's possession of cervids in violation of a state regulation constitutes a public nuisance to be abated. *See Colo. Div. of Wildlife v. Cox*, 843 P.2d 662 (Colo. Ct. App. 1992) (emphasis in original).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

are born every spring. Ex. H at 59:11-16 & Ex. 7 (Dec. 9, 2020 USDA inspection report); *see also* Waltz Decl. Ex. 43 (2014-2018, 2020 animal birth records). This violates WAC 220-450-030(2).

Indeed, the dismal conditions in which OGF keeps the Roosevelt elk would not occur at an AZA accredited facility. OGF crams the elk into a drive-through enclosure that Clallam County conservation staff deem severely overcrowded and overloaded with feces, *see* Ex. H at 81:19-82:7, 83:23-85:4 & Ex. 5; *see also* Harrenstien Decl. ¶ 89. OGF has long had problems with nutrition and the spread of parasites, to the point that the entire elk herd died off, and upon "restocking" the elk continued to have health problems. Ex. F at 174:11-178:7. The drive-through visitors also threaten illness, injury, and death to the elk; they feed unmonitored and unlimited amounts of bread and run over animals with their cars (and may have even run over an elk). Harrenstien Decl. ¶ 91; Ex. M at Ex. 22 (USDA inspection report); Ex. F at 165:21-166:12, 266:8-267:5 (describing peacocks and yak calf killed by cars); Ex. E at 165:20-167:17. The captive elk conditions also risk the spread of disease, like chronic wasting disease, to wild elk. Harrenstien Decl. ¶ 90.[30]

**b. OGF is unlawfully possessing and propagating Sika deer.**

"It is unlawful to possess, [or] propagate . . . live specimens of deleterious exotic wildlife" except as permitted by the DFW director. WAC 220-640-200(2). DFW "may authorize, by written approval, a person to import into the state, hold, possess, and propagate live specimens of deleterious exotic wildlife for scientific research or for display by zoos or aquariums who are accredited institutional members of the association of zoos and aquariums (AZA)." *Id*. 220-640-200(3). Sika deer are deleterious exotic wildlife, meaning they are not native to Washington and are dangerous to the state environment or wildlife. *Id*. 220-640-200(1)(b)(v); RCW 77.08.010(13). To possess and propagate Sika deer, OGF must both have a DFW permit and AZA accreditation.

---

[30] *See also* Cervid Diseases and Resources, The Center for Food Security and Public Health, http://www.cfsph.iastate.edu/Species/cervids.php (last visited March 25, 2021).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

In April 2013, DFW transferred seven Sika deer to OGF.[31] The transfer materials did not authorize, and in fact prohibited, the propagation of the deer. DFW's transfer paperwork noted that each Sika deer "has been marked with an ear tag and unique number. The tags are to remain on the animals for identification. *The males and females are to be separated*. The animals are to be held by Olympic Game Farm in compliance with all provisions of RCW 77.15 and WAC 232.12 [Deleterious Exotic Wildlife, recodified as 220-640-200]." Waltz Decl. Ex. 44. Internal agency emails confirm the transfer permit does not allow OGF to propagate the deer. *Id*. Ex. 45 ("Now just need to follow up with OGF to make sure they get the buck(s) castrated, and that they come into compliance with the legal requirements for holding Deleterious Exotic Wildlife").

At the time of the 2013 transfer of the seven deer, OGF did not possess any Sika deer. *See id*. Ex. 46 (Apr. 1, 2013 USDA Inspection Report). Since then, at least five Sika fawns have been born at OGF. *See id*. Ex. 43 (records showing births as recently as May 20, 2017). OGF has even publicized its breeding of Sika deer to its followers and the public on Facebook. *Id*. Ex. 47 (June 3, 2015 OGF Facebook post: "Baby Sika 2 days old"). OGF is thus violating both its 2013 Sika deer permit and the state's deleterious wildlife regulation.

**D. ALDF Has Standing to Bring Its ESA Claims.**

ALDF has standing because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

At least five of ALDF's members have standing in their own right because they have suffered a concrete and particularized injury in fact that is actual or imminent but not conjectural or hypothetical; the injury is fairly traceable to the Defendants' conduct; and the injury is likely

[31] *See* Waltz Decl., Ex. 44. It is not apparent DFW should have even allowed OGF to possess Sika deer because OGF is not AZA accredited. Regardless of any authorization for possession implied by the transfer, DFW plainly did not permit propagation of the Sika deer.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

redressable by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotations and citations omitted).[32]

Injury-in-fact exists "if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal . . . and that that interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (citations omitted). "[A]esthetic injuries constitute injuries in fact for standing purposes." *Hanson v. U.S. Forest Serv.*, 138 F. Supp. 2d 1295, 1298-99 (W.D. Wash. 2001) (quotation omitted) (finding citizen group members suffered injuries from activities that "harm the species and the beauty of the forests they frequent"). "The alleged injury need not be large: an actual and genuine loss, even if a trifle, will suffice for standing purposes." *Waste Action Proj. v. Draper Valley Holdings, LLC*, 49 F. Supp. 799, 802 (W.D. Wash. 2014) (citations omitted).

