1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

ANIMAL LEGAL DEFENSE FUND,

8

Plaintiff,

9

v.

10

OLYMPIC GAME FARM, INC., *et al.*,

11

Defendants.

12

Cause No. C18-6025RSL

ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

13
14
15
16
17
18
19
20
21

This matter comes before the Court on "Defendants' Motion for Summary Judgment."
Dkt. # 126. Plaintiff alleges, among other things, that the owners and operators of an animal-
based attraction on the Olympic Peninsula have violated the federal Endangered Species Act
("ESA") by taking and possessing protected species and have created a public nuisance in
violation of Washington state law. Defendants seek a summary determination that its brown
bears, wolves, and Canada lynx are not listed species for purposes of the ESA, that it has not
harmed, harassed, or possessed any species in violation of the ESA, and that it is not a public
nuisance.

22
23
24
25
26

Summary judgment is appropriate when, viewing the facts in the light most favorable to
the nonmoving party, there is no genuine issue of material fact that would preclude the entry of
judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial
responsibility of informing the district court of the basis for its motion" (*Celotex Corp. v.*

27
28

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 1

*Catrett*, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018). Although the Court must reserve for the trier of fact genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014). In other words, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable fact finder could return a verdict in its favor. *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1071 (9th Cir. 2019).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and taking the evidence in the light most favorable to plaintiff, the Court finds as follows:

**A. Endangered Species Act**

"The Endangered Species Act of 1973 . . . contains a variety of protections designed to save from extinction species that the Secretary of the Interior designates as endangered or

threatened." *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 690, (1995). *See also* 16 U.S.C. § 1533; *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 159-60 (1978). The ESA's citizen suit provision permits "any person" to commence a civil suit to enjoin alleged violations of the ESA or the regulations issued by the Fish and Wildlife Service ("FWS") under the Act's authority. 16 U.S.C. § 1540(g)(1). Defendants argue that plaintiff's ESA claims fail because (1) some of the animals at issue are not designated as endangered or threatened and/or (2) defendants have not harmed, harassed, or possessed any species in violation of the ESA.

### 1. Listed Species

#### a. Grizzly Bears

Defendants argue that its grizzly bears were born outside of the lower 48 states of the United States and therefore do not fall within the relevant listing. The governing regulations list the grizzly bear (*Ursus arctos horribilis*) as threatened in the "U.S.A., conterminous (lower 48) States, except where listed as an experimental population" (50 C.F.R. § 17.11(h)) and provide that "no person shall take any grizzly bear in the 48 conterminous states of the United States" (50 C.F.R. § 17.40(b)(1)(i)(A)). Defendants argue, however, that because the term "grizzly bear" is defined "as any member of the species *Ursus arctos horribilis* **of** the 48 conterminous States of the United States" (50 C.F.R. § 17.40(b)(2)) (emphasis added), the bear at issue and all of its ancestors must have been born in the lower 48 to fall within the listing. This construction of the regulations puts more weight on the word "of" than it can bear and flies in the face of relevant case law.

According to defendants, FWS used the word "of" to define and identify a "distinct

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 3

population segment" ("DPS") of grizzly bears that were not only born in the lower 48, but that were also descended from grizzly bears born in the lower 48. According to defendants, grizzly bears born at Olympic Game Farm are not "of the 48 conterminous States" because one or more of their ancestors haled from Alaska or Canada. This interpretation is unreasonable. When used as a source identifier for a person or animal, "of" generally refers to that person or animal's place of birth or origin, not to the homeland of ancestors. To the extent defendants are arguing that "of" requires that the grizzly be "originally from" or "born in" the lower 48, the interpretation is not unreasonable, but "of" could just as easily mean that the animal was "found or located in" the lower 48. Defendants offer no authority in support of their preferred interpretation, and other regulatory provisions suggest they are incorrect. The actual listing, as set forth above, states simply "U.S.A., conterminous (lower 48) States," and the prohibition on taking uses the phrase "**in** the 48 conterminous states of the United States" (emphasis added). In announcing the listing, the FWS used the words "of" and "in" interchangeably, described the species by reference to the three locations where they were then found in the conterminous States, and sought "to protect any members of the species occurring elsewhere in the 48 conterminous States." Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 Fed. Reg. 31734, 31735 (July 23, 1975). There is no indication that either Congress or FWS intended the choice of preposition to have the significant and substantive impact defendants suggest. Nor is there any indication that FWS studied or made findings that grizzlies located in the lower 48 that were born elsewhere (or that descended from grizzlies that were born elsewhere) "qualify as separate 'species' or otherwise qualify for

separate legal status under the [ESA]." *Safari Club Int'l v. Jewell*, 960 F. Supp.2d 17, 44 (D.D.C. 2013) (quoting 12–Month Findings on Petitions to Delist U.S. Captive Populations of the Scimitar-horned Oryx, Dama Gazelle, and Addax, 78 Fed. Reg. 33,790, 33,797 (June 5, 2013)). The weight of the statutory and regulatory language therefore support an interpretation of "of the 48 conterminous States" to mean "located or found in the 48 conterminous States."

The relevant case law also supports this interpretation. ESA listings based on geographic boundaries have been interpreted to refer to where an animal is found, not where it was born or where its ancestors haled from. The Tenth Circuit has noted "the well-established fact [that] individual animals can and do lose Endangered Species Act protection simply by moving about the landscape." *Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1235 (10th Cir. 2000).

