UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANIMAL LEGAL DEFENSE FUND,

  Plaintiff,

  v.

OLYMPIC GAME FARM, INC., *et al.*,

  Defendants.

Cause No. C18-6025RSL

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on "Plaintiff's Motion for Partial Summary Judgment." Dkt. # 160.[1] Plaintiff alleges, among other things, that the owners and operators of an animal-based attraction on the Olympic Peninsula have violated the federal Endangered Species Act ("ESA") by taking protected species and have created a public nuisance in violation of Washington state law. Plaintiff seeks a summary determination that Olympic Game Farm, Inc., and its shareholders have (1) taken, harmed, and/or harassed tigers and grizzly bears in violation of the ESA and (2) maintained a public nuisance through their taking and/or possession of tigers, grizzly bears, Canada lynx, gray wolves, Roosevelt elk, and Sika deer.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial

---

[1] A redacted version of plaintiff's motion can be found at Dkt. # 147.

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 1

responsibility of informing the district court of the basis for its motion" (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018). Although the Court must reserve for the trier of fact genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014). In other words, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable fact finder could return a verdict in its favor. *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1071 (9th Cir. 2019).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and taking the evidence in the light most favorable to defendants, the Court finds as follows:

...

**A. Endangered Species Act**

"The Endangered Species Act of 1973 . . . contains a variety of protections designed to save from extinction species that the Secretary of the Interior designates as endangered or threatened." *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 690, (1995). *See also* 16 U.S.C. § 1533; *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 159-60 (1978). The ESA's citizen suit provision permits "any person" to commence a civil suit to enjoin alleged violations of the ESA or the regulations issued by the Fish and Wildlife Service ("FWS") under the Act's authority. 16 U.S.C. § 1540(g)(1). Plaintiff seeks a summary determination that defendants are violating the ESA by "taking" tigers and grizzly bears.

The term "take" is defined in the ESA as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harass" is relevant here and means:

> an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. This definition, when applied to captive wildlife, does not include generally accepted:
>
> (1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act,
>
> (2) Breeding procedures, or
>
> (3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.

50 C.F.R. § 17.3. The term "harass" has "a different character when applied to an animal in captivity than when applied to an animal in the wild." *People for the Ethical Treatment of*

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 3

*Animals, Inc. v. Miami Seaquarium*, 189 F. Supp.3d 1327, 1350 (S.D. Fla. 2016). The regulatory definition of "harass" is intended "to exclude proper animal husbandry practices that are not likely to result in injury from the prohibition against 'take.'" Captive-bred Wildlife Regulation, 63 FR 48634-02, 48636 (Sept. 11, 1998).[2] In promulgating the captive wildlife regulations, the agency concluded that "[s]ince Congress chose not to prohibit the mere possession of lawfully-taken listed species in section 9(a)(1) of the Act, . . . congressional intent supports the proposition that measures necessary for the proper care and maintenance of listed wildlife in captivity do not constitute 'harassment' or 'taking'." *Id.*

---

[2] FWS reasoned that the purposes of the ESA are "best served by conserving species in the wild along with their ecosystems." Captive animals, the FWS noted, are "removed from their natural ecosystems and have a role in survival of the species only to the extent that they maintain genetic integrity." 63 FR at 48636.

> It is true that the Act applies to all specimens that comprise a "species" (as defined in the Act) that has been listed as endangered or threatened, and in general does not distinguish between wild and captive specimens thereof. However, the definition of "take" in the Act clearly applies to individual specimens or groups of specimens, and the captive or non-captive status of a particular specimen is a significant factor in determining whether particular actions would "harass" that specimen or whether such actions would "enhance the propagation or survival" of the species.
>
> To decide otherwise would place those persons holding captive specimens of a listed species in an untenable position. If providing for the maintenance and veterinary care of a live animal were considered to be "harassment", those persons holding such specimens in captivity would be forced to obtain a permit or give up possession since any failure to provide proper care and maintenance would be an unlawful "taking".

