1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANIMAL LEGAL DEFENSE FUND,

Plaintiff,

v.

OLYMPIC GAME FARM, INC., *et al.*,

Defendants.

CASE NO. 3:18-cv-06025-RSL

ORDER GRANTING IN PART
DEFENDANTS' *DAUBERT* MOTION

This matter comes before the Court on defendants' "Motion to Exclude Expert

Testimony." Dkt. # 142. Defendants seek to exclude the testimony of Dr. Valerie Johnson

regarding wolf pups born in 2010 on relevance and/or *Daubert* grounds, the testimony of

Dr. Lisa Harrenstien as speculative, duplicative, and/or untimely, the testimony of Dr.

Jennifer Ward as speculative and/or duplicative, and the testimony of Dr. Sarah Owens as

unhelpful.[1]

---

[1] Plaintiff no longer intends to present the opinions or testimony of Dr. Adam Freedman or Dr. Bridgett vonHoldt, and the Court has therefore not considered defendants' objections thereto. *See* Dkt. # 274. Plaintiff has also withdrawn Dr. Johnson's testimony regarding the proper characterization of Olympic Game Farms' bears and wolves, making a Court ruling on its admissibility unnecessary. *Id.*; Dkt. # 168 at 10, n. 5.

ORDER GRANTING IN PART  DEFENDANTS' DAUBERT
MOTION - 1

## A. Dr. Valerie Johnson

Dr. Johnson is a veterinarian whom plaintiff hired to provide opinions regarding the veterinary care provided to animals at Olympic Game Farm. After reviewing veterinary records from 2010 regarding wolf pups born at Olympic Game Farm, Dr. Johnson provided a supplemental expert report on March 2, 2020. Dr. Johnson states that the treating veterinarian, Dr. Sarah Owens,

> Indicated that the puppies were taken from the mother and fed an inadequate diet of meat only which is severely deficient in calcium and other minerals necessary for proper bone formation. The radiographs display severe metabolic bone disease as evidence by the radiolucency of the bone when compared to soft tissue (bone should be white on an xray). In addition multiple pathologic fractures were present. The fractures observed were in both femurs and both tibiotarsal bones at locations not usually observed in traumatic fractures. Additionally, one of the femur fractures exhibited telescoping of the femur which would likely lead to a nonunion (a fracture that doesn't heal) unless the bone was refractured and a technique used to elongate the bone. The disease and fractures evident in the animal were life threatening and I agree with Dr. Owens that it would be surprising if the animal survived. In addition if this animal did survive the orthopedic conformation the wolf would be extremely abnormal with bowed legs and a very abnormal gait. The records I reviewed did not indicate this animal received orthopedic treatment. If this animal had received no treatment but lived this animal would very likely have severe conformation deficits and crippling lameness.

Dkt. # 144 at 168.

Defendants do not attempt to show that Dr. Johnson's reading of the radiographs or her causal determination were incorrect or that she lacks the expertise to opine on these matters. Rather, they object on the ground that her predictions about death, deformity, and

lameness have not come true and are therefore unhelpful to the jury. Federal Rule of

Evidence 702 provides that expert testimony is admissible if:

> (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). As construed

in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Rule 702 tasks a district judge with

"ensuring that an expert's testimony both rests on a reliable foundation and is relevant to

the task at hand." 509 U.S. 579, 597 (1993). Where an expert offers non-scientific

testimony, "reliability depends heavily on the knowledge and experience of the expert,

rather than the methodology or theory behind" the testimony. *Porter v. Martinez*, 64 F.4th

1112, 1127 (9th Cir. 2023) (quoting *Daubert*, 509 U.S. at 594, and *Hangarter v. Provident

Life & Acc. Ins. Co.*, 373 F. 3d 998, 1017 (9th Cir. 2004)). The analysis "should be applied

with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d

1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588).

> Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology. The court is a gatekeeper, not a fact finder. Accordingly, the district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury. If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon its credibility, rather than the judge. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

determinations that are reserved for the jury. This Court has previously noted that shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (internal quotation marks, citations, and alterations omitted). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

In this case, the expert has the knowledge and expertise necessary to develop an opinion whether a particular clinical finding would likely be symptomatic or asymptomatic and whether any manifestations of the finding would be long-lasting. While Dr. Johnson's methodology – which did not include observing the animal[s] or even inquiring into how the clinical findings actually manifested – is subject to criticism, there are undoubtedly circumstances in which a practitioner can draw conclusions regarding the impacts of clinical findings even in the absence of a physical examination of the patient. Because Dr. Johnson is offering non-scientific testimony, its "reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind" the testimony. *Porter*, 64 F.4th at 1127. Dr. Johnson's prognosis, which was based on (a subset of) facts and data and within her area of expertise, cannot fairly be described as unreliable nonsense despite the fact that the wolves did not, in fact, suffer the fate she predicted. Disputes regarding the accuracy of the opinion – and the overall credibility of

ORDER GRANTING IN PART  DEFENDANTS' DAUBERT
MOTION - 4

Dr. Johnson's testimony -- must be resolved by the jury. Defendants' objection to Dr. Johnson's opinion is overruled.

**B. Dr. Lisa Harrenstien**

**1. Animal Husbandry and Veterinary Care**

Dr. Harrenstien is a veterinarian with over 30 years of experience and is Board Certified as a Specialist in Zoological Medicine. After visiting Olympic Game Farm on two occasions and reviewing veterinary records, Dr. Harrenstien concluded "that the general husbandry care and also the veterinary care of the animals at OGF has been disturbingly poor . . . ." Dkt. # 144 at 233. She then provides a detailed description of her concerns, some of which defendants seek to exclude.

**a. Amadeus**

Amadeus, a Siberian tiger, died in October 2017. Dr. Harrenstien notes that the animal was described as increasing his volumes of drinking and urine production as early as March 2016, with seizures beginning in early 2017. A seizure in October of that year lasted for thirty minutes and ultimately prompted Amadeus' euthanization. Dr. Harrenstien states that Amadeus suffered respiratory difficulties in addition to excessive drinking, excessive urination, and seizures. She concluded that "[t]his tiger certainly suffered from serious illness for at least the final 1.5 years of his life" and opines that, if defendants were not going to provide veterinary care to address his symptoms, Amadeus should have been euthanized in March 2016 to prevent "needless suffering over the subsequent 1.5 years." Dkt. # 144 at 238-39.

ORDER GRANTING IN PART  DEFENDANTS' DAUBERT
MOTION - 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Defendants object to the testimony that Amadeus suffered on the ground that Dr. Harrenstien never observed or interacted with the animal, nor did she talk with anyone who did. Dr. Harrenstien makes no effort to explain whether or how Amadeus' symptoms, individually or collectively, would be expected to cause pain, discomfort, or suffering. As was the case with Dr. Johnson, however, Dr. Harrenstien has the knowledge, experience, and training to determine whether a constellation of clinical findings and symptoms would be painful and/or cause suffering. While her failure to evaluate Amadeus (or talk with anyone who had observed the animal) is subject to criticism and her opinion is disputed, those issues can be pursued on cross-examination and must be resolved by the jury. Defendants' objection to Dr. Harrenstien's  opinion regarding Amadeus is overruled.

### b. Tzar

Tzar, a tiger, had a seizure in October 2018 and died the next day. Dr. Harrenstien opines that most of the possible causes for seizures can be detected with a physical examination and diagnostic testing. There is no indication that any such examination or diagnostic testing was performed. She then states that, if Tzar were found to have had kidney disease, the condition could have been caused by a long list of things (including exposure to antifreeze, stress, diabetes, age, poor diet, kidney stones, genetic causes, infection, *etc*.). Dkt. # 144 at 240. Dr. Harrenstien does not have an opinion regarding the cause of Tzar's seizure, and she has no reason to suspect either that Tzar suffered from kidney disease or that the cause of the kidney disease was something over which defendants had control (such as exposure to antifreeze or dietary choices) rather than

ORDER GRANTING IN PART  DEFENDANTS' DAUBERT
MOTION - 6

something outside defendants' control (such as age or genetic causes). Listing the various potential causes of a hypothetical diagnosis would not help the jury resolve any of the issues in this case. This aspect of Dr. Harrenstien's testimony is therefore inadmissible.

### c. Good Mama[2]

Good Mama was a brown bear who died in September 2019. A full post-mortem examination "showed pathologic fusion of some of her back vertebrae, especially in her lumbar area, which was the result of chronic disease and instability in those vertebrae. The process of back vertebrae joint fusion can involve entrapment of spinal nerves emerging from the vertebrae, which is extremely painful." Dkt. # 144 at 241. Dr. Harrenstien does not, however, opine that Good Mama's spinal nerves were, in fact, entrapped during the fusion process, that entrapment was likely based on the post-mortem findings, or that Good Mama exhibited symptoms of pain consistent with spinal nerve entrapment. In the absence of evidence that Good Mama had entrapment of spinal nerves, Dr. Harrenstien's testimony about the extreme pain caused by that condition is unhelpful and therefore inadmissible.

