1

2                                    THE HONORABLE ROBERT S. LASNIK

3

4

5

6

7                        UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
8                               AT TACOMA

9   ANIMAL LEGAL DEFENSE FUND,              No. 3:18-cv-06025-RSL

10                Plaintiff,                 consolidated with
                                            No. 3:22-cv-05774-RSL
11         v.
                                            **DEFENDANTS' SECOND MOTION
12   OLYMPIC GAME FARM, INC.,               FOR SUMMARY JUDGMENT**
     ROBERT BEEBE, JAMES BEEBE, AND
13   KENNETH BEEBE,                         **NOTE ON MOTION CALENDAR:
                                            December 29, 2023**
14                Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1

## TABLE OF CONTENTS

2                                                                                                          **Page**

3   TABLE OF AUTHORITIES ................................................................................................ ii

4   I. INTRODUCTIONAND RELIEF REQUESTED ........................................................... 1

    II. STATEMENT OF FACTS............................................................................................ 3

5      A. Cheatgrass Is an Invasive Weed That Is Difficult to Control. ............................ 3

6      B. OGF Manages and Controls Cheatgrass. ............................................................ 4

       C. Brown Bears at OGF............................................................................................ 4

7      D. Procedural Background......................................................................................... 6

8      E. ESA Legal Framework. ....................................................................................... 7

9         1. Harass................................................................................................................ 8

          2. Harm ............................................................................................................... 10

10  III. ARGUMENT ............................................................................................................. 10

11     A. ALDF Cannot Establish Standing by Manufacturing Injury Created by Reading
          Legal Pleadings. ................................................................................................. 10

12        1. Organizational Standing Legal Principles ..................................................... 11

13        2. ALDF Members Did Not Suffer Recreational or Aesthetic Injuries Related to
             Brown Bears and Cheatgrass While at OGF.................................................. 12

14        3. ALDF Members Decided Long Ago to Never Return to OGF Based on the
             Living Conditions Observed During Their Visits........................................... 16

15     B. ALDF's Cheatgrass Claim Is Not Actionable Under the ESA and Should Be
          Dismissed for Lack of Jurisdiction. ................................................................... 17

16     C. ALDF's New Cheatgrass Claims for Violation of the ESA Fails as a Matter of Law. .... 20

17        1. ALDF Has No Credible Evidence of Harassment ........................................ 20

18        2. There Is No Evidence That the Six Brown Bears Have Been "Harmed" by OGF's
             Cheatgrass Maintenance Practices. ............................................................... 25

19  IV. CONCLUSION............................................................................................................ 26

20

21

22

23

24

25

26

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - i

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

4

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).....................................................................................................10

5

6

*Animal Prot. Inst., Ctr. for Biological Diversity v. Holsten*,
    541 F. Supp. 2d 1073 (D. Minn. 2008).........................................................................8

7

*Aransas Project v. Shaw*,
    775 F.3d 641 (5th Cir. 2014) ......................................................................................18

8

9

*Blum v. Yaretsky*,
    457 U.S. 991 (1982).....................................................................................................11

10

11

12

*Breaux v. Haynes*,
    No. CV 15-769-JJB-RLB, 2017 WL 5158699 (M.D. La. Aug. 3, 2017), *report
    and recommendation adopted*, No. CV 15-769-JJB-RLB, 2017 WL 5202873
    (M.D. La. Aug. 21, 2017) ............................................................................................20

13

*Cascadia Wildlands v. Scott Timber Co.*,
    328 F. Supp. 3d 1119 (D. Or. 2018) ..............................................................................8

14

15

*Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium*,
    836 F. Supp. 45 (D. Mass. 1993) ................................................................................12

16

17

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)........................................................................................................18

18

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013).........................................................................................11, 13, 15

19

20

*Ctr. for Env't Sci. v. Cowin*,
    No. 1:15-CV-01852-LJO-BAM, 2016 WL 3196774 (E.D. Cal. June 8, 2016).........8

21

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006).....................................................................................................11

22

23

*Forest Conservation Council v. Rosboro Lumber Co.*,
    50 F.3d 781 (9th Cir. 1995) .........................................................................................25

24

25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).....................................................................................................11

26

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
    484 U.S. 49 (1987)....................................................................................................7, 18

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - ii

1    *Hill v. Coggins,*
     423 F. Supp. 3d 209 (W.D.N.C. 2019) ................................................................... passim
2

3    *Hill v. Coggins,*
     867 F.3d 499 (4th Cir. 2017) ..........................................................................................9
4

     *Hollingsworth v. Perry,*
5      570 U.S. 693 (2013)........................................................................................................14

6    *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.,*
     230 F. Supp. 3d 1106 (N.D. Cal. 2017), *order clarified,* No. 16-CV-04294-
7      WHO, 2018 WL 2010980 (N.D. Cal. Apr. 30, 2018)...............................................7

8    *Hunt v. Wash. State Apple Advert. Comm'n,*
     432 U.S. 333 (1977)........................................................................................................11
9

10    *Just Puppies, Inc. v. Frosh,*
     457 F. Supp. 3d 497 (D. Md. 2020)...............................................................................23
11

12    *Lewis v. Casey,*
     518 U.S. 343 (1996)........................................................................................................11
13

     *Louisiana Crawfish Producers Ass'n-W. v. Mallard Basin, Inc.,*
14      No. CV 6:10-1085, 2016 WL 8459914 (W.D. La. Nov. 8, 2016), *report and*
     *recommendation adopted as modified,* No. CV 10-1085, 2017 WL 946712
15      (W.D. La. Mar. 8, 2017) ................................................................................................20

16    *Lujan v. Defs. of Wildlife,*
     504 U.S. 555 (1992)................................................................................11, 16, 17, 18
17

18    *Mo. Primate Found. v. People for Ethical Treatment of Animals, Inc.,*
     No. 4:16 CV 2163 CDP, 2018 WL 1420239 (E.D. Mo. Mar. 22, 2018)................9
19

20    *Nat'l Wildlife Fed'n v. Burlington N. R.R.,*
     23 F.3d 1508 (9th Cir. 1994) .........................................................................................18

21    *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium,*
     189 F. Supp. 3d 1327 (S.D. Fla. 2016), *aff'd,* 879 F.3d 1142 (11th Cir. 2018),
22      *adhered to on denial of reh'g,* 905 F.3d 1307 (11th Cir. 2018) ...........................8, 9

23    *Reynaga v. Roseburg Forest Prods.,*
     847 F.3d 678 (9th Cir. 2017) .........................................................................................10
24

25    *Strahan v. Coxe,*
     127 F.3d 155 (1st Cir. 1997).............................................................................................8
26

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - iii

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
 143 F.3d 515 (9th Cir. 1998) ...............................................................................21

*Terpin v. AT&T Mobility, LLC*,
 No. 18-CV-06975-ODW-KS, 2023 WL 3431906 (C.D. Cal. Mar. 20, 2023) .......................22

**Statutes**

16 U.S.C. § 1532(19) ...............................................................................8

16 U.S.C. § 1538(a)(1)(B) ...............................................................................8

16 U.S.C. § 1540 ...............................................................................7

**Rules**

Fed. R. Civ. P. 37(c)(1) ...............................................................................22

Fed. R. Civ. P. 56(a) ...............................................................................10

Fed. R. Civ. P. 56(e) ...............................................................................11

Fed. R. Civ. P. 12(b)(6) ...............................................................................2

**Regulations**

9 C.F.R. § 3.131(c) ...............................................................................23

50 C.F.R. § 17.3 ...............................................................................8, 9, 10, 20

*Captive-bred Wildlife Regulation*, 63 Fed. Reg. 48634, 48636 (Sept. 11, 1998) ...........................9

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - iv

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1

## I.  INTRODUCTIONAND RELIEF REQUESTED

2

3    Plaintiff, Animal Legal Defense Fund ("**ALDF**"), brought public nuisance claims (now

4 dismissed) and Endangered Species Act ("**ESA**") claims (now mostly dismissed) against

5 Defendants, Olympic Game Farm, Robert Beebe, James Beebe, and Kenneth Beebe (collectively,

6 "**OGF**"), because ALDF does not believe that zoos should exist.  ALDF represents people who

also do not like zoos, yet still visit zoos where they see things that, predictably, they do not like.

