UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br><br>                     Plaintiff,<br><br>     v.<br><br>OLYMPIC GAME FARM, INC., *et al.*,<br><br>                     Defendants. | CASE NO. 3:18-cv-06025-RSL<br><br>ORDER GRANTING IN PART DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY |

This matter comes before the Court on defendants' "Motion to Strike and Exclude Expert Testimony." Dkt. # 304. Defendants seek to exclude the testimony of Dr. Lisa Harrenstien and Angela Gibson because they were not timely disclosed and their testimony fails to satisfy *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In the alternative, defendants request that the experts not be permitted to testify in ALDF's case in chief and that testimony which goes beyond the scope of rebuttal be excluded in its entirety.

## BACKGROUND

On September 6, 2022, the Court denied plaintiff's motion to amend the complaint in the above-captioned matter to add, *inter alia*, an Endangered Species Act claim related to the housing of brown bears in cheatgrass-infested pens and the subsequent failure to provide adequate veterinary care for cheatgrass wounds. Dkt. # 255. Plaintiff filed a

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY - 1

second lawsuit on October 12, 2022, to pursue the cheatgrass claims. *Animal Legal Defense Fund v. Olympic Game Farm, Inc.*, 3:22-cv-05774-RSL ("*ALDF II*"). *ALDF II* was transferred to the undersigned, and the parties filed their joint status report. A case management order was entered in *ALDF II*, setting August 9, 2023, as the deadline for the exchange of expert reports. All discovery was to be completed by October 8, 2023. *ALDF II*, Dkt. # 15.

*ALDF II* and the above-captioned matter were consolidated on May 30, 2023. *ALDF II*, Dkt. # 33. The Court noted that the claims asserted in *ALDF II* were fairly narrow, that the case schedules could be aligned, and that consolidation would avoid duplication and inefficiencies. *Id*. at 1. A consolidated amended complaint was filed in the above-captioned matter, Dkt. # 279, and the Court issued an amended case management order on October 4, 2023, Dkt. # 285. Because the deadlines for joining additional parties, amending pleadings, and exchanging expert reports had already passed, they were not included in the revised scheduling order. The expert disclosure deadline regarding the cheatgrass claims was therefore August 9, 2023, with rebuttal reports due thirty days later, on September 8, 2023. Fed. R. Civ. P. 26(a)(2)(D).

ALDF did not serve any new expert reports by the August 9, 2023, deadline. On September 11, 2023, ALDF served rebuttal reports from Dr. Harrenstien and Ms. Gibson.[1] Defendants object to these reports as untimely and improper in that they contain opinions that go beyond the scope of the expert report submitted by their expert, Dr. Michael Briggs, on August 9, 2023.

---

[1] Both Dr. Harrenstien and Ms. Gibson submitted supplemental reports later in the year.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY - 2

# DISCUSSION

## A. Timeliness

The rebuttal expert reports offered by Dr. Harrenstien and Ms. Gibson were not timely served. ALDF's reliance on Federal Rules of Civil Procedure 6(d) and 26(a)(2)(D) is misplaced. Rule 6(d) extends the time in which a party must act only when "service is made under Rule 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to)." Dr. Briggs' expert report was served under Rule 5(b)(2)(E) and the parties' written "Stipulation for Electronic Service." Dkt. # 29. Rule 6(d) does not, therefore, apply. Rule 26(a)(2)(D)(ii) requires a party to make rebuttal expert disclosures "within 30 days after the other party's disclosure." As discussed above, ALDF's expert reports were served 33 days after Dr. Briggs' report was served.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Whether excluding expert evidence as a discovery sanction is justified requires consideration of "a five-factor test analyzing: 1) the public's interest in expeditious resolution of litigation; 2) the court's need to manage its docket; 3) the risk of prejudice to the defendants; 4) the public policy favoring disposition of cases on their merits; 5) the availability of less drastic sanctions." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (citing *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990)).