At least five members of ALDF have an aesthetic interest in observing the animals at OGF—including the endangered and threatened species—in humane living conditions. For example, Michelle Andrews visited OGF because she loves "seeing and being around animals." Andrews Decl. ¶ 4. But when she went, Andrews "saw wolves in tiny cages and tigers and lions behind chain-linked fencing," which "made [her] heart break" and caused her to "feel physically ill." *Id.* ¶ 10; *see also* Bumgardner Decl. ¶¶ 4-10 (also describing brown bears); Long Decl. ¶¶ 9-13 (upset from observing ESA-listed species, including lynx).[33] Her observation of animals she believed to be suffering compelled her to act: she "left negative reviews online" to warn other people about the trauma she experienced at OGF and "even contacted animal advocacy organizations and local officials so they could learn about the conditions of the animals." Andrews Decl. ¶ 12; *see also* C. McGee Decl. ¶¶ 14-15, 18-21 (describing outreach to OGF, local officials, and animal rescue groups about animals' conditions, and creation of Change.org petition).[34]

---

[32] Only one ALDF member need show standing to sue in her own right. *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 908 (9th Cir. 2020) (citing *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 981 (9th Cir. 2013)).

[33] *See also* C. McGee Decl. ¶ 12-13; S. McGee Decl. ¶¶ 8-10.

[34] *See also* Long Decl. ¶ 17 (describing call to county commissioner about OGF); Bumgardner ¶ 14 (describing how experience viewing animals at OGF motivated her to become involved in captive wild animal rescue efforts).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Andrews lives close to OGF and would like to return to view the animals, but she is reluctant to do so because she remains haunted by the living conditions and she fears observing how the animals will look and act if conditions are not improved. Andrews Decl. ¶¶ 11, 14; *see also* Bumgardner Decl. ¶ 13 (ongoing concern about how OGF animals are handling the cold); Long Decl. ¶¶ 4, 18 (made repeat visits to OGF, which she found ever more distressing). These impaired interests constitute Article III injury-in-fact. *See Kuehl v. Sellner*, 161 F. Supp. 3d 678, 687 (N.D. Iowa 2016), *aff'd* 887 F.3d 845 (8th Cir. 2018); *Hill*, 867 F.3d at 505-06.

As the Fourth Circuit explained in a similar case against a roadside zoo, upon finding that visitor plaintiffs "satisfy the injury in fact element, the second and third standing elements [traceability and redressability] easily follow." *Hill*, 867 F.3d at 506. Here, there is no dispute that Defendants own OGF and its animals and are responsible for the animals' conditions and care. Dkt. 21 ¶ 7; Ex. H at 123:20-23. No "excessive abstraction, undue attenuation, and unbridled speculation" exists for causation. *Waste Action Proj.*, 49 F. Supp. at 802. Likewise, like the *Hill* plaintiffs, ALDF's members "claim they are being deprived of a right to observe [OGF animals] living in a setting that does not violate, and this can be redressed by an injunction directing the Zoo to maintain [them] in such a setting." *Hill*, 867 F.3d at 506; *see also* Andrews Decl. ¶ 14 ("I would gladly visit the animals again if they were given more space and had significantly improved shelter and habitat" or if the animals were "moved from OGF and placed in a sanctuary").[35]

The remaining *Hunt* criteria are also easily met. ALDF's animal protection mission is germane to its members' aesthetic interests in the OGF animals—interests this lawsuit seeks to protect. Waltz Decl., ¶ 49. *See also Lucas*, 2019 WL 5068531, *4 ("the interests ALDF seeks to protect through the public nuisance claim—i.e., to improve the allegedly inadequate conditions of captivity at Farmers' Inn—is germane to its purpose"). In addition, neither the claims nor relief sought require participation of individual ALDF members. *See Chamber of Commerce v. United States*, 274 F. Supp. 3d 1155, 1162 (W.D. Wash. 2017).

[35] *See also* Bumgardner Decl. ¶ 15; Long Decl. ¶ 22; C. McGee Decl. ¶ 26; S. McGee Decl. ¶ 22.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

Accordingly, through its members, ALDF has demonstrated Article III standing.

**E. ALDF Has Standing to Bring Its Public Nuisance Claim.**

In Washington, "a nuisance claim can be brought by 'any person . . . whose personal enjoyment is lessened by the nuisance.'" *ALDF*, 387 F. Supp. 3d at 1205 (quoting RCW 7.48.020). A public nuisance plaintiff must also show that the nuisance be "specially injurious to himself or herself but not otherwise." *Id.* (quoting RCW 7.48.210). As this Court described, "the Washington Supreme Court explained that the special injury requirement 'is not a particularly high bar' and 'injury to the aesthetic appeal and environment of an area is sufficient to support standing if the plaintiff establishes that he or she uses that area for recreational purposes.'" *Id*. at 1206 (quoting *Chelan Basin Conservancy v. GBI Holding Co.*, 413 P.3d 549, 560-61 (Wash. 2018)); *see also Verdier v. Bost*, 2018 WL 4335626, *4 (W.D. Wash. Sept. 11, 2018); *Collins*, 2021 WL 211301, at *5 (zoo visitor's "distress and anguish" from observing animals in what she believes to be "deplorable conditions" are sufficient "aesthetic and recreational injuries" to be "legally cognizable special injury"). Membership groups can bring public nuisance actions based on special injury to the aesthetic interests of their members. *ALDF*, 387 F. Supp. 3d at 1206-07 (describing *Chelan*'s holding, noting, "[l]ike the plaintiff in that case, ALDF is a public interest organization whose members have been 'specially injured' by Defendants' nuisance").