As *amici*, Environmental Defense Fund and others aptly summarize:

> The line dividing protected and unprotected (or differently protected) populations is sometimes an international boundary (*e.g.*, grizzly bears, which south of the US-Canada border are threatened, but north of the border are unlisted [40 Fed. Reg. 31376 (July 28, 1975), codified at 50 C.F.R. § 17.11(h) (1977)]), a state boundary (*e.g.*, brown pelicans, which west of the Mississippi-Alabama state line are listed as endangered, while east of that line are unlisted [50 Fed. Reg. 4938 (Feb. 4, 1985), codified at 50 C.F.R. § 17.11(h) (1997)]), a county boundary (*e.g.*, American alligators which were once listed as endangered everywhere other than in three Louisiana parishes [40 Fed. Reg. 44412 (Sept. 26, 1975)]), a measure of latitude (*e.g.*, bald eagles, which until 1978 were listed as endangered south of 40 degrees north latitude, while those to the north were unlisted [50 C.F.R. § 17.11(i)(1977), revised at 43 Fed. Reg. 6233 (Feb. 14, 1978)]), a point on the coast (*e.g.*, coho salmon, which, if they spawn south of Cape Henry Blanco in Oregon are threatened, but which, if they spawn north of

the cape are unlisted [62 Fed. Reg. 24588 (May 6, 1997)]), a distance from the coastline (*e.g.*, western snowy plovers, which are threatened within 50 miles of the Pacific coast, but unlisted beyond that distance [58 Fed. Reg. 12864 (March 5, 1993)]), or even a point on a river (*e.g.*, least terns, which are endangered along the Mississippi River and its tributaries north of Baton Rouge, but south of Baton Rouge lack any ... protection [50 Fed. Reg. 21784, 21789 (May 28, 1995)]).

Indeed, the protection afforded the gray wolf itself depends on the geographic location (if an "endangered" wolf in Wisconsin crosses the border into Minnesota it becomes "threatened," and therefore has fewer Endangered Species Act protections, 43 Fed. Reg. at 9611-12, codified at 50 C.F.R. § 17.11(h)(1997)).

*Id.*, at 1235 n.4. The Ninth Circuit, when considering a geographically-limited listing for gray wolves, concurred:

[G]ray wolves are protected by the ESA based on where they are found, not where they originate. Canadian gray wolves that migrate into the northern United States, for example, assume protected status when they cross the border. *See* 59 Fed. Reg. at 60,253 (discussing the probable "southern expansion of the Canadian wolf population" into Glacier National Park, where they are classified as endangered); *see also* H.R.Rep. No. 97-567, at 33 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2833 (shifting treatment of protected status depending on seasonal movement patterns); *Ramsey v. Kantor*, 96 F.3d 434, 438 (9th Cir. 1996) (shifting "legal regimes" for protected salmon through the course of their migration). Therefore, the wolves transported from Canada were members of "any population ... of an endangered species or a threatened species" as soon as they entered the United States.

*U.S. v. McKittrick*, 142 F.3d 1170, 1173-74 (9th Cir. 1998).[1]

For purposes of the grizzly bear listing, the Court finds that "of" means "located or found in."[2] Donald, Moxie, and the grizzly bears born at the Olympic Game Farm are therefore protected from "taking" because they are located and found in the lower 48 states of the United States.[3]

### b. Gray Wolves

While this motion was pending, FWS' final rule removing the gray wolf (*Canis lupus*) from the endangered or threatened species list was vacated. Dkt. # 226 at 3-28 (*Defenders of Wildlife v. U.S. Fish and Wildlife Serv.*, C21-0344JSW (N.D. Cal. Feb. 10, 2022)). Defendants' jurisdictional argument is therefore unavailing, and the Court rejects defendants' place-of-origin argument for the reasons set forth above.

Defendants also assert that the gray wolves at Olympic Game Farms are hybrids, having crossed with domestic dogs at some undisclosed point in the past, and are therefore not protected under the ESA. Defendants' factual assertion is based on (a) transfer records related to Seth,

---

[1] As a practical matter, this interpretation of the relevant regulatory provisions makes sense given the goals of the ESA. If the grizzly population in the lower 48 has dropped to such an extent that the species is threatened or endangered in that geographic area, any grizzly found within the specified area could play a role in the species' survival or rehabilitation. Allowing hunters to shoot and kill a grizzly in Montana simply because it was born in Canada would not further the protective goals of the statute.

[2] Because the birth place of the bears is irrelevant to the ESA analysis, the Court need not resolve plaintiff's objection to Robert Beebe's assertion that the brown bears are Kodiaks.

[3] Plaintiff has stipulated that Miska, Yuri, Tug, and Bella are not protected by the ESA.

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 7

Sam, Tonka, and Gracie (Dkt. # 136 at 50-56) and (b) expert testimony that Brutus, Jacob,[4] Seth, and Sam "are hybrid individuals (wolf-dog hybrids)" and that Tonka and Gracie "have little or no hybridization with dogs . . ." Dkt. 128 at 9 and 21). There is no indication that any of the wolves had a parent, grandparent, or even great-grandparent that was a dog. The transfer records show that Seth, Sam, Tonka, and Gracie were all "High Content Wolfdogs," and they were clearly purchased by Olympic Game Farm to display as wolves, not as dogs or hybrids. The most defendants' expert can say is that the Olympic Game Farm wolves "may have some level of domestic dog ancestry" (Dkt. # 128 at 21): the genome sequencing and principal component analysis she performed suggests that the Olympic Game Farm wolves are most closely related to wolves from Nunavut and Yellowstone (Dkt. # 128 at 21-23).

Defendants and their expert are using the term "hybrid" to mean a mixture of two distinct genomes, regardless how far back in the past the actual event of hybridization occurred. However, "[t]he most common definition in the field of population genetics for 'hybrid' is an individual who is a 50-50 first generation cross." Dkt. # 150 at 6; *see also U.S. v. Kapp*, 419 F.3d 666, 672 (7th Cir. 2005) ("Neither the ESA nor the regulations . . . refer specifically to hybrids, which are crosses between listed and unlisted animals."). While courts have been willing to entertain the idea that a second generation individual (*i.e.*, the offspring of a wolf and a 50-50 first generation cross) is a hybrid that is not protected by the ESA (*see Animal Legal Defense Fund v. Fur-Ever Wild*, No. C17-4496JNE-HB (D. Minn. June 13, 2019) (Hearing

---

[4] Jacob is the full sibling of Brutus and the remaining gray wolves at Olympic Game Farm, namely Leah, Angie, Lily, Coco, and Ginger.