*Id.*

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 4

### a. Grizzly Bears

Plaintiff asserts that defendants have harassed their ESA-protected grizzly bears[3] "by, among other things, (1) housing them in muddy, unsanitary, cheatgrass-infested pens and then failing to provide them with adequate vet care for their grossly infected cheatgrass wounds; (2) withholding regular meals and pain medication for severe arthritis in favor of tourists feeding the bears excessive amounts of bread, which only compounds their obesity and joint pain and inflammation; and (3) anesthetizing bears without a vet present and without critical monitoring and support." Dkt. # 192 at 9. *See also* Dkt. # 160 at 18-26. Defendants argue that a determination of liability, standing alone, is outside the scope of the citizen suit provision of the ESA, that the Court lacks jurisdiction over the cheatgrass, veterinary/medical care, and anesthesia claims because plaintiff failed to give written notice of these violations, and that the sole remaining claim regarding the feeding of bread fails because the practice does not adversely affect the bears' nutrition and does not pose a serious threat of harm to the animals.[4]

### i. Citizen Suit Provision

The ESA authorizes "any person" to "commence a civil suit . . . to enjoin any person . . .

---

[3] Plaintiff identifies the protected bears as Donald, Moxie, Connie, Lillie, Fee, Fie, and Fumm (still living) and Patches, Good Momma, Marsha, and Samantha (now deceased). Dkt. # 160 at 17. Plaintiff has stipulated that Miska, Yuri, Tug, and Bella are not protected by the ESA.

[4] Defendants also argue that their bears are not protected by the ESA because they are not *"Ursus arctos horribilis* of the 48 conterminous States of the United States" (50 C.F.R. § 17.40(b)(2)). For the reasons set forth in the Order Granting in Part Defendants' Motion for Summary Judgment, of even date, the Court finds that the ESA protects from "taking" members of the species *Ursus arctos horribilis* located or found in the lower 48 states, including Donald, Moxie, and the grizzly bears that were born at the Olympic Game Farm.

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 5

who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). Defendants argue that a request for a determination that defendants' past conduct violated the ESA falls outside the citizen suit provision because plaintiff has not attempted to show that injunctive relief - the only relief available under the statute - is appropriate. A party may, however, move for summary judgment regarding a part of a claim. Fed. R. Civ. P. 56(a). Thus, a motion seeking to establish that defendants are "in violation" of the ESA is permissible even if the remedy remains to be determined. Nor is plaintiff seeking relief for wholly past violations. Plaintiff asserts that defendants have handled and cared for their tigers and grizzlies in essentially the same way over the past five or six years, including after this lawsuit was filed, and that their conduct constitutes "taking" under the ESA. In these circumstances, a determination that defendants' past conduct harmed or harassed protected animals may justify injunctive relief aimed at curbing similar and on-going conduct in the future.[5]

### ii. Notice Letter

The ESA requires citizen-plaintiffs to provide notice of a violation at least sixty days prior to filing suit. 16 U.S.C. § 1540(g)(2)(A)(i). The Ninth Circuit has identified two purposes for the notice provision: it gives the government a chance to take responsibility for enforcing the applicable statute, and it gives the alleged violator a chance to bring itself into compliance.

---

[5] In a footnote, defendants assert that plaintiff's separation of an ESA violation from the appropriate remedy "precludes any analysis of standing under the ESA." Dkt. # 206 at 10 n.52. They do not explain why that is: standing can be raised and argued at the remedy stage. In addition, defendants improperly ignore or discount the nature of the injuries claimed by plaintiff's members without any competing evidence.

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 6

*Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 650 (9th Cir. 2015). In order to fulfill these purposes, the notice must, "[a]t a minimum ... provide sufficient information ... so that the [notified parties] could identify and attempt to abate the violation." *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998). Although the notice need not list every detail, instance, or aspect of a violation (*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002)), an examination of the notice as a whole (*Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996)) along with the behavior of the recipients (*Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 997 (9th Cir. 2000)) must show that the notice provided enough information that the defendant could "identify and address the alleged violations, considering the defendant's superior access to information about its own activities" (*Klamath-Siskiyou Wildlands Ctr.,* 797 F.3d at 651).

Plaintiff's notice letter, dated September 27, 2018, includes a general allegation that defendants "are violating the ESA's prohibition against 'take' of members of listed endangered and threatened species by harming and/or harassing numerous animals at the Game Farm." Dkt. # 148-9 at 2. That allegation, standing alone, is clearly insufficient. See *Klamath-Siskiyou Wildlands Ctr.,* 797 F.3d at 653. More specifically, plaintiff asserts that:

- protected species are kept in cramped and squalid conditions and are deprived of psychological and social enrichment;
- brown bears are given unrestricted access to bread, an improper food source;
- the manner in which brown bears are fed lacks challenge, leaving the bears

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 7

purposeless;

• the small, barren enclosures in which brown bears are housed frustrate the bears' natural behaviors, are unprotected from the heat, and cause stress; and

• a brown bear had a 5" gash below its shoulder blade and perpendicular to its spine in September 2018.