### 2. Duplication

Defendants' argue that plaintiff should be permitted to present expert testimony regarding reptiles, large felids, hybrid wolves, hoofstock, brown bear enclosures, bread and animal nutrition, hay storage, and storage of controlled drugs through either Dr. Johnson or Dr. Harrenstien, but not both. This matter is taken under advisement. Duplicative evidence

---

[2] The name of this animal appears in the record as both "Good Mama" and "Good Mamma."

ORDER GRANTING IN PART  DEFENDANTS' DAUBERT
MOTION - 7

1   that wastes trial time or is needlessly cumulative will not be admitted pursuant to Fed. R.

2   Ev. 403, but the Court declines to make that determination at this point.

3                       **3. Second Supplemental Report**

4

5         On March 21, 2021, Dr. Harrenstien generated a second supplemental report "as an

6   addendum to [her] prior reports based on new information provided" to her, specifically

7   the "February 2021 deposition transcripts of Dr. Michael Briggs, Clay Richmond (OGF

8   animal keeper from 1970's to October 2019), and James Beebe." Dkt. # 144 at 281. The

9   supplemental report was served on March 22, 2021, three days before dispositive and

10  *Daubert* motions were due, and three months after the December 16, 2020, deadline for

11  plaintiff to serve supplemental expert reports. Plaintiff argues that the second supplemental

12  report should be deemed timely because it was served within weeks of depositions that

13  "clarified issues that OGF has misrepresented or obscured for over a year: how much bread

14  the bears consume and where bear Samantha was housed while wounded." Dkt. # 168 at

15  13.

16

17        Dr. Harrenstien's supplemental opinions regarding the nutritional and health

18  impacts of feeding bread to brown bears could have and should have been provided by the

19  Court-ordered deadline. Details regarding the quantity of bread fed to brown bears during

20  the tourist season were not necessary to the development of opinions regarding the adverse

21  health impacts of feeding bread to bears. Plaintiff has known that the bears at Olympic

22  Game Farm are fed bread – and that the amount of bread increases during the summer

23  tourist season – since the very beginning of its investigation. *See* Dkt. # 1 at ¶¶ 3, 15, 36,

40, 43, 44, and 82-83. Dr. Harrenstien's opinions that bread is low in calcium and fat, gives rise to health risks such as Lysine and threonine deficiency, and contains high amounts of rapidly-digestible starch are unrelated to the amount of bread ingested, and plaintiff offers no reason why it was not disclosed in a timely manner.

The same cannot be said about Dr. Harrenstien's opinions regarding the impact of defendants' reported practice of reducing the frequency of regular meals, which are primarily meat, during the high tourist season and the inappropriateness of the enclosures in which injured or ill bears are housed for extended periods of time. Those opinions depend on deposition testimony that was not available prior to the supplementation deadline. The Court finds good cause to extend the deadline and will permit these opinions to be presented at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## C. Dr. Jennifer Ward

### 1. Quality of Life Opinions

Dr. Ward is a veterinary pathologist who viewed necropsy reports regarding six of defendants' animals. She was a clinical veterinarian for two years before moving into pathology. Dkt. # 144 at 286-87. Defendants do not object to Dr. Ward's analysis of, comments on, and/or disagreements with the gross pathology and histopathology performed by the original pathologists, but they oppose the presentation of opinions regarding the quality of life these animals enjoyed and, in particular, whether they suffered pain before they died.