7    This original lawsuit ("***ALDF I***") has been pending for five years, during which two

8 geriatric brown bears (Good Mama and Samantha) living in the same enclosure unfortunately

9 suffered injuries from cheatgrass, a pervasive weed that is a common bane to pet owners in the

10 Pacific Northwest and the nation.[1]  Both bears were immediately treated for the injuries under the

11 direction of OGF's veterinarian.[2]  Both bears are now deceased, and there is no evidence that their

12 deaths were caused by cheatgrass.[3]  Nor has any other brown bear suffered cheatgrass-related

13 injuries since then.

14    ALDF learned about Samantha and Good Mama's injuries through discovery.[4]  No ALDF

15 member or expert saw these injuries, witnessed the medical treatment provided, or saw the bears

16 after their injuries.[5]  In fact, it is not clear that any ALDF member *ever* saw these two bears.

17 Nonetheless, years after both bears died, ALDF filed a new lawsuit ("***ALDF II***") alleging that

18 OGF is violating the ESA because of cheatgrass, and that other brown bears are at risk of suffering

19 cheatgrass-related injuries.[6]

20

21

22    [1] *See* Declaration of Robert Beebe ("**Beebe Decl.**") ¶¶ 15.

23    [2] *Id.* at ¶¶ 25-30.

24    [3] *Id.* at ¶¶ 28, 38 & Exs. J-K.

   [4] Dkt. 279 at ¶¶ 19, 22.

25    [5] *See id.*

26    [6] *Animal Legal Defense Fund v. Olympic Game Farm*, No. 3:22-cv-05774.

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 1

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone* 206.624.0900

1    Defendants are entitled to summary judgment on ALDF's cheatgrass claims for the

2    following three reasons.

3    *First*, ALDF lacks Article III standing to maintain these cheatgrass claims.  Although

4    ALDF managed to artfully plead its complaint to avoid dismissal under Rule 12(b)(6), depositions

5    of ALDF members Carol McGee, Scott McGee, and Carolyn Long confirm that they only learned

6    of the cheatgrass-related issues second hand through ALDF's selective production of documents

7    provided long *after* they visited OGF, and long *after* they decided that they were never returning

8    to OGF for other reasons.  These members continue to condition their return to OGF on complete

9    resolution of *all* their non-cheatgrass-related concerns.  ALDF's alleged injuries are self-inflicted

10   and its members' alleged plans to return to OGF are illusory.

11   *Second*, ALDF's claim fails to meet statutory jurisdictional requirements.  An ESA citizen-

12   suit is limited to injunctive relief against "ongoing" violations.  Samantha and Good Mama's

13   injuries were unfortunate, but discrete events, and even if those injuries were ESA violations, they

14   were wholly in the past at the time *ALDF II* was filed.  There is no evidence of continuing or

15   ongoing cheatgrass-related injuries.

16   *Third*, ALDF's ESA claims fail on the facts.  ALDF's burden is to come forward with

17   evidence showing that an injunction is needed to prevent imminent injury or death to grizzly bears

18   caused by cheatgrass.  ALDF cannot meet this burden.  There are only five alleged grizzly bears

19   living at OGF, and those five bears have lived at OGF for their entire lives *without suffering any*

20   *cheatgrass injuries*.  That is so because OGF engages in regular cheatgrass control practices that

21   minimize the risk of injury.  ALDF has no evidence that these practices are inadequate and

22   identifies no other reasonable cheatgrass control measures that OGF should be implementing, and

23   tellingly, identifies no such measures in either its 60-day notice or its Amended Complaint.

24   For these reasons, ALDF's cheatgrass-related claims should be dismissed.

25

26

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 2

121005723.6 0069042-00001

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1    ## II.  STATEMENT OF FACTS

2    **A.    Cheatgrass Is an Invasive Weed That Is Difficult to Control.**

3    Cheatgrass is an invasive annual grass found across the Pacific Northwest.[7]  Cheatgrass is

4    not inherently dangerous to domestic and wild animals, especially in its juvenile green stage when

5    it is commonly consumed by hoofstock and other animals.[8]  Instead, cheatgrass can pose as a

6    danger after it produces grass awns that dry out during the summer.[9]  Grass awns can get caught

7    in fur, and if it is not removed through grooming or other means, the awn may migrate and

8    penetrate the skin, injuring the animal and potentially leading to an infection.[10]

9    No one can credibly dispute that cheatgrass is everywhere in the West.  It is endemic, and

10   impossible to eradicate.[11]  It can even be found in Sequim Animal Hospital's lawn and on ALDF

11   expert Dr. Lisa Harrenstien's property.[12]  Because of its pervasiveness, pets commonly experience

12   cheatgrass injuries while outdoors.[13]  Indeed, ALDF member Carol McGee admits that her dog

13   was injured by cheatgrass *twice*, once requiring surgery.[14]  Apparently, even humans are not

14   immune as ALDF member Carolyn Long testified her relative "almost died" from a cheatgrass

15   injury.[15]

16

17

18

19   _____

20   [7] Beebe Decl. ¶ 15.

     [8] *Id.*

21   [9] *Id.*

     [10] *Id.*

22

23   [11] *Id.*

24   [12] Declaration of Jason Morgan ("**Morgan Decl.**"), Exs. A (Deposition of Dr. Heather Short ("**Short Dep.**") 96:5-10) & B (Deposition of Dr. Lisa Harrenstien ("**Harrenstien Dep.**") 39:24-40:9).

25   [13] Morgan Decl., Ex. A (Short Dep. 96:14-20).

26   [14] *Id.*, Ex. C (Deposition of Carol McGee ("**C. McGee Dep.**") 21:25-23:12).

     [15] *Id.*, Ex. D (Deposition of Carolyn Long ("**Long Dep.**") 55:24-56:7).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 3

1    **B.    OGF Manages and Controls Cheatgrass.**

2            In OGF's 50-plus year history, it has experienced less than a handful of instances where an

3    animal suffered injuries from cheatgrass awns.[16]  That is because OGF actively manages and

4    controls cheatgrass through multiple measures, including pulling cheatgrass down to its roots,

5    mowing and trimming to prevent grass awns from developing and drying out, planting native

6    plants to choke out cheatgrass, selective use of herbicides, and when necessary, tilling (or

7    excavation) of fields.[17]

8            OGF has never received a citation from the USDA regarding cheatgrass in its animal

9    enclosures and its property, or for cheatgrass-related injuries and related veterinary care.[18]  OGF

10   knows that it is impossible to eradicate the weed and, therefore, continuously monitors animal

11   enclosures for signs of cheatgrass growth. [19]  OGF regularly investigates new methods of

12   eradicating cheatgrass that other farmers and similar facilities utilize to incorporate into its current

13   animal husbandry practices.[20]  This includes testing non-toxic solutions, such as white vinegar,

14   and other chemical herbicides, such as WeedMaster and Killz All, around the bear enclosures'

15   hotlines, other fence lines, and public walkways and pathways.[21]  None of these solutions have

16   successfully eradicated cheatgrass, but they have helped mitigate cheatgrass growth.[22]

17   **C.    Brown Bears at OGF.**

18           There are approximately 350 animals currently living at OGF.[23]  Since 2018, there have

19   been 15 brown bears and three black bears who have lived at OGF, with many more brown bears

20   _____

21           [16] Beebe Decl. ¶ 24; *see also* Morgan Decl., Ex. E (Deposition of Clayton Richmond ("**Richmond Dep.**")) 182:4-13).

22           [17] Beebe Decl. ¶¶ 17-22.

23           [18] *Id.* at ¶¶ 8-14 & Exs. C-H.

         [19] *Id.* at ¶¶ 15-17.

24           [20] *Id.* at ¶¶ 21.

25           [21] *Id.* at ¶ 21.