Under this test, exclusionary sanctions would be improper. Defendants assert that "[a]llowing untimely opinions would further delay resolution of this 5-year-old lawsuit to accommodate the late opinions and related discovery," Dkt. # 304 at 7, but the delay at issue covered one weekend: rebuttal reports were due on Friday, September 8th and were served on Monday, September 11th. Defendants had almost two months after service in

which to conduct any necessary follow-up discovery. The slight delay in service had no impact on the case schedule or defendants' ability to defend the litigation. The Court finds that the first three factors of the *Wendt* test do not support exclusion.[2] The public policy favoring resolution of cases on the merits also does not support exclusion. Although preventing the experts from testifying is not tantamount to a dismissal, it would arbitrarily truncate the record and deprive the fact-finder of relevant information when evaluating the merits of the cheatgrass claims. The last factor – the availability of less drastic sanctions – is neutral. The failure to disclose at issue is so minor that, even though less drastic sanctions are available, they will not be utilized.

The Court finds that the three-day delay in serving rebuttal expert reports was harmless. The opinions and testimony contained therein will not be excluded on timeliness grounds.

**B. Improper Rebuttal Testimony**

ALDF states that the cheatgrass-related opinions and testimony disclosed on September 11, 2023, were offered to rebut Dr. Briggs' cheatgrass opinions.

> The mere fact that Plaintiff designated only rebuttal experts on these issues is not sufficient grounds to strike the [Harrenstien and Gibson reports] and exclude their testimony. *See Johnson v. Grays Harbor Cmty. Hosp.*, No. C06–5502BHS, 2007 WL 4510313, at *1 (W.D. Wash. Dec. 18, 2007) ("the Court will not exclude Plaintiff's rebuttal experts from testifying solely because Plaintiff designated only rebuttal experts"). As [Dr. Harrenstien and Ms. Gibson] are designated as rebuttal experts, however, their testimony is limited. At trial, [Dr. Harrenstien and Ms. Gibson] cannot testify in Plaintiff's case-in-chief, and they cannot testify unless and until [Dr. Briggs testifies] as to the opinions for which [Dr. Harrenstien and Ms. Gibson] have been designated as rebuttal experts. *See id.* at *2.

---

[2] While ALDF's failure to make Ms. Gibson available for deposition prior to the discovery deadline may have prejudiced defendants' ability to prepare for trial, the prejudice does not arise from the three-day delay in disclosing her report.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY - 4

*Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 636 (D. Haw. 2008). *See also Miesen v. Hawley Troxell Ennis & Hawley LLP*, No. 1:10-CV-00404-DCN, 2021 WL 1124758, at *8 (D. Idaho Mar. 24, 2021) (where expert report was served long after the deadline for initial expert disclosures but in time for rebuttal disclosures, "the Court will allow [the expert] to testify as a rebuttal witness, subject to other objections the Defendants may lodge, but [the expert] may not testify as a case-in-chief expert"); *Sharma v. City of Vancouver*, No. C06-5688BHS, 2008 WL 11343467, at *2 (W.D. Wash. June 17, 2008) ("Until and unless Defendants' experts testify, Plaintiff's experts will be unable, as a practical matter, to truly rebut such testimony. Therefore, Plaintiff's rebuttal experts will be allowed to testify at trial only after Defendants' experts have testified."). After hearing from Dr. Briggs, the Court will be in a position to determine what aspects of Dr. Harrenstien's and Ms. Gibson's testimony are truly rebuttal and what must be excluded as untimely case-in-chief evidence.[3]

### C. *Daubert* Challenge to Dr. Harrenstien's Opinions

Defendants seek to exclude the following opinions and testimony offered by Dr. Harrenstien:

- the failure to seek veterinarian care for Samantha's skin and muscle infections in February 2020 and April 2020 was "negligent;"
- testimony regarding the standards for managing and the acceptable amount of cheatgrass in animal enclosures;
- the identification of specific plant species found at OGF;

---

[3] ALDF argues that Dr. Harrenstien previously disclosed her cheatgrass-related opinions in supplemental and rebuttal reports provided in March 2021 and August 2022 as well as in a declaration dated March 21, 2021. The supplemental and rebuttal reports have nothing to do with cheatgrass, foxtail, or grass awns. Dkt. # 318-1, # 318-2, and # 318-3. The March 2021 declaration reveals only that pathology reports suggested that grass awns may have been causally related to the death of Good Mama in September 2019 and the front leg injuries suffered by Samantha in April 2020. Dkt. # 159 at ¶¶ 64 and 66. Dr. Harrenstien suggests other causes for these losses, but does not offer any opinions regarding the existence of cheatgrass in the bear enclosures, how to manage cheatgrass in the enclosures, or how defendants' procedures compare with those used at other facilities.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY - 5