As shown in subsection D above, ALDF's members suffer harms sufficiently distinct from the general public, which satisfies the "low bar of standing in a public nuisance context." *See ALDF*, 387 F. Supp. 3d at 1207. All five of ALDF's member declarants are animal lovers within the visiting community,[36] who visited OGF on the mistaken belief that OGF was caring well for its captive wild animals. *See* Andrews Decl. ¶¶ 2-4; Bumgardner Decl. ¶ 3; Long Decl. ¶¶ 2-4; C.

[36] Three of ALDF's members live or have lived in Sequim. *See* Bumgardner Decl. ¶ 1; C. McGee Dec. ¶ 1. Four live on the Olympic Peninsula, and the fifth, Michelle Andrews, is in Olympia. *See* Andrews Decl. ¶ 1; Long Decl. ¶ 1. Other visitors—who are part of the community—have long been harmed by observing the inhumane conditions of the animals at OGF. *See, e.g.*, Sensenbach Decl. (area native visited OGF when a college student and "was much more aware of the animals' conditions during the 2019 visits than I was when I went as a child, and I was traumatized by what I observed"); Ex. A at 36:8-25, 45:18-47:25 (former tour guide describing how visitors complained about animals' enclosures and conditions weekly, and how the conditions caused women to cry and men to yell at OGF staff); Ex. E at 212:3-6, 106:13-107:15 (describing visitor concerns and complaints).

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

McGee Decl. ¶¶ 2-3, 8; S. McGee Decl. ¶¶ 2-3, 5. They felt distress and anguish when finding the animals were kept in what they believed to be deplorable conditions. *See, e.g.*, Andrews Decl. ¶¶ 5-11. As a result, they are unable to return to OGF for aesthetic and recreational enjoyment, unless OGF improves its conditions and care for the animals or transfers the animals to sanctuary. *See, e.g.*, *id.* ¶ 14. These harms suffice for ALDF's standing under the *Chelan* framework.

Moreover, OGF's predicate violations of federal and state laws giving rise to the public nuisance cause ALDF's members injuries, and an order to abate the nuisance would redress the injuries. As explained above, OGF impairs ALDF's members' aesthetic interests in ESA-listed species; the federally listed grizzly bears and Canada lynx are also protected by Washington ESA, as are the wolves. *See* WAC 220-610-010. OGF's unlawful possession of them in inhumane conditions and care harm ALDF's members. *E.g.*, Andrews Decl. ¶ 10; Bumgardner Decl. ¶¶ 4-10; Long Decl. ¶¶ 9-13. The same is true for OGF's unlawfully possessed cervids, who gorge on unlimited bread while confined to small, over-grazed, dangerous, and feces-laden conditions in the drive-through. C. McGee Decl. ¶¶ 6-11; S. McGee Decl. ¶¶ 3-7. Further, OGF's possession and breeding of elk and deleterious wildlife, like Sika deer, increases the risk of disease transmission to the wild Roosevelt elk on the Olympic Peninsula—animals in whom ALDF's members have aesthetic and recreational interests, and, for professional nature photographer member Scott McGee, an economic interest. *See id. See also Colo. Div. of Wildlife*, 843 P.2d 662 (unlawful possession of cervids had "potential to impact *both* the agricultural industry and wildlife resources of the state" and was public nuisance to abate) (emphasis in original).

## IV. CONCLUSION.

For the foregoing reasons, ALDF respectfully requests that the Court grant summary judgment and declare that OGF has violated the ESA and is maintaining a public nuisance.

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883

RESPECTFULLY SUBMITTED this 25th day of March, 2021.

SMITH & LOWNEY, PLLC

By: /s/ Claire E. Tonry
Claire E. Tonry, WSBA No. 44497
Attorneys for Plaintiff
2317 East John Street; Seattle, WA 98112
Tel: (206) 860-2883; Fax: (206) 860-4187
Email: Claire@smithandlowney.com

Daniel H. Waltz, WSBA No. 45708
Animal Legal Defense Fund
The Yard, 700 Pennsylvania Ave SE
Washington, DC 20003
Tel: (707) 795-2533; Fax (707) 795-7280
Email: dwaltz@aldf.org

Cristina Kladis, *Pro Hac Vice*
Animal Legal Defense Fund
525 E. Cotati Ave., Cotati, CA 94931
Email: ckladis@aldf.org

*Attorneys for Plaintiff Animal Legal Defense Fund*