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 8

Transcript at Dkt. # 147-17); *Kuehl v. Sellner*, 161 F. Supp.3d 678, 689 (N.D. Iowa 2016)), there is no support in the ESA, its legislative history, the implementing regulations, or case law for defendants' contention that a negligible amount of non-wolf genetic material from a distant ancestor excludes an individual from the protections of the statute. If defendants were correct, an animal's status under the ESA could never be determined without a DNA analysis, and a significant number, if not the vast majority, of organisms that are currently considered endangered or threatened would lose their protection. The Court declines to adopt a definition of "hybrid" that upends decades of regulatory and judicial enforcement of the act. Based on the existing facts, the wolves at Olympic Game Farm are protected under the ESA.

### c. Canada Lynx

Canada lynx are listed as threatened and protected by the ESA when found within the lower 48 states of the United States. 50 C.F.R. § 17.11(h). It is undisputed that Olympic Game Farm's lynx, Purrsia, is a Canada lynx. Defendants assert, however, that Purrsia was born in captivity and is therefore excepted from the "take" protections of the ESA. *See* 50 C.F.R. § 17.40(k)(4)(i) ("You may take lawfully obtained captive lynx without a permit."). In support of this assertion, defendants offer the declaration of Robert Beebe, the owner and president of Olympic Game Farm, to show that Purrsia was obtained from Cindy Price of Belfair, Washington, who, in turn, acquired the lynx from Bitterroot Bobcat & Lynx in Stevensville, Montana, where she was born in captivity. Dkt. # 135 at ¶ 22. Exhibit N to the Beebe declaration is a Montana Certificate of Interstate Movement showing that a 3-week old female lynx was transferred from Stevensville to Belfair. The certification of health was signed on May 26, 2010.

Exhibit M is a U.S. Department of Agriculture ("USDA") record of transport dated June 3, 2010, indicating that Chris Price received a 1 pound female kitten born on May 14, 2010, from Bitterroot Bobcat & Lynx/Barbara Roe. Exhibit L is a delivery receipt signed by Robert Beebe on August 19, 2010, indicating that Olympic Game Farm had received a 20 pound female Canada lynx from Cindy Price.

Plaintiff objects to consideration of this evidence, arguing that Robert Beebe has no personal knowledge of the circumstances of Purrsia's birth and that Exhibits M and N are inadmissible hearsay and have not been properly authenticated. In response, defendants argue that it is plaintiff's burden to affirmatively prove that Purrsia was born in the wild, so the inadmissibility of the evidence offered by defendants is irrelevant. In the American legal system, "the ordinary default rule [is] that plaintiffs bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (citing 2 J. Strong, McCormick on Evidence § 337, p. 412 (5th ed. 1999) ("The burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion"); C. Mueller & L. Kirkpatrick, Evidence § 3.1, p. 104 (3d ed. 2003) ("Perhaps the broadest and most accepted idea is that the person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims")). In the context of a statutory claim where Congress has not specified the party that bears the burden of proof, courts usually assume without much analysis that plaintiffs bear the burden of persuasion regarding the essential aspects of their claims unless a contrary statutory purpose is

apparent. *Id.*, at 57; *Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 378 (1st Cir. 2018) (citing *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009)). If an element of a claim is fairly characterized as an affirmative defense or exemption, however, the burden of persuasion may be shifted to defendants, especially where the defendants have better access to evidence and are in the best position to show that the defense or exemption applies. *Schaffer*, 546 U.S. at 57 (citing *Fed. Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37-44-45 (1948)); *Irobe*, 890 F.3d at 378. When the burden has shifted, the non-moving party must show that there are genuine issues of material fact as to whether an exception or defense to statutory liability applies to avoid summary judgment, but the party asserting the exception or defense would have the ultimate burden of establishing that it applies at trial. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153, (1989) (Freedom of Information Act case); *Green v. U.S.*, 630 F.3d 1245, 1248-49 (9th Cir. 2011) (Federal Tort Claims Act case).

The issue, then, is whether the "captive lynx" provision defines the scope of the ESA protections plaintiff seeks to enforce or is an affirmative defense or exception to liability. FWS has determined that Canada lynx in the contiguous United States are threatened wherever found. 50 C.F.R. § 17.11(k). The form and extent of the protection provided to Canada lynx under the ESA is set forth in the special rules for mammals at 50 C.F.R. § 17.40(k) and varies depending on whether the lynx is wild or captive. Wild lynx are entitled to the full panoply of the prohibitions and provisions of 50 C.F.R. § 17.31 and § 17.32, including the prohibition against taking without a permit. 50 C.F.R. § 17.40(k)(2). A captive Canada lynx, on the other hand, is generally not protected from taking under the ESA as long as it was lawfully obtained. 50 C.F.R.