Dkt. # 148-9 at 3, 10-11. There is no mention of cheatgrass or related wounds, the withholding of meals or medications, or improper anesthetizations. The allegations regarding the size and barrenness of the bears' enclosures would not, as plaintiff would have it, provide adequate notice that the enclosures have too much of something, such as cheatgrass. Similarly, a description of a wound that appears to be wholly unrelated to cheatgrass does not give notice of a claim of infected cheatgrass wounds (or even of a general failure to provide veterinary or wound care). *Id.* Defendants could not, based on the notice letter, reasonably be expected to anticipate most of the violations that are now being claimed. The one exception is the bread-feeding allegation. The notice clearly identifies bread as an improper food source for brown bears and alleges on-going, unrestricted, and regular feedings of bread. Given defendants' better knowledge of their activities and practices, to the extent the feeding of bread resulted in the withholding of more appropriate food sources or medications, the bread complaint encompasses these claims as well.

### iii. "Take" Under the ESA

Plaintiff argues that it is entitled to a summary determination that feeding brown bears unrestricted amounts of bread is not a generally accepted animal husbandry practice, does not comply with the standards for humane care and treatment of animals under the Animal Welfare

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 8

Act ("AWA"), 7 U.S.C. § 2131, *et seq.*, or is likely to result in injury to the bears, and, therefore, it constitutes "harassment" under the ESA. In response, defendants argue that the only criterium against which their animal husbandry practices can be measured is the standards promulgated under the AWA. But the ESA does not adopt the AWA as the sole standard for the care of captive wildlife. Rather, the ESA requires both AWA compliance and that the animal husbandry practices be "generally accepted" in order to fall within the first "captive wildlife" exclusion in the definition of "harass." *See Hill v. Coggins*, 867 F.3d 499, 509-10 (4th Cir. 2017).[6] While an agency determination that a laboratory, zoo, or pet owner is in compliance with the AWA is certainly evidence that the challenged animal husbandry practice is generally accepted and "meet[s] or exceed[s] the minimum standards for facilities and care under the [AWA]" (50 C.F.R. § 17.3), the court must independently evaluate the animal husbandry practices for purposes of an ESA claim when conflicting evidence is presented (*Graham v. San Antonio Zoological Society*, 261 F. Supp.3d 711, 743-44 (W.D. Tex. 2017)).[7]

---

[6] Plaintiff asserts that there is a third element that must be satisfied in order to benefit from the animal husbandry exclusion from the term "harass," namely, that the practice is "not likely to result in injury to the wildlife." Dkt. # 160 at 8 (quoting 50 C.F.R. § 17.3). Although there is support for this third element in FWS' comments when defining "harass," *see* 63 FR at 48636, grammatically it is imbedded within the third subsection of the definition, which has to do with veterinary care, and is arguably not applicable to the first subsection, which has to do with animal husbandry practices. Plaintiff's block quotation of 50 C.F.R. § 17.3 obscures the structure of the definition. Dkt. # 160 at 8. Because the parties have not squarely addressed the applicability of a likelihood-of-harm criterium, the Court declines to decide the issue.

[7] Defendants cite two district court decisions for the proposition that a judicial determination of whether they complied with the ESA is unconstitutional and would substitute the judgment of a federal court for the technical expertise of the responsible agency. Dkt. # 126 at 20 n.103. The decision out of the Western District of North Carolina, while noting constitutional vagueness concerns, was ultimately able to interpret and apply the "generally accepted" standard in keeping with the Fourth Circuit's

It is plaintiff's burden to show that the AWA's minimum standards were not met or that defendants' conduct did not fall within generally accepted animal husbandry practices. *Hill*, 867 F.3d at 510; *Graham*, 261 F. Supp.3d at 741. When offering a standard other than the AWA against which defendants' conduct is to be measured, plaintiff must show that it has been "generally accepted," meaning that it applies to the care or facilities at issue and that it has been widely adopted and accepted. *See Hill*, 423 F. Supp.3d at 221 (following remand from the Fourth Circuit).