### a. Brutus

Dr. Ward examined the physical remains of the wolf Brutus, photographs taken during the original necropsy, radiographs of the remains, recut slides from blocks of tissue submitted for evaluation in the original necropsy, preliminary and final necropsy reports, clinical records, and a summary of the timeline for handling the remains. Dr. Ward's interpretation of the slides and review of the original necropsy report revealed a lesion in the skeletal muscle of Brutus' esophagus. Dkt. # 144 at 291 and 294. She opines that, "[w]hile the esophageal lesion may not have contributed to the death of this wolf directly, I would expect it to have caused pain, and consider it likely that it contributed to a generally debilitated and stressed condition." Dkt. # 144 at 294. She also notes that other conditions that affected Brutus, such as tooth attrition, coxofemoral osteoarthritis, and bilateral cataracts "may have contributed to discomfort and/or diminished quality of life." *Id.*

Defendants do not attempt to show that Dr. Ward's interpretation of the macro and micro evidence presented to her was incorrect or that she lacks the expertise to opine on these matters. Rather, they object on the ground that she never saw Brutus alive, never spoke to anyone at Olympic Game Farm, and never spoke to Brutus' attending veterinarian before speculating that his esophageal lesion caused pain, debilitation, and/or stress. As discussed above, where the expert has the knowledge and expertise necessary to develop an opinion regarding a non-scientific matter, such as whether a particular clinical finding would likely be symptomatic or asymptomatic, this factor weighs heavily in favor of its reliability. Even though Dr. Ward's inability to observe Brutus and failure to inquire whether he manifested symptoms related to the esophageal lesion raise issues regarding her methodology, those issues and defendants' challenges to the accuracy of her opinion must be resolved by the jury. The objection to Dr. Ward's testimony regarding Brutus is overruled.

### b. Good Mama

Dr. Ward examined recut slides from blocks of tissue submitted for evaluation during Good Mama's original necropsy, preliminary and final necropsy reports, clinical records, Olympic Game Farm's notes, and chain of custody forms. Defendants do not identify any part of Dr. Ward's commentary regarding Good Mama's necropsy that is objectionable. The only reference to pain in association with Good Mama is the seemingly neutral statement that "[t]he specific impact [of the observed arteriosclerosis and atherosclerosis] in regards to morbidity (i.e., pain, discomfort, decreased exercise tolerance, impaired tissue perfusion, and other impacts on general health, comfort and

quality of life), could not be determined." Dkt. # 144 at 298. Any objection to Dr. Ward's testimony regarding Good Mama is overruled.

### c. Tiggers

Dr. Ward examined tissue slides, the original necropsy reports, clinical records, and chain of custody forms with regards to the Siberian tiger named Tiggers. Defendants do not take issue with Dr. Ward's interpretation of the necropsy results, including her lengthy description of the tissues from Tiggers' foot pad and uterus and her summary of the gross necropsy findings. They do, however, object to her conclusions regarding how those clinical findings would have manifested prior to Tiggers' death. Dr. Ward concludes that:

▪ given the "invasive malignancy that extended through the uterine wall" coupled with the "abundant necrotic material" described on gross necropsy, "it would be surprising if this did not manifest in a foul smelling vaginal discharge." Dkt. 144 at 310.

▪ the necropsy findings "are indicative of chronic and severe renal disease . . . which would have manifested with clinical signs of end stage renal disease." *Id.*

▪ the "very significant pawpad lesion" revealed on histopathology "would be a source of pain if it involved even a single digit," and there was reason to believe that the condition impacted the majority of Tiggers' digits. Dkt. # 144 at 311.

▪ the finding of amyloidosis in multiple tissues suggests that Tiggers "was chronically ill and would have been visibly declining over a period of years." *Id.*

The fact that Dr. Ward did not examine Tiggers while she was alive or otherwise attempt to confirm her conclusions through the observations of others makes the testimony impeachable, not inadmissible.

ORDER GRANTING IN PART  DEFENDANTS' DAUBERT
MOTION - 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### d. Sophie

Dr. Ward examined tissue slides, the original necropsy reports, clinical records, and chain of custody forms with regards to the African lion named Sophie. Defendants do not identify any part of Dr. Ward's commentary regarding Sophie's necropsy that is objectionable. Dr. Ward mentions that Sophie likely showed clinical signs of an underlying pulmonary disease (Dkt. # 144 at 316) and that certain orthopedic issues "may or may not have had a significant impact on her quality of life" (Dkt. # 144 at 318), but there is no opinion regarding ante-mortem pain or suffering. Any objection to Dr. Ward's testimony regarding Sophie is overruled.