         [22] *Id.*

26           [23] *Id.* at ¶ 4.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 4

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1   during the last 50-plus years of operation.[24]  Of those bears, only six are alleged grizzly bears

2   (including one geriatric bear who recently died) who may be subject to protection under the ESA:

3   Donald, Moxie, Lilly (or Lillie), Fee, Fie, and Fumm.[25]  Donald and Moxie were born in Canada

4   in captivity and were transferred to OGF in June 2016 when they were six months old.[26]  Lilly was

5   born at OGF in 1991, and Fee, Fie, and Fumm were born at OGF in 1998.[27]  As of December 2023,

6   Donald and Moxie are approximately seven years old, Lilly is approximately 32 years old, and Fee

7   and Fie are approximately 25 years old.[28]  Fumm recently passed away of old age at 25 years old.[29]

8   None of these bears have experienced a cheatgrass injury while living at OGF.[30]

9       Good Mama and Samantha are two brown bears who were born at OGF in January 1991.[31]

10   These two geriatric bears lived in the same enclosure and experienced cheatgrass-related injuries

11   in August and September 2019.[32]  Both bears received prompt medical attention from Sequim

12   Animal Hospital for their injuries.[33]  For the bear Samantha, treatment of cheatgrass injuries

13   included temporary confinement in a mobile bear trailer, at the direction of the attending

14   veterinarian.[34]  OGF proceeded to remediate the bear field by removing a foot of topsoil and

15   reseeding the entire enclosure.[35]  Good Mama passed away on September 20, 2019.[36]  Samantha

16

17   [24] *Id.*

18   [25] ALDF has stipulated that Miska, Yuri, Tug, and Bella are not protected by the ESA.

19   [26] Beebe Decl. ¶ 4.

     [27] *Id.*

20   [28] *Id.*

21   [29] *Id.*

22   [30] *Id.*

23   [31] *Id.* at ¶¶ 25, 29.

     [32] *Id.* at ¶ 24.

24   [33] *Id.* at ¶ 25, 29.

25   [34] *Id.* at ¶ 34.

     [35] *Id.* at ¶ 31.

26   [36] *Id.* at ¶ 28.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 5

1    passed away in March of 2021.[37]  Neither necropsy report showed that their deaths were directly

2    caused by their cheatgrass-related injuries.[38]

3          Since 2019, no brown bear has experienced a cheatgrass-related injury at OGF.[39]  And to

4    OGF's knowledge, Samantha and Good Mama were the only brown bears at OGF to have ever

5    suffered a cheatgrass-related injury.[40]

6    **D.    Procedural Background.**

7          In 2018, ALDF filed suit against OGF, asserting jurisdiction under the citizen-suit

8    provision of the ESA.[41]  For the first time at summary judgment in March 2021, ALDF asserted

9    that the bear enclosures contained cheatgrass and that the use of a bear trailer to treat bears who

10   were healing from a cheatgrass injury amounted to a take under the ESA.[42]

11         In March 2022, this Court denied ALDF's summary judgment motion in its entirety and

12   granted in part OGF's summary judgment motion.[43]  The Court dismissed a number of ALDF's

13   claims (including the cheatgrass-related claims), primarily on two grounds:  (1) ALDF failed to

14   identify a relevant generally accepted animal husbandry standard, or (2) the Court lacked

15   jurisdiction over claims that were not included in ALDF's 60-day notice letter.  In so holding, the

16   Court rejected ALDF's reliance on the Association of Zoos and Aquariums ("**AZA**") accreditation

17   standards, concluding that "the AZA is an elite, voluntary, zoological association" and that

18   aspirational AZA standards do not reflect generally accepted animal husbandry practices.[44]

19

20   ─────────────────────

21        [37] *Id.* at ¶ 38.

22        [38] *Id.* at ¶ 28, 38 & Exs. J-K; Morgan Decl., Exs. F (Deposition of Dr. Laura Williams 16:3-19, 29:3-11, 30:10-16) & G (Deposition of Dr. Jeffrey Abbott 20:12-23, 23:10-24:4, 30:19-31:25).

23        [39] Beebe Decl. ¶ 24.

         [40] *Id.*

24        [41] *Animal Legal Defense Fund v. Olympic Game Farm*, No. 3:18-cv-06025 (*ALDF I*).

25        [42] Dkt. 147 at 18-22.

26        [43] Dkts. 228, 229.

         [44] Dkt. 228 at 21.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 6

1    ALDF subsequently sought leave to amend its complaint to include the same cheatgrass

2    claim, which was denied in September 2022.[45]  In October 2022, ALDF filed a second lawsuit,

3    *ALDF II*, premised on the same cheatgrass claim already raised and dismissed on summary

4    judgment in *ALDF I*.[46]  ALDF alleged that OGF was violating the ESA by harassing and harming

5    brown bears by keeping them "in enclosures rife with cheatgrass" and by providing the bears with

6    inadequate veterinary care for cheatgrass-related injuries.[47]  The Court dismissed ALDF's

7    complaint for lack of standing.[48]  ALDF then amended its complaint and asserted it had

8    organizational standing based on three ALDF members (Carol and Scott McGee and Carolyn

9    Long) who learned about Good Mama and Samantha's 2019 cheatgrass injuries and related

10   veterinary care purely "[t]hrough ALDF's discovery in this lawsuit, pre-consolidation."[49]  The

11   McGees have not been to OGF since 2014, and Ms. Long had not been to OGF since 2017.[50]  No

12   ALDF member has personally seen the bear trailer either.[51]

13   **E.    ESA Legal Framework.**

14   The ESA citizen-suit provision provides for a cause of action to enjoin ongoing violations

15   of the ESA or its implementing regulations or to prevent imminent future violations that are

16   reasonably certain to occur.[52]  As a forward-looking statute, the ESA does not authorize courts to

17   issue injunctive relief for "wholly past violations."[53]  Further, the citizen-suit provision is strictly

18   _____

19   [45] Dkts. 234, 255.

20   [46] *ALDF II*, Dkt. 1.

     [47] *Id.* at ¶¶ 1, 37.

21   [48] *ALDF II*, Dkt. 20 at 8.

22   [49] *ALDF II*, Dkt. 21 at ¶¶ 5, 8.

23   [50] Morgan Decl., Exs. C (C. McGee Dep. 64:12-16), D (Long Dep. at 50:19-22), & H (Declaration of Scott McGee ("**S. McGee Dep.**") 44:2-23).

24   [51] *See* Dkt. 279 at ¶ 22.

25   [52] 16 U.S.C. § 1540; *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1120 (N.D. Cal. 2017), *order clarified*, No. 16-CV-04294-WHO, 2018 WL 2010980 (N.D. Cal. Apr. 30, 2018).

26   [53] *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 63-64 (1987) (interpreting identical language in the Clean Water Act's citizen-suit provision).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 7

1   limited to prospective injunctive relief and does not allow for an award of damages or civil

2   penalties.[54]  Any injunctive relief granted must be "precisely tailored to remedy the precise [ESA]

3   violation."[55]

4          Under the ESA, it is unlawful to "take" any species listed as endangered or threatened if

5   provided by special regulation.[56]  The term "take" is defined as "harass, harm, pursue, hunt, shoot,

6   wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[57]  The terms

7   "harass" and "harm" are relevant here and have "a different character when applied to an animal

8   in captivity than when applied to [an] animal in the wild."[58]

9      **1.     Harass**

10          The term "harass" includes "an intentional or negligent act or omission which creates the

11   *likelihood of injury* to wildlife by annoying it to such an extent as to significantly disrupt normal

12   behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."[59]  That

13   definition, however, is limited for captive wildlife:

14          [W]hen applied to captive wildlife, ["harassment"] does not include generally
            accepted:
15

16                  (1) Animal husbandry practices that meet or exceed the minimum standards
            for facilities and care under the Animal Welfare Act,

17                  (2) Breeding procedures, or

18

19

20

21          [54] *Cascadia Wildlands v. Scott Timber Co.*, 328 F. Supp. 3d 1119, 1131-32 (D. Or. 2018); *Ctr. for Env't Sci. v. Cowin*, No. 1:15-CV-01852-LJO-BAM, 2016 WL 3196774, at *3 (E.D. Cal. June 8, 2016).