- testimony regarding the standards for the size and condition of temporary housing for brown bears;
- testimony regarding the standard of care for Samantha's cheatgrass wounds; and
- the dangers associated with public feeding of brown bears and the causal connections between feeding bread to bears, obesity, and osteoarthritis.[4]

### 1. Negligence

In presenting a general summary of her conclusions regarding cheatgrass-related issues, Dr. Harrenstien states that "Olympic Game Farm does not meet Animal Welfare Act or industry standards for prevention and treatment of grass awn injuries among its brown bears. OGF's husbandry and veterinary care measures for brown bears as they relate to grass awns have been substandard and negligent." Dkt. # 300 at ¶ 14. ALDF appears to concede that Dr. Harrenstien may not offer an opinion as to whether defendants' conduct satisfies the legal standard of "negligence." She shall avoid any such testimony at trial.

### 2. Cheatgrass Management and Amount

Defendants argue that Dr. Harrenstien lacks the expertise to testify regarding appropriate techniques for managing cheatgrass and that her opinion regarding the amount of cheatgrass that is acceptable is unreliable because it is not based on any objective standard or generally accepted practice. Federal Rule of Evidence 702 provides that expert testimony is admissible if:

> (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods;

---

[4] Defendants also object to Dr. Harrenstien's recently disclosed opinions that (a) the trailer used to house sick or injured bears is covered in rust and therefore does not comply with Animal Welfare Act requirements, (b) allowing the public to feed bears is dangerous and not supportive of the bears' health, and (c) defendants fail to prevent the public from feeding other food items to hoofstock and brown bears. Whether these opinions are proper rebuttal testimony or untimely case-in-chief evidence will be determined at trial.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY - 6

and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). As construed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Rule 702 tasks a district judge with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). Where an expert offers non-scientific testimony, "reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind" the testimony. *Porter v. Martinez*, 64 F.4th 1112, 1127 (9th Cir. 2023) (quoting *Daubert*, 509 U.S. at 594, and *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F. 3d 998, 1017 (9th Cir. 2004)). The analysis "should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588).

> Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology. The court is a gatekeeper, not a fact finder. Accordingly, the district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury. If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon its credibility, rather than the judge. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury. This Court has previously noted that shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (internal quotation marks, citations, and alterations omitted). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY - 7

Dr. Harrenstien is a clinical veterinarian who is Board Certified in Zoological Medicine. Her certification examination included questions regarding the evaluation and management of toxic or harmful pasture plants. Dkt. # 300 at ¶ 3. She has been a veterinarian for over 30 years and has advised zoological facilities regarding the toxicity and potential dangers of enclosure plants. *Id.* at ¶¶ 5 and 8. For some period of time, she was part of an inspection team that evaluated, *inter alia*, zoos' prevention and management of animal exposure to harmful plants like cheatgrass and foxtail. Id. at ¶ 10. Her current practice requires her to consider plant-animal interactions, to treat wounds related to inappropriate plant contact, and to advise regarding the prevention, detection, and treatment of animal disease related to plant contact or ingestion. *Id.* at ¶ 6. She directs the selection of plant species and landscaping at her clinic to ensure the safety of her animal patients. *Id.* Dr. Harrenstien has the knowledge and experience to opine regarding the management and safe amount of cheatgrass even if there is no regulatory or industry standard against which to measure her opinions. While those opinions may not conclusively establish that defendants' conduct falls outside generally accepted animal husbandry practices, they are admissible.