§ 17.40(k)(4). FWS reasoned that "captive-bred specimens have neither a positive nor negative effect on the species in the wild" and chose to rely on an international treaty for the regulation of trade for captive lynx rather than the ESA itself. Determination of Threatened Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related Rule, 65 FR 16052-01, 16084 (Mar. 24, 2000). Thus, proof that an animal is a Canada lynx is insufficient to identify the protections to which the animal is entitled. Because the regulatory scheme does not create a presumption that a particular animal is wild or captive, plaintiff must make that showing before it can establish that an ESA violation has occurred. Plaintiff has failed to offer any evidence that Purrsia was born in the wild or otherwise falls outside of the definition of a captive lynx.[5]

Plaintiff argues that, even if Purrsia is a "captive lynx," the ESA incorporates "applicable State and tribal laws and regulations," making a "[v]iolation of State or tribal law . . . a violation of the Act." 50 C.F.R. § 17.40(k)(5) (responding to the question "[a]re any activities not allowed or restricted for captive lynx?"). Plaintiff's claim that defendants have violated Washington's animal cruelty laws with regards to Purrsia is discussed below in Section C. Defendants argument that the reference to "State or tribal law" in subsection (5) refers to the transportation and shipping regulations mentioned in subsection (4)(iii) is unpersuasive. The subsection (5) reference is limited only by the term "applicable," and the fact that subsection (4)(iii) deals with issues of interstate commerce has no bearing on the scope of subsection (5)'s command that one

---

[5] In light of this ruling, the Court need not determine whether paragraph 22 and/or Exhibits M and N to the Beebe declaration are admissible.

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 12

comply with "applicable State and tribal laws and regulations" when handling captive lynx. Thus, to the extent plaintiff's state law claim regarding Purrsia survives, the ESA claim would likewise survive.

### 2. "Take" of Protected Animals

The term "take" is defined in the ESA as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The terms "harm" and "harass" are relevant here. The term "harm" is defined as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F. R. § 17.3. The term "harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. This definition, when applied to captive wildlife, does not include generally accepted:

> (1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act,
>
> (2) Breeding procedures, or
>
> (3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.

50 C.F.R. § 17.3. The term "harass" has "a different character when applied to an animal in

captivity than when applied to an animal in the wild." *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F. Supp.3d 1327, 1350 (S.D. Fla. 2016). The regulatory definition of "harass" is intended "to exclude proper animal husbandry practices that are not likely to result in injury from the prohibition against "take." Captive-bred Wildlife Regulation, 63 FR 48634-02, 48636 (Sept. 11, 1998).[6]

### a. Grizzly Bears

Plaintiff asserts that defendants have harmed and harassed its grizzly bears "by, among other things, (1) housing them in muddy cheatgrass-infested pens and then failing to provide

---

[6] FWS reasoned that the purposes of the ESA are "best served by conserving species in the wild along with their ecosystems." Captive animals, the FWS noted, are "removed from their natural ecosystems and have a role in survival of the species only to the extent that they maintain genetic integrity." *Id.*

It is true that the Act applies to all specimens that comprise a "species" (as defined in the Act) that has been listed as endangered or threatened, and in general does not distinguish between wild and captive specimens thereof. However, the definition of "take" in the Act clearly applies to individual specimens or groups of specimens, and the captive or non-captive status of a particular specimen is a significant factor in determining whether particular actions would "harass" that specimen or whether such actions would "enhance the propagation or survival" of the species.

To decide otherwise would place those persons holding captive specimens of a listed species in an untenable position. If providing for the maintenance and veterinary care of a live animal were considered to be "harassment", those persons holding such specimens in captivity would be forced to obtain a permit or give up possession since any failure to provide proper care and maintenance would be an unlawful "taking". Since Congress chose not to prohibit the mere possession of lawfully-taken listed species in section 9(a)(1) of the Act, the Service believes that congressional intent supports the proposition that measures necessary for the proper care and maintenance of listed wildlife in captivity do not constitute "harassment" or "taking".

*Id.*

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 14

them with adequate vet care for their grossly infected cheatgrass wounds; (2) withholding

regular meals and pain medication for severe arthritis in favor of tourists feeding the bears

excessive amounts of bread, which only compounds their obesity and joint pain and

inflammation; and (3) anesthetizing bears without a vet present and without critical monitoring

and support." Dkt. # 192 at 9. Defendants argue that the Court lacks jurisdiction over the

cheatgrass, veterinary/medical care, and anesthesia claims because plaintiff failed to give written

notice of these violations. Defendants argue that the sole remaining claim regarding the feeding

of bread fails because the practice does not violate the Animal Welfare Act ("AWA"), 7 U.S.C.

§ 2131, *et seq*. Although the jurisdictional argument was not raised in defendants' motion, it was

asserted in opposition to plaintiff's motion for summary judgment, and plaintiffs have had an

opportunity to reply. The Court therefore considers the issue here.

The ESA requires citizen-plaintiffs to provide notice of a violation at least sixty days

prior to filing suit. 16 U.S.C. § 1540(g)(2)(A)(i). The Ninth Circuit has identified two purposes

for the notice provision: it gives the government a chance to take responsibility for enforcing the

applicable statute, and it gives the alleged violator a chance to bring itself into compliance.

*Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 650 (9th Cir. 2015). In order to

fulfill these purposes, the notice must, "[a]t a minimum ... provide sufficient information ... so

that the [notified parties] could identify and attempt to abate the violation." *Sw. Ctr. for*

*Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998). Although

the notice need not list every detail, instance, or aspect of a violation (*Cmty. Ass'n for*

*Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002)), an

examination of the notice as a whole (*Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996)) along with the behavior of the recipients (*Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 997 (9th Cir. 2000)) must show that the notice provided enough information that the defendant could "identify and address the alleged violations, considering the defendant's superior access to information about its own activities" (*Klamath-Siskiyou Wildlands Ctr.,* 797 F.3d at 651).

Plaintiff's notice letter, dated September 27, 2018, includes a general allegation that defendants "are violating the ESA's prohibition against 'take' of members of listed endangered and threatened species by harming and/or harassing numerous animals at the Game Farm." Dkt. # 148-9 at 2. That allegation, standing alone, is clearly insufficient. See *Klamath-Siskiyou Wildlands Ctr.,* 797 F.3d at 653. More specifically, plaintiff asserts that:

- protected species are kept in cramped and squalid conditions and are deprived of psychological and social enrichment;

- brown bears are given unrestricted access to bread, an improper food source;

- the manner in which brown bears are fed lacks challenge, leaving the bears purposeless;

- the small, barren enclosures in which brown bears are housed frustrate the bears' natural behaviors, are unprotected from the heat, and cause stress; and

- a brown bear had a 5" gash below its shoulder blade and perpendicular to its spine in September 2018.