Defendants do not seriously contest plaintiff's assertion that, at a minimum, they must feed endangered animals a diet that is appropriate to their species. Instead, they assert that they meet that standard. *See* Dkt. # 126 at 21( the bears "are fed a species appropriate diet - comprised mainly of meat, grains, fruit, and berries - that is approved by Olympic Game Farm's attending veterinarians and meets the requirements of the Animal Welfare Act."); Dkt. # 206 at 19-20 ("Bears are fed regular meals of meat, USDA-approved red meat fat, and fish three times a week during their active period and twice a week in winter. They are also fed fruits and vegetables. . . . Visitors to Olympic Game Farm have fed bread to bears for decades, and this practice has been approved by the attending veterinarian and USDA."). Factual disputes regarding whether defendants' practices provide the bears with a species appropriate diet prevent summary judgment on this issue for either party. The trier of fact will need to determine, among

---

direction and constitutional requirements. *Hill v. Coggins*, 423 F. Supp.3d 209, 219-21 (W.D.N.C. 2019). The Court finds that the decision in *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F. Supp.3d 1327 (S.D. Fla. 2016), is unpersuasive for the reasons stated in *Graham*, 261 F. Supp.3d at 741-43.

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 10

other things, whether bread comprised a substantial portion of the calories given the bears (or was rather a snack supplementing an otherwise appropriate diet). Evidence regarding defendants' consultations with veterinarians and USDA inspectors, the types of conditions and diseases caused by a diet heavy in rapidly digestible starches, the types of conditions and diseases to which defendants' bears have been susceptible, and whether defendants' feeding and medication regimens were impacted by the feeding of bread will all inform the analysis of whether defendants' animal husbandry was generally acceptable and AWA compliant.[8]

### b. Tigers

Plaintiff asserts that defendants have harassed their tigers by failing to provide adequate veterinary care as required by 9 C.F.R. § 2.40, foregoing annual and semi-annual examinations, delaying or failing to report symptoms, relying on veterinarians with limited experience with tigers, failing to perform diagnostic tests, refusing to follow treatment recommendations, anesthetizing cats without veterinarian supervision, and shooting (rather than euthanizing) one of its cats. Plaintiff also asserts that the tiger enclosures are small and barren, that the concrete floors exacerbate joint problems in the big cats, that the tigers are fed donated horse and cow carcasses, and that defendants failed to provide adequate claw care (resulting in the claws growing into the foot pad and causing injury upon removal). Dkt. # 160 at 9-15. Of these complaints, the 60-day notice letter mentions the size and lack of complexity of the enclosures,

---

[8] The relevant AWA standards require, among other things, that an exhibitor of animals accurately report information to the veterinarian. 9 C.F.R. § 2.40. There is evidence that the Olympic Game Farm veterinarians do not know how much bread the bears are consuming.

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 11

lameness attributable to and exacerbated by inadequate flooring, and the failure to provide adequate care for a tiger, Amadeus, as he failed and ultimately died. Dkt. # 148-9 at 8-9. The Court finds that, given defendants' better information regarding its care and treatment of Amadeus and the other cats, the last allegation put defendants on notice that plaintiff was challenging the adequacy of the veterinary care provided to tigers suffering from kidney disease. Dkt. # 160 at 9-10. The Court lacks jurisdiction, however, over the feeding-of-carcasses claim and the other lack of care allegations.

There are genuine issues of fact regarding whether the veterinary care provided to tigers suffering from renal disease meets or exceeds the minimum standards for care under the AWA. The relevant standards require that:

> (a) Each dealer or exhibitor shall have an attending veterinarian who shall provide adequate veterinary care to its animals in compliance with this section.
>
>> (1) Each dealer and exhibitor shall employ an attending veterinarian under formal arrangements. In the case of a part-time attending veterinarian or consultant arrangements, the formal arrangements shall include a written program of veterinary care and regularly scheduled visits to the premises of the dealer or exhibitor; and
>>
>> (2) Each dealer and exhibitor shall assure that the attending veterinarian has appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use.
>
> (b) Each dealer or exhibitor shall establish and maintain programs of adequate veterinary care that include:
>
>> (1) The availability of appropriate facilities, personnel, equipment, and services to comply with the provisions of this subchapter;
>>
>> (2) The use of appropriate methods to prevent, control, diagnose, and treat

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 12

>    diseases and injuries, and the availability of emergency, weekend, and holiday care;
>
>    (3) Daily observation of all animals to assess their health and well-being; Provided, however, That daily observation of animals may be accomplished by someone other than the attending veterinarian; and Provided, further, That a mechanism of direct and frequent communication is required so that timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian;
>
>    (4) Adequate guidance to personnel involved in the care and use of animals regarding handling, immobilization, anesthesia, analgesia, tranquilization, and euthanasia; and
>
>    (5) Adequate pre-procedural and post-procedural care in accordance with established veterinary medical and nursing procedures.