### e. Marsha

Dr. Ward examined tissue slides, the original necropsy reports, clinical records, and chain of custody forms with regards to the brown bear named Marsha. As was the case with Good Mama and Sophie, defendants do not identify any part of Dr. Ward's commentary regarding Marsha's necropsy that is objectionable. The only reference to pain, suffering, or quality of life in association with Marsha is a summarization of the animal's clinical records, noting that she was prescribed gabapentin for pain approximately six weeks before her death and, on July 22, 2020, Marsha was reported "to be in such pain that [she] could not stand, and was euthanized." Dkt. # 144 at 322. Any objection to Dr. Ward's testimony regarding Marsha is overruled.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### f. Tundra

Dr. Ward examined tissue slides, the original necropsy reports, clinical records, and chain of custody forms with regards to the arctic fox named Tundra. Defendants do not identify any part of Dr. Ward's commentary regarding Tundra's necropsy that is objectionable, but most of this part of her report is an elaboration of the findings and interpretations of the original pathologist as it relates "to the suffering of this animal." Dkt. # 144 at 325. Dr. Ward opines that the lower urinary tract disease shown by the macro and micro evidence would have caused pain, suffering, and/or discomfort and that Tundra would have exhibited observable, clinical signs that should have alerted the caregivers that intervention was necessary. Defendants again object that Dr. Ward never saw Tundra alive, never spoke to anyone who had seen him alive, and never spoke to Tundra's attending veterinarian before speculating that the disease caused pain and suffering. As discussed above, an expert's knowledge and expertise is the most important criteria for evaluating the reliability of opinions regarding non-scientific matters, such as whether a particular clinical finding would cause pain and/or observable symptoms. Even though Dr. Ward's inability to observe Tundra and failure to inquire whether he manifested symptoms related to the urinary tract disease raises issues regarding her methodology, those issues and defendants' challenges to the accuracy of her opinions must be resolved by the jury. The objection to Dr. Ward's testimony regarding Tundra is overruled.

1

2      ## 2. Duplication

3          Defendants' argue that Dr. Ward's opinions are duplicative of those which will be

4      offered by Drs. Johnson and Harrenstien. This matter is taken under advisement. On one

5      level, the experts play different roles. Dr. Ward interprets pathology reports, providing a

6      picture of the animals' condition when they died and her opinions regarding the length of

7      time certain disease processes and symptoms affected the animals. Drs. Johnson and

8      Harrenstien use that information to explain how the diseases or conditions manifest ante-

9      mortem and the standard of care in identifying and addressing the conditions. As discussed

10     above, however, Dr. Ward also intends to opine regarding the ante-mortem presentation of

11     the conditions she identified during necropsy. Duplicative evidence that wastes trial time

12     or is needlessly cumulative will not be admitted pursuant to Fed. R. Ev. 403, but the Court

13     declines to exclude any particular testimony at this point.

14     ## D. Dr. Sara Owens

15         Defendants downplay Dr. Owens' contacts with Olympic Game Farm to argue that

16     she has no basis for her evaluation of its care, husbandry, and housing practices. Dr.

17     Owens was the treating veterinarian for the wolf pups with long-bone fractures discussed

18     above. She fielded a phone call regarding a lion suffering from impaction, receiving

19     information regarding its condition, its environment, and the frequency with which

20     defendants' big cats were impacted. And she visited Olympic Game Farm at least twice,

21     the first time touring the free-range areas, going through the enclosures, and "asking

22     questions about everything." Dkt. # 144 at 406. Dr. Owens has just as much, if not more,

ORDER GRANTING IN PART  DEFENDANTS' DAUBERT
MOTION - 15

familiarity with the Olympic Game Farm operation as Drs. Johnson and Harrenstien. Defendants do not challenge her expertise as a veterinarian, and her interactions provide the facts and data on which her opinions are based.

Defendants also argue that Dr. Owens' opinions are stale - and therefore unhelpful - because they are based on observations and interactions that occurred in 2010.  Plaintiff contends that the basics of animal care, veterinary services, and enclosures at Olympic Game Farm has not changed materially in the last 45 years, much less in the last 13 years. If that is not true, it goes to the weight to be given Dr. Owens' testimony, not its admissibility.

For all of the forgoing reasons, defendants' *Daubert* motion is GRANTED as to Dr. Harrenstien's list of the various potential causes of Tzar's hypothetical diagnosis of kidney disease, her testimony about the extreme pain caused by Good Mama's hypothetical nerve entrapment, and her untimely opinions regarding the nutritional and health impacts of feeding bread to brown bears. The Court takes under advisement defendants' objections to duplicative testimony. The motion is DENIED in all other respects.

Dated this 30th day of May, 2023.

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART  DEFENDANTS' DAUBERT
MOTION - 16