22          [55] *Animal Prot. Inst., Ctr. for Biological Diversity v. Holsten*, 541 F. Supp. 2d 1073, 1080 (D. Minn. 2008); *see also Strahan v. Coxe*, 127 F.3d 155, 171 (1st Cir. 1997) (denying request for permanent injunctive relief because
23   "probable violation of the ESA could be curtailed without such extreme measures").

24          [56] 16 U.S.C. § 1538(a)(1)(B).

            [57] *Id.* at § 1532(19).

25          [58] *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F. Supp. 3d 1327, 1349-50
26   (S.D. Fla. 2016), *aff'd*, 879 F.3d 1142 (11th Cir. 2018), *adhered to on denial of reh'g*, 905 F.3d 1307 (11th Cir. 2018).

            [59] 50 C.F.R. § 17.3 (emphasis added).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 8

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1       (3) Provisions of veterinary care for confining, tranquilizing, or
2       anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.[60]

3  "[M]easures necessary for the proper care and maintenance of listed wildlife in captivity do not

4  constitute 'harassment' or 'taking'."[61]  To establish harassment under the ESA, a plaintiff bears

5  the burden to prove "(1) that the [defendant's] animal husbandry practices fall within 50 C.F.R.

6  § 17.3's definition of harass, *and* (2) that those practices do not fall within the first enumerated

7  exclusion from that definition."[62]

8       The ESA does not establish standards for animal care of listed species in captivity.[63]

9  "Congress elected not to prescribe captive care requirements in the ESA, or expand the definition

10  of 'take' to include the humane treatment of endangered species in captivity."[64]  Instead, those

11  standards are issued by the USDA pursuant to the Animal Welfare Act ("**AWA**") and enforced by

12  Animal and Plant Health Inspection Service ("**APHIS**"), an agency within the USDA.[65]  Other

13  than the AWA, "[t]here is no set of regulations or other guidance promulgated by the FWS or

14  USDA delineating what 'generally accepted' animal husbandry practices are with respect to any

15  endangered or threatened species . . . ."[66]

16

17

18

---

19      [60] *Id*.

20      [61] *Captive-bred Wildlife Regulation*, 63 Fed. Reg. 48634, 48636 (Sept. 11, 1998) ("The purpose of amending the [FWS] definition of 'harass' is to exclude proper animal husbandry practices that are not likely to result in injury from the prohibition against 'take'.  Since captive animals can be subjected to improper husbandry as well as to harm and other taking activities, the [FWS] considers it prudent to maintain such protections, consistent with Congressional intent.").

22      [62] *Hill v. Coggins*, 867 F.3d 499, 510 (4th Cir. 2017) (emphasis added).

23      [63] *Miami Seaquarium*, 189 F. Supp. 3d at 1354.

24      [64] *Id*.

25      [65] *Id*. ("[Congress] left such responsibility with the Secretary of Agriculture under the authority granted by the AWA and his delegee, APHIS."); *Mo. Primate Found. v. People for Ethical Treatment of Animals, Inc.*, No. 4:16 CV 2163 CDP, 2018 WL 1420239, at *2 (E.D. Mo. Mar. 22, 2018).

26      [66] *Hill v. Coggins*, 423 F. Supp. 3d 209, 219 (W.D.N.C. 2019).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 9

1    **2.    Harm**

2    The term "harm" is more serious and is limited to an act which "*actually kills or injures*

3    wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or

4    sheltering."[67]  To establish harm, plaintiffs must show by the preponderance of the evidence that

5    there is "an actual injury [that] has occurred or is reasonably certain to occur in the imminent

6    future," not just the mere possibility for a future injury.[68]

7    **III.  ARGUMENT**

8    A moving party is entitled to summary judgment if "there is no genuine dispute as to any

9    material fact and the movant is entitled to judgment as a matter of law."[69]  A factual dispute is

10   material if its resolution will affect the outcome of the litigation; it is genuine only if the evidence

11   "is such that a reasonable jury could return a verdict for the nonmoving party."[70]  The basic issue

12   is "whether the evidence presents a sufficient disagreement to require submission to a jury or

13   whether it is so one-sided that one party must prevail as a matter of law."[71]

14   **A.    ALDF Cannot Establish Standing by Manufacturing Injury Created by Reading**
     **Legal Pleadings.**
15

16   This Court initially dismissed ALDF's initial complaint in *ALDF II* for lack of standing

17   and for relying on "speculat[ion] that there might be an ALDF member who saw cheatgrass in the

18   Grizzly bear enclosures, recognized it for the hazard it posed to the animals, and was injured as a

19   result."[72]  Although ALDF's artful pleading and "mere allegations" were sufficient to survive a

20   second motion to dismiss, ALDF must show on summary judgment "specific facts" that at least

21   one ALDF member has suffered an actual "concrete and particularized" injury that is fairly

22

23   [67] 50 C.F.R. § 17.3 (emphasis added).

     [68] *Hill*, 423 F. Supp. 3d at 224.

24   [69] Fed. R. Civ. P. 56(a).

25   [70] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

26   [71] *Id.* at 251-52; *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 685-86 (9th Cir. 2017).

     [72] *ALDF II*, Dkt. 20 at 7-8.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 10

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

traceable to cheatgrass in the brown bear enclosures and redressable by a favorable decision.[73] But depositions of ALDF's members and an additional round of discovery has confirmed that ALDF relies on "self-inflicted" harm to manufacture standing for cheatgrass-related claims and that no ALDF member has any present intent to return to OGF.[74]

### 1.   Organizational Standing Legal Principles

An organization only has standing to assert a legal claim on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[75]

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[76]

Article III standing is not "commutative" and "a plaintiff must demonstrate standing for each claim he seeks to press."[77]  "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."[78]

---

[73] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting Fed. R. Civ. P. 56(e)).

[74] *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

[75] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

[76] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

[77] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006).

[78] *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("If the right to complain of one administrative deficiency automatically conferred the right to complain of all administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review.").

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 11

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1    **2.      ALDF Members Did Not Suffer Recreational or Aesthetic Injuries Related to Brown Bears and Cheatgrass While at OGF.**

2

3       ALDF's original lawsuit (*ALDF I*) was based on a mistaken visit in 2014 by Carol and

4    Scott McGee, who left upset after seeing brown bears eat bread.[79] Ms. Long also visited the brown

5    bears several times (with the last time in 2015) and professed to be disturbed by bears eating bread,

6    although she oddly admitted that she, her husband, and her grandson fed bread to the bears.[80]

7       None of the declarants have any meaningful connection to any of the bears at OGF, let

8    alone the brown bears at issue here.  The McGees saw two or three bears once in 2014 and spent

9    a grand total of less than five minutes observing those bears, which Ms. McGee admits looked

10   "physically, fine."[81]  Ms. Long saw a handful of bears a few more times, spending no more than

11   five minutes each time while driving through the bear fields.[82]  The last time Ms. Long saw a

12   brown bear at OGF was in 2015 and she "did not see any injuries" to the bears.[83]  She visited OGF

13   in 2017 to gather information for *ALDF I*, but she did not bother to check in on the brown bears.[84]

14   Neither the McGees nor Ms. Long know which bears they saw during their brief visits, whether

15   those bears are still alive, or whether the bears they saw were, indeed, grizzlies.[85]  Regardless, all

16   three readily admit that that they refuse to return to OGF until *all* of their identified concerns from

17   *ALDF I* are resolved.[86]

18

19   _____

20   [79] Dkt. 151 at ¶¶ 8-9, 12; Dkt. 152 at ¶¶ 5-6, 8.

20   [80] Dkt. 153 at ¶¶ 5, 16; Morgan Decl., Ex. D (Long Dep. 37:8-38:5, 38:14-39:6, 46:18-21, 59:20-60:6).