### 3. Identification of Plant Species

Defendants take issue with Dr. Harrenstien's statement that the Shutter Diagnostic Lab of the Montana State University Extension Service suspects that grass samples collected from OGF "are of the *Hordeum* spp. Genus (of which foxtail barley is a member)." Dkt. # 305 at 60. Prior to becoming a veterinarian, Dr. Harrenstien "taught plant identification topics, including field identification, in the teaching positions [she] held in the mid-to-late 1980's." Dkt. # 300 at ¶ 6. She further asserts that "[a]ll of [her] clinical veterinarian work has included intermittent need for visual identifications of plants." *Id.* In classifying the OGF grasses as *Hordeum*, she is not relying on her own expertise, however, but rather on the analysis conducted and conclusions reached by a lab.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY - 8

The Court takes this matter under advisement. There does not appear to be any dispute that OGF has awn-producing grasses, such as cheatgrass and foxtail, in or near enclosures in which brown bears are housed. If plaintiff feels the need to have Dr. Harrenstien opine at trial that the grasses are a species of barley, it must first show that a veterinarian would rely on a laboratory's seemingly untested suspicion that a sample belongs to a particular genus.

### 4. Standards for Temporary Housing

Defendants object to Dr. Harrenstien's opinion that the bear trailer in which Samantha was housed for treatment and recovery was too small, arguing that Dr. Harrenstien never saw Samantha in the trailer, has no personal knowledge of Samantha's relative size, and cannot point to any regulatory or industry standard for the size of brown-bear enclosures of this type. Dr. Harrenstien is familiar with brown bears in general, has reviewed medical records containing information about Samantha's size, has seen the trailer at issue, and is familiar with the established standards for the size of polar bear enclosures. That her opinion is not compelled by an established standard and may be subject to challenge does not make it inadmissible where she has the expertise and experience to support the testimony.

### 5. Standard of Care for Cheatgrass Wounds

Dr. Harrenstien has come to the conclusion that Samantha received improper care for her cheatgrass wounds. Defendants argue that this opinion should be excluded because it is not compelled by or based on a regulation or standard industry practice. Again, Dr. Harrenstien has the knowledge and experience to offer an opinion regarding the adequacy of the care Samantha received. Even if those opinions, standing alone, fall short of proving plaintiff's claims, they are both relevant and reliable for purposes of *Daubert*.

### 6. Impacts of Bread in the Bears' Diet

In September 2023, defendants served supplemental discovery responses stating that (a) they no longer allow the public to bring bread in from outside to feed OGF animals and (b) they are unaware of any brown bear becoming sick from eating whole wheat bread. In response, Dr. Harrenstien argues that these statements should not be taken at face value, offers a new opinion regarding the dangers of allowing the public to feed brown bears, and repeats her earlier opinion that osteoarthritis, a condition found in some of OGF's bears, is causally connected to the feeding of bread.

Dr. Harrenstien's arguments challenging defendants' discovery statements are not the proper subject of expert testimony. No expertise or specialized knowledge is necessary to assert that OGF has not expressly prohibited the feeding of foods other than bread to the brown bears, that OGF staff are lax in enforcing rules, or that OGF makes no effort to obtain health information regarding the bears. The expert opinions she does offer are untimely. OGF's practice of allowing visitors to feed animals bread has been known since the very beginning of the litigation. Dr. Harrenstien could have and should have disclosed her opinions regarding the dangers inherent in allowing the public to feed brown bears and the general health impacts of including bread in the bears' diet by the December 16, 2020, deadline for supplemental expert reports. In fact, opinions regarding the nutritional and health impacts of feeding bread to brown bears that were first disclosed in March 2021 were excluded as untimely in the context of the first round of summary judgment motions. Dkt. # 277 at 8-9. Neither the addition of cheatgrass-related claims nor defendants' supplemental discovery responses justify the insertion of these bread-feeding opinions at the end of October 2023.

### D. *Daubert* challenge to Ms. Gibson's Opinions

Defendants seek to exclude the following opinions and testimony offered by Ms. Gibson:

- testimony regarding the standards for managing, and the acceptable amount of, cheatgrass in animal enclosures;
- testimony regarding potential cheatgrass-related injuries; and
- testimony regarding bear housing and the need to assess quality of life.