Dkt. # 148-9 at 3, 10-11. There is no mention of cheatgrass or related wounds, the withholding

of meals or medications, or improper anesthetizations. The allegations regarding the size and barrenness of the bears' enclosures would not, as plaintiff would have it, provide adequate notice that the enclosures have too much of something, such as cheatgrass. Similarly, a description of a wound that appears to be wholly unrelated to cheatgrass does not give notice of a claim of infected cheatgrass wounds (or even of a general failure to provide veterinary care). *Id.* Defendants could not, based on the notice letter, reasonably be expected to anticipate most of the violations that are now being claimed. The one exception is the bread-feeding allegation. The notice clearly identifies bread as an improper food source for brown bears and alleges on-going, unrestricted, and regular feedings of bread. The Court therefore has jurisdiction to hear that claim.

Defendants argue that they are entitled to summary judgment on the bread-feeding claim because the practice satisfies the general standards for humane care and treatment that must be provided for animals exhibited to the public under the AWA. The argument is premised on an incorrect legal analysis. Defendants seek to convert an agency finding of compliance with one statute into a determination that there is no ESA liability. But in order to fall within the first "captive wildlife" exclusion in the definition of "harass," the ESA requires both AWA compliance and that the animal husbandry practices be "generally accepted." *See Hill v. Coggins*, 867 F.3d 499, 509-10 (4th Cir. 2017). While an agency determination that a laboratory, zoo, or pet owner is in compliance with the AWA is certainly evidence that the challenged animal husbandry practice is generally accepted and "meet[s] or exceed[s] the minimum standards for facilities and care under the [AWA]" (50 C.F.R. § 17.3), the court must

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 17

independently evaluate the animal husbandry practices for purposes of an ESA claim when

conflicting evidence is presented (*Graham v. San Antonio Zoological Society*, 261 F. Supp.3d

711, 743-44 (W.D. Tex. 2017)).[7]

It is plaintiff's burden to show that the AWA's minimum standards were not met and/or

that defendants' conduct did not fall within generally accepted animal husbandry practices. *Hill*,

867 F.3d at 510; *Graham*, 261 F. Supp.3d at 741. When offering a standard other than the AWA

against which defendants' conduct is to be measured, plaintiff must show that it has been

"generally accepted," meaning that it applies to the care or facilities at issue and that it has been

widely adopted and accepted. *See Hill*, 423 F. Supp.3d at 221 (following remand from the Fourth

Circuit).

Defendants assert that their bears "are fed a species appropriate diet - comprised mainly

of meat, grains, fruit, and berries - that is approved by Olympic Game Farm's attending

veterinarians and meets the requirements of the Animal Welfare Act." Dkt. # 126 at 21. There

are factual disputes regarding virtually all of these assertions. First, there is evidence that bread

comprised a substantial portion of the calories given the bears during the tourist season, to the

point that other meals were curtailed. Second, there is evidence that the veterinarians did not

---

[7] Defendants cite two district court decisions for the proposition that a judicial determination of whether they complied with the ESA is unconstitutional and would substitute the judgment of a federal court for the technical expertise of the responsible agency. Dkt. # 126 at 20 n.103. The decision out of the Western District of North Carolina, while noting constitutional vagueness concerns, was ultimately able to interpret and apply the "generally accepted" standard in keeping with the Fourth Circuit's direction and constitutional requirements. *Hill v. Coggins*, 423 F. Supp.3d 209, 219-21 (W.D.N.C. 2019). The Court finds that the decision in *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F. Supp.3d 1327 (S.D. Fla. 2016), is unpersuasive for the reasons stated in *Graham*, 261 F. Supp.3d at 741-43.

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 18

know how much bread the bears were eating and therefore could not have approved a diet of which they were ignorant. Finally, there is evidence that the practice was not acceptable under the AWA, even if there were no specific regulatory prohibitions. Plaintiff offers the USDA inspector's 2014 report which "strongly advised" defendants to immediately begin "a gradual transition to a more species appropriate snack," suggesting vegetables, grain, or forage in place of the bread. Dkt. # 148-38 at 3. Although there was no regulatory standard to cite, the practice was clearly not acceptable to the inspector. One of plaintiff's veterinarian experts explains that feeding bears unrestricted amounts of bread (*i.e.*, rapidly digestible starch) "contributes to insulin resistance, obesity, diabetes, and arthritis due to its pro-inflammatory properties." Dkt. # 159 at ¶ 62. Obesity, Dr. Harrenstien further opines, aggravates arthritis and contributes to cardiovascular stress, and the heavy reliance on bread as a food source during the tourist season reduces the opportunities for administering medications for these conditions *Id*. at ¶¶ 62 and 78.[8] Relying solely on the fact that no AWA citation was issued regarding the feeding of bread, defendants offer no rebuttal to this evidence. In the context presented here, plaintiff has raised an inference that feeding unrestricted bread to bears (especially if, in fact, the feeding was used to reduce the animals' daily dietary provisions and interfered with their recommended medication schedules) is neither generally accepted nor AWA compliant.

### b. Wolves

With regards to the Olympic Game Farm wolves, defendants assert that "[t]he enclosures,

---

[8] Defendants object to Dr. Harrenstien's opinions regarding the effects of a bread-based diet as duplicative of opinions offered by Dr. Johnson. Dkt. # 142 at 20. The objection is overruled.