9 C.F.R. § 2.40. Plaintiffs argue that defendants ignored obvious symptoms of renal disease, failed to keep veterinarians apprised of those symptoms, declined to obtain veterinary care in a timely manner, and, when they did, failed to follow treatment recommendations. In response, defendants have provided evidence from which one could reasonably infer that their population of tigers is older and more medically needy than most, that chronic renal disease is common in older felids, and that there is no way to cure the disease short of a kidney transplant. Dkt. # 205 at ¶¶ 11-12. Defendants have also presented evidence that intravenous fluids and diet changes - two treatments designed to prolong the life of tigers with chronic kidney disease - are not without their risks and that many facilities simply "monitor for signs of chronic kidney disease, watch the animal's quality of life, and when the animal's quality of life has deteriorated too far, they euthanize the animal." Dkt. # 205 at ¶¶ 12-15. Olympic Game Farm apparently follows this "generally acceptable practice." Dkt. # 205 at ¶ 15. Given the competing evidence in the record,

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 13

the trier of fact will need to determine whether the veterinary care provided to tigers with renal failure satisfies the applicable standards.

Plaintiff also seeks a summary determination that shooting a tiger whose quality of life has degraded too far is not a generally accepted method of euthanasia. There is support for this assertion, namely a USDA inspection report from 2004 noting that "[g]unshot is not an acceptable method of routine euthanasia for any animal" other than "hoofstock that are to be butchered for carnivore food." Dkt. # 148-13 at 2. Defendants were instructed to update their AWA-mandated Program of Veterinary Care ("PVC") to clarify which animals may be euthanized by gunshot and who would administer the gunshot. Defendants' December 2020 PVC specifies that "sick, diseased, injured, or lame animals shall be provided veterinary care or euthanized" and that the licensee would administer a "gunshot to the head in extreme emergencies." Dkt. # 190-10 at 4. Thus, a gunshot is, in some circumstances, an appropriate method of euthanasia under the AWA. Plaintiff offers no other generally accepted standard which precludes this method of euthanasia. To the contrary, there is evidence that veterinarians and their associations approve the method. Dkt. # 203 at 146; Dkt. # 205 at ¶ 18; Dkt. # 205 at 104 (2020 American Veterinary Medical Association ("AVMA") Guidelines specifying that "[a] properly placed gunshot can cause immediate insensibility and a humane death").[9] In 2014,

---

[9] The AWA guidance for inspectors specifies that the AVMA's guidelines on euthanasia describe humane methods that comply with the AWA. Dkt. # 205 at 62 (citing 9 C.F.R. § 1.1). Failure to comply with the AVMA's guidelines is not, in and of itself, an AWA violation because the inspector must still assess whether the facility's method "produces rapid unconsciousness and subsequent death without evidence of pain or distress" or "utilizes anesthesia produced by a agent that causes painless loss of

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 14

defendants euthanized by gunshot a tiger named Bree who "stopped eating, had lost weight, and was suffering badly." Dkt. # 160 at 11. It is not clear what version of the PVC was in place at the time, whether Bree's condition justified the use of a gun under the PVC, or - most importantly - whether the euthanization met the regulatory definition of "euthanasia." Summary judgment on this claim is not warranted.

With regards to the claims related to the size, construction, and barrenness of the tiger enclosure, the claims are dismissed for the reasons set forth in the Order Granting in Part Defendants' Motion for Summary Judgment, of even date. Plaintiff has failed to show that the Association of Zoos and Aquariums ("AZA") standards of excellence, which have been adopted by a small minority of exhibitors, reflect "generally accepted" animal husbandry practices and have offered no other standards against which to measure defendants' conduct.

**B. Public Nuisance**

For the reasons stated in the Order Granting in Part Defendants' Motion for Summary Judgment, of even date, plaintiff's public nuisance claim under Washington law cannot proceed.

For all of the forgoing reasons, plaintiff's motion for summary judgment (Dkt. # 160) is DENIED.

Dated this 8th day of March, 2022.

*Robert S. Lasnik* (signature)
Robert S. Lasnik
United States District Judge

---

consciousness and subsequent death." Dkt. # 205 at 62.

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT - 15