21   [81] Morgan Decl., Ex. C (C. McGee Dep. 42:6-10).

22   [82] *Id.*, Ex. D (Long Dep. 26:19-21, 31:18-20, 42:25-43:2).

23   [83] *Id.*, Ex. D (Long Dep. 44:4-5, 59:20-60:6).

24   [84] *Id.*, Ex. D (Long Dep. 46:9-21, 59:20-60:6).

25   [85] With no actual knowledge about which bears they have briefly seen, the McGees and Ms. Long "cannot in the circumstances of this case have been injured" by their observations at OGF.  *Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium*, 836 F. Supp. 45, 52 & n.4 (D. Mass. 1993).

26   [86] Morgan Decl., Exs. C (C. McGee Dep. 37:10-22, 63:11-22, 77:15-80:16), H (S. McGee Dep. 43:2-8, 48:22-49:11), & D (Long Dep. 53:23-54:2, 57:3-14).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 12

1    Over the course of this five-year litigation, ALDF stumbled upon a new legal theory related

2    to Good Mama and Samantha's 2019 cheatgrass injuries disclosed in discovery.  But ALDF could

3    not find a member who had actually observed and were injured by cheatgrass or any cheatgrass-

4    related injuries.  As a result, ALDF attempted to cause injury to its own members by providing the

5    McGees and Ms. Long with a selective set of court-filed documents discussing cheatgrass issues

6    at OGF.[87]  Again, neither the McGees nor Ms. Long have seen a brown bear at OGF since 2014

7    and 2015.  Further, it is undisputed that the McGees and Ms. Long only "became aware" of Good

8    Mama and Samantha's 2019 cheatgrass-related injuries "through ALDF's discovery" and that they

9    did not have any concerns related to cheatgrass during their past visits *until* ALDF fed them

10   information contained in court-filed documents.[88]  But a "self-inflicted injur[y]" does not create

11   standing.[89]  "In other words, [ALDF] cannot manufacture standing merely by inflicting harm on

12   themselves based on their fears of hypothetical future harm that is not certainly impending."[90]

13       Ms. Long stated in her deposition that she was not made aware of the cheatgrass-related

14   issues until she "saw the first amended complaint" in *ALDF II* or in the alternative, through court

15   filings or other unidentified documents provided by ALDF.[91]  Ms. Long explained that she

16   "learned about the cheatgrass [issues]" from four legal documents: "[her] declaration, the

17   declaration from Dr. Lisa Harrenstien, the first amended complaint, and the … request for …

18   partial summary judgment."[92]  She was not provided with any other legal documents, such as

19   Dr. Michael Briggs' expert report or Robert Beebe's declarations, and stated that she "assume[d]"

20   all the information ALDF gave her was complete and accurate because "it's a legal document" and

21

---

22   [87] *Id.*, Exs. C (C. McGee Dep. 65:10-66:1), H (S. McGee Dep. 33:1-12, 44:25-45:11), & D (Long Dep. 9:15-24, 57:16-59:2).

23   [88] Dkt. 279 at ¶¶ 19, 22.

24   [89] *Clapper*, 568 U.S. at 418.

25   [90] *Id.* at 416.

26   [91] Morgan Decl., Ex. D (Long Dep. 57:3-59:8).

     [92] *Id.*, Ex. D (Long Dep. 9:15-10:4; 56:3-59:8).  It is unclear which amended complaint Ms. Long has read.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 13

1   therefore "all legal and true."[93]  And despite her alleged distress, Ms. Long could not provide any

2   additional details about how she learned about the cheatgrass issues, such as when ALDF provided

3   her with the legal documents or what conversations she had with ALDF that may have triggered

4   her emotionally.  And to ensure continued opacity, ALDF has asserted attorney-client privilege

5   over the very communications that form the basis for these injuries.[94]

6          Ms. Long was equally clear that her emotional connection with the brown bears was based

7   on information she read in documents:

8          Q. Do you believe you have an emotional connection to the bears at
           Olympic Game Farm?

9          A. Yes.

10         Q. What is the basis for that connection?

11         A. Having read all the documents about their problems, their lack of
           vet care, their injuries, lack of treatment, and medications not given,
12         having learned that, I have an emotional connection to them.[95]

13

14  The aesthetic interest and distress that Ms. Long alleges is nothing more than a general grievance

15  that any "concerned bystander[]" has while reading the news about a topic that he or she cares

16  about written by someone with an agenda to push forward.[96]

17         Similarly, the McGees each testified that their knowledge of cheatgrass-related injuries and

18  their emotional connection to the brown bears here are based on documents that ALDF provided

19  to them—the specific timing and details of which ALDF has withheld as privileged.[97]  But in her

20  deposition, Ms. McGee testified that her knowledge of, and emotional connection to, the bears is

21  based on information supplied by ALDF years after-the-fact:

22         Q. And what have you heard about Samantha?

23  ────────────────

24         [93] *Id.*, Ex. D (Long Dep. 59:4-18).

         [94] *Id.*, Ex. I.

25         [95] *Id.*, Ex. D (Long Dep. 60:19-61:1).

         [96] *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013).
26
         [97] Morgan Decl., Ex. I.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 14

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

    A. Through the documents I've read … I think she's one of the bears that have passed away, but I'm not sure if that was the one that passed away from cheatgrass or some other form of -- some other health issues.

    Q. So your -- is it fair to say that your knowledge of Samantha comes only comes from documents provided to you?

    A. Yes.

    Q. And when were those documents provided?

    A. That was in the motion. *Sometime either end of 2022 or sometime in the beginning of 2023*, around there.
…

    Q. So if I understand correctly, your emotional connection is based solely on documents that you've read?
…

    THE WITNESS: So the two bears that I saw in 2014, I have an emotional connection. Do I know their names? No. The bears that I've read on the documents, do I have an emotional connection? Yes. Have I seen them? I don't know which one I have seen and have not seen in 2014.[98]

15 Scott McGee similarly testified that he learned about cheatgrass from "ALDF documentation" and

16 that he has an emotional connection to the brown bears "[b]ecause they're animals in captivity,

17 suffering. So basic human empathy."[99] If all it takes to establish an aesthetic injury-in-fact is to

18 feed witnesses with select pleadings describing defendant's conduct in a vacuum, then

19 organizations have free rein to shop for individuals who have visited an area at some point and

20 manipulate them into feeling distressed about carefully curated information. But the Supreme

21 Court has instructed that parties "cannot manufacture standing merely by inflicting harm on

22 themselves based on their fears of hypothetical future harm that is not certainly impending."[100]

23

24

25    [98] *Id.*, Ex. C (C. McGee Dep. 65:10-66:1, 67:2-11) (emphasis added).

    [99] *Id.*, Ex. H (S. McGee Dep. 44:1-46:8).

26    [100] *Clapper,* 568 U.S. at 416.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 15

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1    ALDF's theory of establishing injury-in-fact is especially problematic because it allows a

2    plaintiff to bootstrap an additional claim onto a preexisting aesthetic harm, which is contrary to

3    the principles that standing must be established for *each claim presented*, namely a "concrete and

4    particularized" injury that is "fairly … trace[able]" to the challenged conduct underlying each

5    claim and "not … th[e] result [of] the independent action of some third party not before the

6    court."[101]   Establishing injury-in-fact based on cherry-picked legal documents is especially

7    egregious when the attorneys hide the actual communications and disclosures from discovery on

8    privilege grounds.

9    **3.      ALDF Members Decided Long Ago to Never Return to OGF Based on the**
             **Living Conditions Observed During Their Visits.**

10

11    Even if the McGee's and Ms. Long's aesthetic injuries could be traced to cheatgrass in the

12    bear enclosures, their injuries are speculative given their firm decisions to never return to OGF for

13    other reasons—namely, the conditions of animal enclosures as they existed during their past visits.

14    None of those conditions that caused distress involved cheatgrass.  Because many of their concerns

15    have already been dismissed from this lawsuit, there is no actual and imminent injury.