### 1. Cheatgrass Management and Amount

Ms. Gibson currently works at the Oakland Zoo and has fifteen years of experience caring for bears in captivity.[5] She is a steering committee member of the Association of Zoos and Aquariums' Bear Taxon Advisory Group and teaches bear husbandry courses. Dkt. # 305 at 47. There is no indication that she has ever studied or managed toxic or harmful plants, and Ms. Gibson acknowledges that cheatgrass is simply not a topic that comes up when discussing bears and trends in management practices. *Id.* at 50. Her only cheatgrass-related opinion involves the application of an extremely general principle, namely, that if a bear under human care is injured or killed by something in its enclosure, the zoological staff should make it a priority to identify the cause and remove it. *Id.* Ms. Gibson does not appear to have the knowledge or experience to opine regarding the management or maximum safe amount of cheatgrass. She will not be permitted to testify on this topic.

### 2. Potential Cheatgrass Injuries

Ms. Gibson's proffered testimony regarding the dangers cheatgrass awns pose to bears is likewise unsupported by any knowledge of or experience with cheatgrass. There is nothing in her report that suggests she has ever seen a cheatgrass wound or has developed some expertise in cataloguing or dealing with cheatgrass injuries. The source of information behind the list of potential cheatgrass injuries she includes in her report is unstated, but it does not appear to be based on her own knowledge, skill, experience,

---

[5] Overall she has twenty years of experience in the zoological field.

training, or education. Fed. R. Ev. 702. Ms. Gibson will not be permitted to testify regarding the potential hazards of cheatgrass.

### 3. Standards for Bear Housing and Quality of Life Assessments

Ms. Gibson is particularly well-placed to opine regarding best practices for handling, treating, training, and monitoring bears in captivity. Defendants object to her opinions on these subjects because Ms. Gibson never saw Samantha in the trailer, has no personal knowledge of Samantha or the trailer, and cannot point to any regulatory or industry standard for the size of brown-bear enclosures of this type. Ms. Gibson spends her time managing bears in captivity and teaching others how to enhance the care of bears. She is permitted to accept as true facts told to her regarding the specific trailer and bear at issue in formulating her opinions. That Ms. Gibson's opinions are not compelled by an established standard and may be subject to challenge does not make them inadmissible where she has the expertise and experience to support the testimony.

### E. Duplication of Expert Testimony

Defendants argue that plaintiffs should be permitted to present expert testimony regarding cheatgrass, cheatgrass-related injuries, and bear housing through either Dr. Harrenstien or Ms. Gibson, but not both. This matter is taken under advisement. As discussed above, the two experts have the knowledge and experience to testify regarding slightly different subjects. Although duplicative evidence that wastes time or is needlessly cumulative will not be admitted pursuant to Fed. R. Ev. 403, the Court declines to make that determination at this point.

For all of the foregoing reasons, defendants' motion to exclude expert testimony is GRANTED in part. Dr. Harrenstien and Ms. Gibson may not testify in plaintiff's case-in-chief regarding opinions disclosed after August 9, 2023, and will be permitted to do so in rebuttal only to the extent that the opinions are truly rebuttal (*i.e.*, they are not necessary to

prove elements of a claim on which plaintiff bears the burden of proof and they respond to opinions in the August 9th Briggs report). The Court recognizes that these limitations put plaintiff at a significant disadvantage at both the summary judgment phase and trial, but

> [p]laintiff essentially "lay-in-wait" and lobbed expert opinions on the affirmative elements of [its] claims into the case at the eleventh hour, when [defendants] would have no opportunity to respond. Rule 37(c) sanction is designed to curtail just such gamesmanship in the expert disclosure process. The date for rebuttal disclosures "is not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Amos v. Makita U.S.A, Inc*., Case No. 2:09-cv-01304-GMN-RJJ, 2011 WL 43092, at *2 (D. Nev. Jan. 6, 2011).

*Terpin v. AT&T Mobility, LLC*, No. 18-CV-06975-ODW-KS, 2023 WL 3431906, at *9 (C.D. Cal. Mar. 20, 2023). Dr. Harrenstien's opinions regarding "negligence" and the impacts of bread in a bear's diet and Ms. Gibson's opinions regarding cheatgrass will not be considered in the summary judgment context and will be excluded from trial. The Court takes under advisement whether Dr. Harrenstien may opine at trial that the grasses found in the bear enclosure at OGF are a species of barley and whether the experts' testimony is unnecessarily duplicative.

Dated this 22nd day of March, 2024.

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY - 13