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 19

shelters, care, and living conditions provided to the wolf-dog hybrids meet or exceed the requirements of the Animal Welfare Act." Dkt. # 126 at 21. As discussed above, however, compliance with the AWA does not foreclose the possibility of an ESA violation. Defendants have not, therefore, shown that they are entitled to judgment as a matter of law with regards to the wolf-related ESA claim.

### c. Lions

Plaintiff alleges that the Olympic Game Farm lions are (a) kept in enclosures that are only 20% of the minimum size generally accepted by zoo professionals and lion experts and are too cold and too hard to stave off obesity and arthritis, (b) deprived of treatment for their joint disease, and (3) subjected to unsafe food preparation and feeding practices. Dkt. # 192 at 15-16. Of these complaints, the 60-day notice letter mentions only the size and temperature of the enclosures. Dkt. # 148-9 at 6-7. The Court therefore lacks jurisdiction over the other claims.

With regards to the size and temperature of the lion enclosure, there is no evidence that defendants violated the minimum standards for facilities under the AWA. Plaintiff must therefore identify a relevant "generally accepted" standard with which defendants arguably failed to comply. It has not done so. Plaintiff relies solely on the Association of Zoos and Aquariums ("AZA") Lion Species Survival Plan to establish a size standard of 10,000 square feet for lion enclosures and a supplemental heat requirement whenever temperatures drop below 50° F. Dkt. # 148-9 at 6-7; Dkt. # 195 at ¶ 9. Plaintiff does not, however, assert or attempt to show that an organization with the stated goal of promoting its accreditation "as the standard of excellence in the zoo and aquarium profession" (https://www.aza.org/strategic-plan) has instead

set forth a plan that is "generally accepted." As described in *Hills v. Coggins* on remand, the AZA is an elite, voluntary, zoological association: less than 10% of USDA-licensed exhibitors are accredited by the organization. Plaintiff does "not explain how standards that are met by so small a minority of exhibitors" and which are represented to be the standard of excellence to which zoos and aquariums should aspire reflect "generally accepted" animal husbandry practices. 423 F. Supp.3d at 222. Plaintiff has not raised a genuine issue of material fact regarding the size and temperature of the lion enclosure for purposes of the ESA.[9]

### d. Tigers

Plaintiff asserts that defendants failed to provide adequate veterinary care to their tigers as required by 9 C.F.R. § 2.40, foregoing annual and semi-annual examinations, delaying or failing to report symptoms, relying on veterinarians with limited experience with tigers, failing to perform diagnostic tests, refusing to follow treatment recommendations, anesthetizing cats without veterinarian supervision, and shooting (rather than euthanizing) one of its cats. Plaintiff also asserts that the tiger enclosures are small and barren, that the concrete floors exacerbate joint problems in the big cats, that the tigers are fed donated horse and cow carcasses, and that

---

[9] Plaintiff has not offered a separate analysis showing that defendants "harmed" the captive lions. As discussed in the text, the term "harm" is defined as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding and sheltering." 50 C.F. R. § 17.3. While it is possible for a zoo to "harm" its animals even if it has not "harassed" them, *Graham*, 261 F. Supp.3d at 746, FWS has stated "that measures necessary for the proper care and maintenance of listed wildlife in captivity do not constitute "harassment" *or "taking."* Captive-bred Wildlife Regulation, 63 FR 48634-02, 48636 (Sept. 11, 1998) (emphasis added). Having failed to make a separate argument regarding "harm," the Court will not guess at what plaintiff's arguments might be in this respect.

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 21

defendants failed to provide adequate claw care (resulting in the claws growing into the foot pad and causing injury upon removal). Dkt. # 160 at 9-15. Of these complaints, the 60-day notice letter mentions the size and lack of complexity of the enclosures, lameness attributable to and exacerbated by inadequate flooring, and the failure to provide adequate care for a tiger, Amadeus, as he failed and ultimately died. Dkt. # 148-9 at 8-9. The Court finds that, given defendants' better information regarding its care and treatment of Amadeus and the other cats, the last allegation put defendants on notice that plaintiff was challenging the adequacy of the veterinary care provided to tigers suffering from kidney disease. Dkt. # 160 at 9-10. The Court lacks jurisdiction, however, over the feeding-of-carcasses claim and other lack of care allegations.

Plaintiff has raised a genuine issue of fact regarding whether the veterinary care provided to tigers suffering renal disease meets or exceeds the minimum standards for facilities and care under the AWA. The relevant standards require, among other things, that an exhibitor of animals "have an attending veterinarian who shall provide adequate veterinary care to its animals" and conduct regularly scheduled visits, give the veterinarian appropriate authority to provide necessary care, use appropriate prevention, diagnostic, and treatment methods, and timely and accurately report information to the veterinarian. 9 C.F.R. § 2.40. Plaintiff has provided evidence from which one could reasonably infer that defendants failed to satisfy these standards by, *inter alia*, failing to report known symptoms of kidney disease and failing to follow veterinarian recommendations. This aspect of the ESA claim may therefore proceed.

With regards to the claims related to the size, construction, and barrenness of the tiger

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 22

enclosure, plaintiff relies solely on the AZA Tiger Species Survival Plan to establish the minimum acceptable requirements regarding square footage, materials, and occupational interest of the facilities. For the reasons stated above in Section A.2.c., plaintiff has failed to show that the AZA's standards of excellence, which have been adopted by a small minority of exhibitors, reflect "generally accepted" animal husbandry practices. Defendants are entitled to summary judgment on these claims.

### 3. "Possess" Protected Animals

The ESA prohibits the "tak[ing]" of any endangered or threatened species, and makes it unlawful to possess any endangered or threatened species that has been unlawfully "taken" 16 U.S.C. § 1538(a)(1)(B) and (D). Defendants' motion for summary judgment on this claim presupposes a summary determination that they have not "taken" a protected species in violation of the ESA. As discussed elsewhere in this Order, plaintiff has raised a triable issue of fact regarding whether the feeding of unrestricted bread to bears, its housing and care of wolves, the failure to provide adequate veterinarian care to tigers suffering from renal disease, and/or the failure to provide timely and adequate care for Purrsia's broken femur constitutes a "taking." Defendants are not entitled to summary judgment regarding possession for those claims.