16    During her deposition, Ms. Long explained that her visits to OGF made her sad because of

17    the conditions of the bear enclosures at the time of her visits.[102]  This is consistent with her 2021

18    declaration, in which she explained that she "intentionally ha[s] not visited [OGF] since 2017

19    because it is so depressing" due to the lack of "enrichment for the animals," the "barren and

20    dilapidated" nature of the animal enclosures, and animals begging for bread.[103]  Moreover, she

21    admitted that there must be more improvements made to OGF besides just having the "cheatgrass

22    … dealt with" for her to return, including legal claims that are no longer in this case.[104]  By

23

---

24    [101] *Lujan*, 504 U.S. at 560-61 (alterations in original) (citation omitted).

25    [102] Morgan Decl., Ex. D (Long Dep. 34:8-20, 40:5-41:3, 42:8-16, 44:19-45:1, 46:22-47:12).

26    [103] Dkt. 153 at ¶¶ 6, 11-12, 16, 19.

      [104] Morgan Decl., Ex. D (Long Dep. 51:4-9, 52:3-54:2).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 16

1   conditioning her return to OGF on changes that fall outside the scope of this lawsuit, ALDF cannot

2   show that Ms. Long has an "actual or imminent" injury.[105]

3        During their depositions, the McGees explained that they believe OGF engages in "animal

4   slavery"[106] and will not return to OGF unless all their concerns about the animal enclosure

5   conditions observed during their 2014 visit are addressed.[107]   Consistent with her 2021 declaration

6   explaining that she "left [OGF] traumatized over the conditions of the animals," Ms. McGee

7   identified multiple issues at OGF that must be resolved to warrant another visit. [108]   Mr. McGee

8   expressed the same concerns and stated that they did not want to pay an admission fee when they

9   were near OGF in 2017 and 2018 because "the sight of the animals four years back still weighed

10  heavy on us."[109]   Because their "all or nothing" remedy approach includes legal claims that already

11  have been dismissed, there is no possibility that the McGees will return to OGF, let alone see for

12  their own eyes any cheatgrass in the bear enclosures for the first time.   As a result, ALDF cannot

13  meet its burden to establish standing for its cheatgrass claim, warranting dismissal on summary

14  judgment.

15  **B.    ALDF's Cheatgrass Claim Is Not Actionable Under the ESA and Should Be
         Dismissed for Lack of Jurisdiction.**

16

17        Standing is not the only jurisdictional flaw with ALDF's cheatgrass claims.   Even if ALDF

18  could prove that Good Mama's and Samantha's 2019 cheatgrass-related injuries and use of the

19  bear trailer were actual violations of the ESA (which they are not), there is no evidence in the

20  record that shows an *ongoing* violation that needs to be or can be remedied.   Injuries to two brown

21  ─────────────────────

22  [105] *See Lujan*, 504 U.S. at 560, 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

23  [106] The McGees define "animal slavery" as "using animals … in ways that if they had a … choice in the
24  matter, they would … probably object" and "if humans were used that way, we could consider it enslavement." Morgan Decl., Ex. H (S. McGee Dep. 18:20-19:19); *see also id.*, Ex. C (C. McGee Dep. 19:1-20:7).

25  [107] Morgan Decl., Exs. H (S. McGee Dep. 47:17-49:1) & C (C. McGee Dep. 63:11-14, 77:15-80:14).

    [108] Dkt. 151 at ¶¶ 9-14; Morgan Decl., Ex. C (C. McGee Dep. 77:15-78:16, 79:18-80:14).
26
    [109] Dkt. 152 at ¶¶ 6-12, 15-17, 19; Morgan Decl., Ex. H (S. McGee Dep. 48:11-49:2).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 17

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1   bears who shared the same enclosure over four years ago are isolated events in the span of 50 years

2   of practice, and were remedied years before the complaint in *ALDF II* was filed.[110]  Because ALDF

3   relies entirely on "wholly past injuries," this Court lacks subject matter jurisdiction over ALDF's

4   cheatgrass claim.[111]

5          Congress designed the ESA citizen-suit provision to address harms that exist "in the present

6   or the future, not in the past." [112]  To obtain injunctive relief, a plaintiff "must prove that there is a

7   reasonable likelihood of future violations of the ESA."[113]  There must be "a real and immediate

8   threat of future or continuing injury *apart from any past injury*."[114]  "'Past exposure to illegal

9   conduct does not in itself show a present case or controversy regarding injunctive relief ... if

10  unaccompanied by any continuing, present adverse effects.'"[115]

11         Here, Donald, Moxie, Lilly, Fee, and Fie are the only alleged grizzly bears that could be

12  subject to protection under the ESA.[116]  None of those bears have ever sustained a cheatgrass-

13  related injury while living at OGF.[117]  Samantha herself never experienced another cheatgrass-

14  related injury after 2019, and died peacefully of old age in 2021.  Dr. Harrenstien even admitted

15  in her deposition that she has never seen any brown bears with cheatgrass-related injuries during

16  any of her visits to OGF in 2018, 2020, and 2023.[118]

17

18         [110] *See Gwaltney*, 484 U.S. 49, 59; *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 (9th Cir. 1994) (evidence of past takings standing alone cannot establish sufficient likelihood of a future injury).

19         [111] *Gwaltney*, 484 U.S. at 59-60.

20         [112] *Id.* at 59.

21         [113] *Nat'l Wildlife Fed'n*, 23 F.3d at 1511.

22         [114] *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) (emphasis added).

23         [115] *Lujan*, 504 U.S. at 564 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *see also Aransas Project*, 775 F.3d at 648 ("Although past wrongs may help establish the threat of a future injury, they are insufficient alone.").

24         [116] OGF continues to object to the classification of these six brown bears as "grizzly bears."  *See* Dkt. 206 at 11-14.

25         [117] There is no evidence of Good Mama or Samantha ever sustaining a cheatgrass-related injury except in 2019, nor is there evidence that these injuries were ESA violations.

26         [118] Morgan Decl., Ex. B (Harrenstien Dep. 58:23-59:13, 62:4-64:20, 72:24-73:3).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 18

1    Moreover, OGF has never received a citation or even a warning from professionally trained

2    USDA inspectors for cheatgrass in the bear enclosures, its cheatgrass maintenance practices, or its

3    veterinary care for animals who have sustained cheatgrass-related injuries.[119]  Even when USDA

4    was notified of Good Mama's cheatgrass encounter and subsequent death, the inspector still issued

5    a clean inspection report that said there were "[n]o non-compliant items identified during this

6    inspection."[120]

7    Under these circumstances, there is no plausible basis to allege an ongoing violation.

8    Plaintiff's expert admitted that she did not observe any cheatgrass at OGF during her visits in 2018

9    and 2020.[121]  Even ALDF's September 2023 site visit conducted for the sole purpose of finding

10   cheatgrass in bear enclosures did not reveal clear evidence of cheatgrass awns at OGF, and

11   revealed zero evidence of any cheatgrass-related injury.[122]  And no ALDF member has seen the

12   brown bear enclosures since 2015 at the latest.[123]  As for the bear trailer, it has only been used

13   twice to treat bears in the last 10 years (both times for Samantha) and has not been used for

14   recovery purposes since Samantha's 2020 non-cheatgrass-related injuries.[124]

15   Without an ongoing violation, "there is no effective relief that this Court could fashion to

16   redress the plaintiffs' alleged ESA related injuries, and any such decision by this Court would

17

18

19

20   _____

     [119] Beebe Decl. ¶¶ 8-14 & Exs. C-H.

21   [120] *Id.* at ¶ 28 & Ex. F.

22   [121] Morgan Decl., Ex. B (Harrenstien Dep. 58:23-59:13, 62:4-64:20).

23   [122] *Id.*, Ex. J (email from lab stating it "do[es] not have expertise in grasses of [the Pacific Northwest]" and
     that it "suspect[s]" the samples it tested is a species of barley, a genus that includes other plants besides cheatgrass
     and foxtail).