## B. Public Nuisance

Washington's nuisance law has been codified at RCW 7.48, *et. seq.*, and provides that a nuisance constitutes "unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render

dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property." RCW § 7.48.120. "A public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." RCW § 7.48.130. "A private person may maintain a civil action for a public nuisance, if it is specially injurious to himself or herself but not otherwise." RCW § 7.48.210.

Plaintiff argues that defendants' violations of the ESA, Washington's ESA, and/or Washington's cervid laws "supply a predicate for a public nuisance action." Dkt. # 192 at 19 (quoting *Animal Legal Defense Fund v. Olympic Game Farm, Inc.*, 387 F. Supp.3d 1202, 1207 (W.D. Wash. 2019) ("*ALDF I*") (Judge Leighton's order denying defendants' motion to dismiss the public nuisance claim)). In essence, plaintiff is arguing either that the conduct of a business in violation of governing laws and regulations is a nuisance per se or that the violation of animal protection laws is a public nuisance because it interferes with public morals. There are cases from other jurisdictions that might support such claims. *See, e.g., Animal Legal Defense Fund v. Special Memories Zoo LLC*, No. 20-C-216, 2021 WL 101121, at *1-2 (E.D. Wis. Jan. 12, 2021) (in light of defendants' default, "the Court hereby finds that the defendants did violate the ESA and that the operation of the zoo constituted a nuisance"); *Collins v. Tri-State Zoological Park of W. Md.*, 514 F. Supp.3d 773, 780 (D. Md. 2021) ("Maryland has historically recognized a public nuisance claim where a defendant's business operations involve dereliction of public morals."); *Penn. Soc'y for Prevention of Cruelty to Animals v. Bravo Enters. Inc.*, 237 A.2d 342, 348 (Pa. 1968) (("A legislative proscription, such as that found in the cruelty to animals statute, is

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 24

declarative of the public policy and is tantamount to calling the proscribed matter prejudicial to the interests of the public. Injury to the public is the essence of public nuisance. Therefore, [defendant's] activities are properly enjoinable as being contrary to law and prejudicial to the interests of the public.") (internal citation omitted). None of these cases applies Washington law, however, and plaintiff has not attempted to show that RCW 7.48, *et seq*., has been or could be stretched so far as to make the conduct of which they complain a public nuisance.

The Washington law cited by plaintiff relates almost exclusively to violations of environmental laws involving the discharge of pollutants into waterways. Such conduct has long been considered a nuisance in Washington, *see Miotke v. City of Spokane*, 101 Wn.2d 307, 329 (1984) (discharge of raw sewage into a river) and *Tiegs v. Boise Cascade Corp*., 83 Wn. App. 411, 416 (1996) (release of pollutants into an aquifer), and RCW § 7.48.140(2) makes clear that "to corrupt or render unwholesome or impure the water of any . . .  spring, stream, pond, lake, or well, to the injury or prejudice of others" is a public nuisance. Other types of conduct that the legislature deems a public nuisance includes the placement of dead animals "in any place to the prejudice of others," the obstruction of waterways, roads, or public transportation, the manufacture or storage of explosives "within fifty rods" of another building, the conduct of a business that emits offensive smells or is otherwise dangerous to public health, the use of premises for the illegal sale of wine, beer, or liquor, and the failure to cover or fence off holes that are at least ten inches wide at the top and at least four feet in depth (unless the hole is open and obvious). RCW § 7.48.140. All of the conduct that the legislature has identified as a public nuisance adversely impacts land, the use and enjoyment of property, or public health and safety.

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 25

"Although Washington courts have allowed other actions or inactions to form the basis of a public nuisance claim, this enumerated list is instructive because it confirms the legislature was conforming public nuisance to accepted and known public threats." *ALDF I*, 387 F. Supp.3d at 1205. *See Kitsap County v. Kev, Inc.*, 106 Wn.2d 135, 139-40 (1986) (finding that "[a]lmost daily violations of controlled substances and prostitution laws" interferes with the comfort, repose, health, and safety of the neighborhood and was a public nuisance); *Kitsap County v. Kitsap Rifle & Revolver Club*, 184 Wn. App. 252 (2014) (affirming trial court's finding that the operation of a shooting range near residential neighborhoods substantially and unreasonably interfered with the neighbors' use and enjoyment of their properties and were therefore a public nuisance). It is undoubtedly true that conduct that violates a statute or regulation may constitute a public nuisance, but merely establishing such a violation is rarely enough. RCW § 7.48.140(6) and (8) specify two types of unlawful activity that are deemed a public nuisance - establishing a gun powder magazine at a place other than that designated by the governing municipal authorities and maintaining a place where intoxicating beverages are sold in contravention of the law. By negative implication, other statutory or regulatory violations are public nuisances only if they fall within the traditional concepts of nuisance law.