24   [123] *Id.*, Exs. C (C. McGee Dep. 64:12-16), H (S. McGee Dep. 44:2-23), & D (Long Dep. 59:20-60:6).

25   [124] Beebe Decl. ¶¶ 34, 37.  Future use of the bear trailer to treat future cheatgrass injuries is also entirely
     speculative.  It would require both a future cheatgrass injury to occur (which is unlikely) and then for the injury to
26   occur under circumstances that prompt a veterinarian to recommend use of the bear trailer for treatment purposes.
     These are not the kind of certainly pending ESA issues that warrant an injunction.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 19

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1    constitute an advisory opinion."[125]  Accordingly, this Court must dismiss the cheatgrass claim for

2    lack of subject matter jurisdiction.[126]

3    **C.    ALDF's New Cheatgrass Claims for Violation of the ESA Fails as a Matter of Law.**

4             Jurisdictional flaws aside, ALDF's cheatgrass claims fail on the merits.  ALDF's burden is

5    to come forward with admissible evidence showing that an ESA protected grizzly bear is either

6    being "harass[ed]" or "harm[ed]" by OGF.  This ALDF cannot do.  ALDF has no evidence that

7    any of the five brown bears currently living at OGF ever suffered a cheatgrass-related injury, and

8    cannot form a plausible argument that they are likely to do so in the future.  OGF engages in

9    aggressive and regular cheatgrass control practices, and ALDF has failed to identify a generally

10   accepted, AWA compliant cheatgrass control practice that OGF is not following.  Accordingly,

11   these ESA claims must fail.

12            **1.    ALDF Has No Credible Evidence of Harassment**

13            Under the ESA, harassment is "an intentional or negligent act or omission which creates

14   the *likelihood of injury* to wildlife by annoying it to such an extent as to significantly disrupt normal

15   behavioral patterns."[127]    As this Court previously explained, harassment does not include

16   "generally accepted" animal husbandry practices that are compliant with the AWA.[128]  ALDF has

17   the burden to show both (a) that there is such a "generally accepted" standard and (b) that OGF is

18   violating that standard.

19            Here, OGF's enclosures for brown bears are, without dispute, compliant with the AWA.

20   USDA inspector Diane Forbes testified that the brown bear enclosures meet the requirements of

21

22

---

23            [125] *Louisiana Crawfish Producers Ass'n-W. v. Mallard Basin, Inc.*, No. CV 6:10-1085, 2016 WL 8459914,
         at *6 (W.D. La. Nov. 8, 2016), *report and recommendation adopted as modified*, No. CV 10-1085 (LEAD), 2017 WL
24       946712 (W.D. La. Mar. 8, 2017).

25            [126] *Breaux v. Haynes*, No. CV 15-769-JJB-RLB, 2017 WL 5158699, at *6 (M.D. La. Aug. 3, 2017), *report
         and recommendation adopted*, No. CV 15-769-JJB-RLB, 2017 WL 5202873 (M.D. La. Aug. 21, 2017).

26            [127] 50 C.F.R. § 17.3.

              [128] *See* Dkt. 228 at 17.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 20

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1   the AWA.[129]  OGF has never received a USDA citation related to cheatgrass (or any  animal safety

2   issue) for brown bears.  This includes a USDA review of necropsy reports for Good Mama,

3   resulting in the conclusion that there were "[n]o non-compliant items."[130]

4          Furthermore, there should be no dispute that OGF is engaged in regular and appropriate

5   cheatgrass control measures.  As detailed above, these control measures include weeding, mowing,

6   plowing, and the limited use of herbicides, resulting in a historically good track record of

7   cheatgrass control.[131]  Dr. Harrenstien even identifies most of these practices as different ways to

8   control cheatgrass growth.[132]

9          Critically, ALDF's Amended Complaint and 60-day notice do not identify any specific

10   AWA violations associated with the control of cheatgrass (or the use of the bear trailer).[133]  Nor

11   do those documents identify any "generally accepted" cheatgrass control measures that OGF

12   should be using.[134]  The entire purpose of the 60-day notice provision is to identify actions that

13   can be taken to avoid ESA violations (and the need for unnecessary litigation).[135]  ALDF fails to

14   demonstrate (or even allege) "that there is a 'generally accepted' animal husbandry standard that

15   was so widely known as to give [OGF] fair notice about what they were required to do in order to

16   comply."[136]

17          ALDF, no doubt, will try to turn this into a battle of the experts about cheatgrass control.

18   But ALDF did not timely designate an affirmative expert for its cheatgrass claims, or produce an

19   expert report related to cheatgrass or the use of the bear trailer for Samantha.  Instead, ALDF

---

[129] Morgan Decl., Ex. K (Declaration of Dr. Diane Forbes Dep. 206:25-207:9, 208:25-209:7, 214:18-215:1, 215:8-11).

[130] Beebe Decl. ¶ 28 & Ex. F.

[131] *Id.* at ¶¶ 8-23.

[132] Morgan Decl., Ex. B (Harrenstien Dep. 100:5-16, 101:7-16, 105:9-19).

[133] *See generally* Dkts. 235-1, 279.

[134] *Id.*

[135] *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998).

[136] *Hill*, 423 F. Supp. 3d at 223-24.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 21

1    produced only "rebuttal" reports by Dr. Harrenstien and Dr. Angela Gibson in response to an

2    opinion by Dr. Briggs.  But ALDF, not OGF, bears the burden of showing harassment, and the

3    existence of a generally accepted practice that was not followed.  A rebuttal to Dr. Briggs cannot

4    satisfy that affirmative obligation.[137]

5           Besides, these rebuttal reports are unhelpful to ALDF.  Dr. Gibson discusses AZA

6    standards, which this Court has already found to be inapposite.[138]  Further, Dr. Gibson's opinion

7    is even less credible when she has not seen the brown bears, the brown bear enclosures, or the bear

8    trailer herself.

9           Dr. Harrenstien's views are equally unhelpful.  She conceded in her deposition that she is

10   not educated or trained on managing invasive weeds beyond what she does as a "homeowner …

11   [in her] own yard."[139]  Without any authority, training, or experience, she asserts that even a single

12   grass awn found in an animal enclosure would warrant a citation from a USDA inspector for

13   violating the AWA.[140]  Yet, no USDA inspector has ever issued a citation or warning regarding

14   cheatgrass in the brown bear enclosures (or any other enclosures) or the veterinary care for

15   cheatgrass-related injuries.[141]  Indeed, the lack of USDA citations about the bear enclosure

16   conditions in the last six years and historically rare instances of animals sustaining cheatgrass-

17   related injuries reflect how OGF's cheatgrass maintenance practices meet the overall purpose of

18

19

20

21

---

22   [137] *See Terpin v. AT&T Mobility, LLC*, No. 18-CV-06975-ODW-KS, 2023 WL 3431906, at *7-9 (C.D. Cal. Mar. 20, 2023); *see also* Fed. R. Civ. P. 37(c)(1).

23   [138] Dkt. 229 ("Plaintiff has failed to show that the [AZA] standards of excellence, which have been adopted

24   by a small minority of exhibitors, reflect "generally accepted" animal husbandry practices and have offered no other standards against which to measure defendants' conduct.").

25   [139] Morgan Decl., Ex. B (Harrenstien Dep. 39:24-40:12).

26   [140] *Id.*, Ex. B (Harrenstien Dep. 86:19-88:4).

     [141] Beebe Decl. ¶¶ 8-14, 23 & Exs. C-H.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 22

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1    the AWA to "ensure the humane treatment of animals"[142] and the AWA regulation to keep the

2    "[p]remises … clean and in good repair in order to protect the [brown bears] from injury . . . ."[143]

3        More importantly, Dr. Harrenstien testified that what is considered generally accepted

4    practices to control cheatgrass is completely subjective:

5        Q. Is there a generally accepted practice regarding the management,
         control, and removal of cheatgrass, foxtail, barley, and other grasses
6        with awns from animal enclosures?

7        A. *There must be.*  I mean, there -- there are sort of agricultural
         recommendations ….   But re-tilling, mechanically removing as
8        many of those particular grass species as you can just so you don't
         have to do this over and over and replace those grasses with grasses
9        that don't make awns because there are plenty of those grass species.