Washington cases consistently evaluate a claim of nuisance by determining whether the conduct interferes with the use and enjoyment of property or creates a public hazard. *See Tiegs v. Watts*, 135 Wn.2d 1, 13 (1998) ("An actionable nuisance must either injure the property or unreasonably interfere with enjoyment of the property."); *Grundy v. Thurston County*, 155 Wn.2d 1, 6 (2005) (a nuisance is "a substantial and unreasonable interference with the use and

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 26

enjoyment of land"); *Puget Sound Traction, Light & Power Co. v. Grassmeyer*, 102 Wash. 482, 490 (1918) ("This franchise is property, and any unlawful interference therewith is actionable.");

*Kitsap Rifle & Revolver Club*, 184 Wn. App. at 279 ("A nuisance exists if there has been a substantial and unreasonable interference with the use and enjoyment of property.") *See also* RCW § 7.48.010 ("[W]hatever is injurious to health or indecent or offensive to the senses . . . so as to essentially interfere with the comfortable enjoyment of the life and property, is a nuisance"). "In so far as a general rule can be formulated, the enjoyment of one's premises must be sensibly diminished, either by actual tangible injury to the property itself, or by the promotion of such physical discomforts as detract sensibly from the ordinary enjoyment of life." *Crawford v. Cent. Steam Laundry*, 78 Wash. 355, 357 (1914). While there is language in *Kitsap County v. Kev, Inc.*, 106 Wn.2d at 139, that suggests that mere operation of a business in violation of a law that regulates or prohibits the conduct is a nuisance per se, the case on which the Supreme Court relied for that proposition, *King County ex rel. Sowers v. Chisolm*, 33 Wn. App. 809 (1983), did not involve a nuisance claim. Rather, the ordinance that was violated in *Chisolm* specifically authorized injunctive relief to remedy violations, "indicat[ing] a decision by the legislative body that the regulated behavior warrants enjoining, and that the violation itself is an injury to the community." *Id.* at 818-19. The Washington Supreme Court has since clarified that simply showing that the challenged conduct is unlawful does not establish a nuisance per se. Despite the "expansive definition" of nuisance in RCW § 7.48.120 that refers to "unlawfully doing an act," the court noted that an activity is generally considered a nuisance "only when it 'interferes unreasonably with other persons' use and enjoyment of their property.'" *Id.* at 155 (quoting

*Tiegs v. Watts*, 135 Wn.2d 1, 13 (1998)). Although there is a wide range of landowner conduct that could run afoul of state or local law, where neither the legislature nor the courts has seen fit to declare the conduct to be a nuisance per se, "it will be considered a nuisance as a matter of law only if that conduct interfere with others' use and enjoyment of their lands." *Tiegs v. Boise Cascase Corp.*, 83 Wn. App. 411, 418 (1996) (quoting 8 Thompson on Real Property, Thomas Edition § 67.03(a)(1), at 94-95 (David A. Thomas ed., 1994)).

In the case before the Court, there is no indication that Olympic Game Farm's operations impair or threaten "the comfort, repose, health or safety of others . . . or in any way renders other persons insecure in life, or in the use of property." RCW § 7.48.120. Nor has plaintiff made any effort to establish a moral nuisance, which under Washington law generally requires the exhibition of lewd performances or the use of property for prostitution, illegal gambling, or the manufacture, distribution, or ingestion of controlled substances. *See* RCW § 7.48.052. Plaintiff has accused defendants of serious statutory violations, but they are entirely unrelated to plaintiff's use and enjoyment of property or to public health or safety. Absent some injury that falls within Washington's nuisance laws, the public nuisance claim fails.

**C. Washington's Animal Cruelty Laws**

For purposes of this motion, the Court is concerned only with whether plaintiff's have raised a genuine issue of material fact regarding defendant's alleged violation of state animal cruelty laws with regards to the Canada lynx. *See* Section A.1.c. Plaintiff asserts that defendants violated state law – and therefore the ESA – with regards to Purrsia by "knowingly, recklessly, or with criminal negligence inflict[ing] unnecessary suffering or pain upon an animal" and/or

"knowingly, recklessly, or with criminal negligence . . . fail[ing] to provide the animal with necessary . . . medical attention and the animal suffers unnecessary or unjustifiable physical pain as a result of the failure . . . ." RCW § 16.52.207(1)(a) and (2)(a). Plaintiff has offered evidence that, on September 7, 2016, Purrsia was anesthetized in order to treat an abscess on the cheek. During that process, Purrsia's femoral (thigh) bone fractured and the injury had to be surgically repaired. Dkt. # 195 at ¶ 16. "Two weeks later, the bone pin used to stabilize the fracture was coming out of the skin and the fracture site was infected with obvious pus." Dkt. # 195 at ¶ 17. Plaintiff's expert opines that these complications were the result of (i) the choice of an inappropriate type of internal fixation (a single bone pin with an external splint), (ii) the failure to follow aseptic technique during surgery, and (iii) the failure to perform appropriate postoperative monitoring. *Id*. At some point, an orthopedic surgeon recommended proceeding with a second surgery to give better stability to the fracture: the surgery occurred three weeks after the recommendation was made.[10] *Id.* at ¶ 18. During the period in which Purrsia's bone was fractured, the animal was likely in extreme pain. During the healing process, Purrsia's movements and behaviors would have been restricted. *Id.* Dr. Harrenstien opines that "[t]he treatment provided for the lynx was insufficient and resulted in unnecessary suffering. *Id.*

Defendants, relying solely on their argument that the only state and tribal laws that matter are those related to transportation, offer no alternative analysis of RCW § 16.52.207 or facts regarding the delay in providing medical attention for Purrsia's infected femur. Although it is

---

[10] This interpretation of the evidence is not without doubt. Dr. Harrenstein states that "it was over three weeks before the second surgery occurred," but it is not clear when the three-week period began.

not clear that mere negligence in providing veterinary care violates Washington's animal cruelty laws, in the absence of any countervailing argument or facts, plaintiff has raised a triable issue of fact regarding this claim.

For all of the forgoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff has raised a triable issue of fact regarding whether the feeding of unrestricted bread to bears, the housing and care of wolves, the failure to provide adequate veterinarian care to tigers for renal disease, and/or the failure to provide timely and adequate care for Purrsia's broken femur violates the ESA. All other aspects of plaintiff's ESA claims and the public nuisance claim are DISMISSED.

Dated this 8th day of March, 2022.

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 30