10       ….

11       Q. Are there any other generally accepted practices regarding the
         management, control, and removal of cheatgrass, foxtail or barley,
12       or grasses with awns, in your opinion?

13       A. I would say -- my opinion is that the herbicide route is not likely
         to be effective.  But, again, I haven't -- I haven't had to do that. I just
14       know that in general, the grasses are more resilient than whatever
         toxin you're going to apply to them.

15
         Q. So my question was a little bit different --
16
         A. So the answer is no.
17
         Q. Okay.  So there are no other generally accepted practices that
18       you're aware of regarding the management, control, and removal of
         cheatgrass, foxtail, barley, and other grasses with awns?
19
         A. Not other than what I've already described.[144]
20
    This equivocal testimony fails to provide a generally accepted standard that facilities should

21   follow.  And to the extent that it does, OGF has already implemented the control practices that

22   Dr. Harrenstien identifies, namely the herbicides, mowing, tilling, and removal of cheatgrass.[145]

23   _____

24       [142] *Just Puppies, Inc. v. Frosh*, 457 F. Supp. 3d 497, 515 (D. Md. 2020).

25       [143] 9 C.F.R. § 3.131(c).

26       [144] Morgan Decl., Ex. B (Harrenstien Dep. 100:5-16, 102:8-24) (emphasis added).

         [145] Beebe Decl. ¶¶ 15-22.

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 23

1    The court in *Hill* explained the constitutional due process justifications behind plaintiff's

2    burden to show by the preponderance of the evidence "a clearly articulated, findable, and

3    understandable exposition of a 'generally accepted' animal husbandry standard."[146] There, zoo

4    visitors similarly brought an ESA citizen suit against zoo operators for allegedly harming and

5    harassing grizzly bears based on their bear enclosure conditions.[147] The court rejected the

6    plaintiffs' reliance on the AZA accreditation standards as a "generally accepted" animal husbandry

7    practices because such standards were developed by a voluntary zoological organization and

8    adopted by less than 10 percent of the 2,800 USDA-licensed exhibitors.[148] Plaintiffs' expert

9    opinions based on those AZA accreditation standards were nothing more than a "subjective

10   opinion of his 'reasonable expectation' [that] cannot and does not carry the force of law as a federal

11   regulation."[149]

12       Similarly, here, ALDF continues to rely on Dr. Harrenstien's vague opinions and the AZA

13   accreditation standards to challenge OGF's cheatgrass maintenance practices in its untimely

14   rebuttal expert opinions. This is because Dr. Harrenstien has admitted that there are no written

15   generally accepted animal husbandry practices regarding cheatgrass maintenance and that one

16   must resort to researching the internet, emailing listservs, or asking agricultural extension

17   agents.[150] She characterizes generally accept animal husbandry practices as "a best practices thing,

18   a common-sense thing."[151] But just as in *Hill*, Dr. Harrenstien's opinion is admittedly not rooted

19   in "any learned treatise, published literature, scholarly writing or peer-reviewed material in support

20

21   ―――――――――――――
     [146] 423 F. Supp. 3d at 217, 220-21.

22   [147] *Id.* at 211.

23   [148] *Id.* at 222.

24   [149] 423 F. Supp. 3d at 220; *see also id.* at 219 ("[Plaintiffs] cite[] to a formally adopted set of regulations, but then dictates that those regulations are superseded by a higher, more stringent standard that cannot be found in the Code of Federal Regulations or anywhere else.").

25   [150] Morgan Decl., Ex. B (Harrenstien Dep. 105:4-23, 106:14-108:3); *see also id.* (Harrenstien Dep. 93:20-

26   94:2).

     [151] *Id.*, Ex. B (Harrenstien Dep. 93:11-19).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 24

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1  of [her] conclusion that [OGF's cheatgrass maintenance] animal husbandry practices are not

2  'generally accepted.'"[152]

3       Because of the extremely broad nature of what is considered generally accepted cheatgrass

4  control and lack of specific AWA regulations, ALDF cannot meet its burden of proof to show that

5  OGF has harassed the six brown bears identified in its Amended Complaint by violating the AWA

6  or generally accepted animal husbandry standards.  Any expert opinion it offers is unsubstantiated,

7  conclusory, and undermined by the totality of the record.  ALDF cannot even identify what more

8  OGF should be doing in terms of its cheatgrass maintenance practices because short of turning the

9  bear enclosures into a barren, concrete filled cell devoid of *any vegetation*, OGF already has

10  explored and implemented commonly used cheatgrass control procedures.  Accordingly, the

11  cheatgrass claim should be dismissed.

12      **2.    There Is No Evidence That the Six Brown Bears Have Been "Harmed" by OGF's Cheatgrass Maintenance Practices.**

13

14       ALDF also cannot show that OGF's cheatgrass maintenance procedure and related

15  veterinary care have subjected any of the six brown bears to "harm" as defined by the ESA.  "A

16  mere potential for future injury is insufficient to establish a 'harm'"[153]  Instead, there must be

17  evidence that "an actual injury has occurred or is reasonably certain to occur in the imminent

18  future" that will significantly impair essential behavioral patterns, including breeding, feeding, or

19  sheltering.[154]

20       As stated above, none of the six brown bears identified in the Amended Complaint have

21  been killed or injured by cheatgrass in their bear enclosures.  ALDF's expert admits as much.[155]

22  And OGF's year-round cheatgrass maintenance practices mitigate and minimize the threat that

23

24      [152] *Hill*, 423 F. Supp. 3d at 223.

25      [153] *Id.* at 224.

26      [154] *Id.*; *see also Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784-86 (9th Cir. 1995).

    [155] Morgan Decl., Ex. B (Harrenstien Dep. 170:15-24).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 25

1    cheatgrass awns pose to the six brown bears to a degree significantly lower than what bears

2    naturally encounter in the wild.[156]

3         To the extent that ALDF points to Good Mama's and Samantha's 2019 cheatgrass injuries

4    as evidence of actual injuries, neither bear had ever sustained a cheatgrass-related injury except in

5    2019, nor is there any evidence of any other brown bear sustaining a cheatgrass-related injury.

6    These two injuries only show the *mere possibility* for an injury, not the regular and likely

7    occurrence of an injury.  Accordingly, this Court should conclude as a matter of law that there is

8    no evidence that shows that there is a triable issue left in this case regarding the cheatgrass claim.

9                              **IV.  CONCLUSION**

10        For the foregoing reasons, the Court should enter summary judgment dismissing ALDF's

11   claims for violation of the ESA based on cheatgrass and related veterinary care as a matter of law.

12

13        *I certify that this memorandum contains 8,342 words in compliance with the Local Civil*

14   *Rules.*

15                                   Respectfully submitted,

16        DATED: December 5, 2023.     STOEL RIVES LLP

17                                   /s/ Jason T. Morgan
18                                   Jason T. Morgan, WSBA No. 38346
                                     Aric H. Jarrett, WSBA No. 39556
19                                   Tiffany Wang, WSBA No. 57367
                                     600 University Street, Suite 3600
20                                   Seattle, WA  98101
21                                   Phone:  (206) 624-0900
                                     Facsimile:  (206) 386-7500
22                                   Email:   jason.morgan@stoel.com
                                              aric.jarrett@stoel.com
23                                            tiffany.wang@stoel.com

24                                   Attorneys for Defendants

25

26
    ───────────────
    [156] *See* Beebe Decl. ¶¶ 15-24; Morgan Decl., Ex. A (Short Dep. 96:5-10).

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 26

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on December 5, 2023, I caused the foregoing document to be

3   electronically filed with the Clerk of the Court using the CM/ECF system, which will send

4   notification of such filing to all counsel of record.

5      DATED:  December 5, 2023.

6

7      *s/ Jason T. Morgan*
       Jason T. Morgan, WSBA 38346

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (3:18-cv-06025-RSL) - 27

121005723.6 0069042-00001